# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERICIA A. STEVENSON, as
Guardian ad Litem and Conservator
of MAJESTIC HOWARD, Individually,
and as Guardian of MAJESTIC HOWARD,
JR., and KARISMA STRONG,

       Plaintiff,

vs.                                                                                 No. CIV 17-855 JB\LF

CITY OF ALBUQUERQUE,
OFFICER JONATHAN FRANCO,
individually, OFFICER BEN DAFFRON,
individually, OFFICER JOSHUA CHAFIN,
individually, OFFICER SONNY MOLINA,
individually,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Defendants Daffron, Chafin, and Molina's

Motion for Summary Judgment on the Basis of Qualified Immunity, filed October 4, 2019

(Doc. 102)("MSJ").  The Court held a hearing on January 10, 2020.  The primary issue is whether

Defendants Ben Daffron, Joshua Chafin, and Sonny Molina ("Movants"), police officers with the

Albuquerque Police Department ("APD"), are entitled to qualified immunity when they allegedly

kneed Majestic Howard in the torso, shoulder, and head while attempting to arrest him.  More

specifically, the Court must determine: (i) whether Daffron violated Howard's clearly established

rights under the Fourth Amendment to the Constitution of the United States of America by using

objectively unreasonable force in arresting Howard; (ii) whether Chafin and Molina violated

Howard's clearly established constitutional rights when they did not intervene to prevent Daffron

from violating Howard's constitutional rights; and (iii) whether Daffron, Chafin, and Molina

violated Howard's clearly established constitutional rights when they did not prevent Franco's use of force against Howard. Additionally, the Plaintiffs request leave to take additional depositions under rule 56(d) of the Federal Rules of Civil Procedure. The Court concludes that: (i) Daffron is entitled to summary judgment on the Plaintiffs' excessive force claim on Howard's behalf, because Daffron's use of force was objectively reasonable; (ii) Chafin and Molina are entitled to qualified immunity on the Plaintiffs' failure-to-intervene claim on Howard's behalf regarding Daffron's use of force, because the Plaintiffs cannot show that Daffron violated Howard's constitutional rights, and establishing a constitutional violation is a necessary predicate to any claim that an officer failed to intervene; (iii) even if Daffron's use of force violated Howard's Fourth Amendment rights, Chafin and Molina did not violate Howard's clearly established Fourth Amendment rights by failing to intervene, because they had no realistic opportunity to do so; and (iv) assuming Franco used objectively unreasonable force, Daffron, Chafin, and Molina did not violate Howard's clearly established rights by failing to prevent Franco's use of force, because they had no realistic opportunity to do so. Finally, the Court concludes that the Plaintiffs are not entitled to additional discovery under rule 56(d), because the Plaintiffs have not identified with specificity the facts that additional discovery will yield, and because additional discovery is not necessary to defend against the MSJ. Accordingly, the Court grants the MSJ.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in their summary judgment motion papers for the MSJ. See MSJ ¶¶ 1-30, at 4-8; Plaintiffs' Response in Opposition to Daffron, Chafin, and Molina's Motion for Summary Judgment on the Basis of

Qualified Immunity ¶¶ 1-19, at 2-10, filed November 4, 2019 (Doc. 107)("Response"), id. at ¶¶ A-Z, at 22-34.[1]

On October 30, 2015, Howard entered a City-owned bait vehicle[2] near Indian School Boulevard and University Avenue, in Northeast Albuquerque, New Mexico. See MSJ ¶ 1, at 4 (asserting this fact)(citing Bait Car Video at 00:01-00:05, filed October 4, 2019 (Doc. 104-1)); Response ¶¶ 1, 3, at 2-3 (citing Computer Aided Dispatch Report at 1, filed October 4, 2019 (Doc. 102-1)("CAD Report")).[3] Using a screwdriver, Howard started the bait vehicle and began driving it. See MSJ ¶ 2, at 4 (asserting this fact)(citing Bait Car Video at 00:04-00:46.[4] At 1:14 a.m.,

_____

[1]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56.1(b).

[2]"A bait car, also called a hot car, is a vehicle that law enforcement agencies to use capture car thieves or thieves who steal items from cars." "Bait Car," Wikipedia.org, http://en.wikipedia.org/wiki/Bait—car (last visited January 22, 2020)(footnote omitted). "The vehicles are modified with audio/video surveillance technology, and can be remotely monitored and controlled. Those set up to catch car thieves may include GPS tracking. A 'kill switch' may be installed in the vehicle allowing police to remotely disable the engine and lock all doors remotely, preventing escape." Bait Car. The Court offers this information solely as background for the reader's edification and does not present this information as the truth or as facts material to the issues in this opinion.

[3]The Plaintiffs admit that, on October 30, 2015, Howard entered a city-owned bait vehicle. See Response ¶ 1, at 2 (stating that the Plaintiffs "admit 'Undisputed Material Fact' . . . No. 1." The Plaintiffs also assert, in the Response, that the Movants responded to a call "in the Indian School and University Area." Response ¶ 3, at 3. Although the Plaintiffs did not letter this fact as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes them as additional material facts for the purposes of this motion. The Court finds support for this fact in the record and the Movants do not controvert this fact. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[4]The Plaintiffs admit that "Mr. Howard started the BAIT vehicle," but assert that "it is not clear from the video evidence what was used or how he started it." Response ¶ 2, at 2. The Plaintiffs cite to the Deposition of Jonathan Franco at 42:19-25 (taken Sept. 12, 2019), filed

Albuquerque Police Department ("APD") dispatch noted the bait vehicle had been stolen, and dispatched this information to Daffron and Franco. See MSJ ¶¶ 3-4, at 4.[5] At 1:17 a.m., Molina and Jones were dispatched to locate the stolen vehicle. See MSJ ¶ 5, at 4; Response ¶ 3, at 3.[6] At 1:18 a.m., Chafin was dispatched to locate the stolen vehicle. See MSJ ¶ 4, at 4; Response ¶ 3, at 3 (noting that "Chafin responded to a priority 1 call for a BAIT vehicle theft").

While pursuing the vehicle, APD dispatch tried at least once to disable the vehicle, but the attempt was unsuccessful. See MSJ ¶ 8, at 5; Daffron Lapel Video at 00:56-01:03.[7] Howard drove

---

October 4, 2019 (Doc. 102-2)("Franco Depo."), in which Franco states that he "had no clue" about "what was going on inside the vehicle." Response ¶ 2, at 2. The portion of the Franco Depo. to which the Plaintiffs cite, however, does not controvert specifically whether Franco used a screwdriver to start the bait vehicle, as Franco was discussing his knowledge as to whether Franco was armed. See Franco Depo. at 42:8-25 (discussing whether Howard "was doing [anything] that was physically threatening"). The Court concludes that Howard used a screwdriver to start the vehicle, as the camera footage from inside the bait vehicle shows Howard holding a screwdriver when he enters the vehicle, and then moving the screwdriver towards the vehicle's ignition block. See Bait Vehicle Recording at 00:04 (Ex. A to MSJ). Although the Plaintiffs purport to dispute the text's fact, they do not specifically controvert it. See D.N.M.LR-Civ 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted"). Further, the video evidence shows clearly that Howard used a screwdriver to start the vehicle. See Scott v. Harris, 550 U.S. 372, 378-81 (2007)(noting that courts may making factual findings against the parties' asserted disputes if video evidence establishes a fact clearly).

[5]The Plaintiffs state: "Plaintiffs dispute UMF Nos. 3 through 7 because they are incomplete and inaccurate with respect to the information that Defendants had before pursuing Mr. Howard." Response ¶ 3, at 2-3. The Plaintiffs' argument does not specifically controvert the proffered fact, so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[6]In the MSJ, the Movants assert that, "[a]t 1:17 a.m., Officer Molina was dispatched to the Call along with Officer Michael Jones." Response ¶ 5, at 4 (citing CAD Report at 2).

[7]The Plaintiffs purport to dispute the text's fact, and argue that Franco "was not sure whether Mr. Howard's vehicle was disabled." Response ¶ 4, at 3 (citing Deposition of Jonathan Franco at 11:2-18 (taken Sept. 12, 2019), filed October 4, 2019 (Doc. 102-2)("Franco Depo."). The Plaintiffs cites to a portion of a deposition that the parties did not submit, and none of the parties submitted the Franco Depo.'s page 11. The Court, accordingly, does not adopt as fact the Plaintiffs' additional assertions.

the vehicle from University Avenue and Indian School Boulevard in Northeast Albuquerque to

Hazeldine Avenue and Broadway Boulevard, in Southwest Albuquerque. <u>See</u> MSJ ¶ 7, at 5

(stating that the bait vehicle "stopped near Hazeldine")(citing CAD Report at 2).[8] Howard drove

within posted speed limits. <u>See</u> Response ¶ 3, at 3 (stating this fact)(citing CAD Report at 1-2).[9]

The vehicle stopped near Hazeldine Avenue in Southwest Albuquerque. <u>See</u> MSJ ¶ 7, at 5 (stating

this fact)(citing CAD at 2).[10] Franco viewed the stop as high-risk. <u>See</u> MSJ ¶ 9, at 5 (stating this

---

[8]The Plaintiffs purport to dispute the text's fact, but do not controvert specifically that the bait vehicle stopped near Hazeldine. As the Court finds support for the text's fact in the record, the Court deems this fact undisputed. <u>See</u> D.N.M.LR-Civ 56.1(b).

[9]The Plaintiffs assert the text's fact not as an additional material fact, but in response to the MSJ's proposed fact 7, arguing that, "[n]eedless to stay [sic], there was not a high-speed pursuit." Response ¶ 3, at 3.. In responding, the Plaintiffs list several additional facts, of which this is one. Although the Plaintiffs did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes them as additional material facts for the purposes of this motion. The Court finds support for this fact in the record, <u>see</u> CAD Report at 1-2, and the Movants do not controvert this fact. <u>See</u> Defendants Daffron, Chafin, and Molina's Reply in Support of Motion for Summary Judgment on the Basis of Qualified Immunity ¶ 7, at 1-2, filed November 25, 2019 (Doc. 115)("Reply"). The Court accordingly adopts as undisputed the text's fact. <u>See</u> D.N.M.LR-Civ. 56.1(b).

[10]The Movants assert that the "bait vehicle stopped at 1:23 a.m. near Hazeldine." MSJ ¶ 7, at 5 (citing CAD Report at 2). The Plaintiffs purport to dispute the text's fact, but do not address where the vehicle stopped. The CAD Report states that the bait vehicle stopped at Hazeldine. <u>See</u> CAD Report at 2. The Court has no independent reason to doubt the CAD Report's accuracy, and the Plaintiffs to not controvert the text's fact, so the Court adopts it as undisputed. <u>See</u> D.N.M.LR-Civ. 56.1(b).

fact)(citing Franco Depo. at 28:9-18).[11]  When the bait car that Howard was driving stopped,[12]

officers immediately exited their service vehicles, drew their service weapons, and ordered

Howard to exit the bait vehicle with his hands in the air.  See MSJ ¶ 9, at 5 (stating this fact)(citing

Daffron Lapel Video at 2:20-25 (dated October 30, 2015), filed October 4, 2019 (Doc. 104-4);

---

[11]The Plaintiffs purport to dispute this fact and argues that the portion of the record to which the Movants cite does not support this fact.  See Response ¶ 5, at 3 (arguing that, in the portion of the Franco Depo. to which the Movants cite, Franco discusses only the command structure for high-risk stops).  The record supports the text's fact, however:

**Q.  And what made this a high-risk stop?**

A.  It was somebody in possession of a stolen vehicle.

. . .

**Q.  That made it a high-risk stop for you?**

A.  No, just knowing that it's a stolen vehicle.

Franco Depo. at 26:16-23 (Oliveros, Franco).  Because the Plaintiffs do not cite to the record in support of their purported dispute of the text's fact, and because the Franco Depo. supports the APD Defendant's proposed fact, the Court concludes that there is no genuine dispute in the record and adopts the text's fact as undisputed.  See D.N.M.LR-Civ. 56.1(b).

[12]Although the Movants assert that "the vehicle stopped because it was disabled," the portion of the record to which the Movants cite does not support this assertion.  See MSJ ¶ 8, at 5 (citing Franco Depo. at 11:15-18).  Although APD had been attempting to disable the vehicle, it had been unsuccessful in doing so, see Daffron Lapel Video at 1:55-2:18, filed October 4, 2019 (Doc. 104-2), and the Plaintiffs note that Franco, in the Franco Depo., states that he believes the vehicle stopped because APD disabled it, see Franco Depo. at 11:2-18.  The Court, therefore, concludes that the record supports not that APD disabled the vehicle, but rather only that the vehicle stopped.  Finally, in the Reply, the Movants concede that "Plaintiffs have created a dispute as to DMF No. 8, however, this fact merely set context for the encounter and is not crucial to an award of qualified immunity."  See Reply ¶ 8, at 2.  The Court concludes there is a genuine dispute, so the Court does not adopt the Movants' proposed fact that the vehicle stopped because APD disabled it.

Jones Lapel Video at 1:18-59 (dated October 30, 2015), filed October 4, 2019 (Doc. 104-5)).[13]

Howard remained in the vehicle for two minutes and four seconds while officers shouted for him

to exit the vehicle. See MSJ ¶ 11, at 5 (stating this fact)(citing Daffron Lapel Video at 2:16-4:20;

Jones Lapel Video at 1:18-159).[14] While in the vehicle, Howard did not communicate with or

threaten the officers. See Response ¶ 7, at 4. (stating this fact)(citing Franco Depo. at 43:24-

44:9).[15]

---

[13]The Plaintiffs purport to dispute the text's fact, but concede that "officers gave Mr. Howard three commands to exit the vehicle with his hands in the air." Response ¶ 6, at 3-4 (citing Jones Lapel Video at 3:38-4:19). Because the Plaintiffs do not controvert this fact and the portion of the record to which the Movants cite supports the text's fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[14]The Plaintiffs purport to dispute the text's fact, but concedes that, "according to the video evidence, Mr. Howard remained in the vehicle for approximately two minutes." Response ¶ 7, at 4. Because the Plaintiffs do not controvert this fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[15]Although the Plaintiffs did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes them as additional material facts for the purposes of this motion. In disputing the APD's proposed fact that Howard remained in the vehicle for two minutes while officers commanded him to exit, the Plaintiffs list several additional facts. Specifically, the Plaintiffs assert that:

> it is material that during this time, Mr. Howard did not verbally threaten the Defendants in anyway. *See* Doc. 104, [Daffron Lapel Video, Jones Lapel Video, Franco Lapel Video, Chafin Lapel Video], Franco Depo., 43:24-44:9. It is undisputed that Mr. Howard never hit or kicked the Defendants in any way at any time. [Franco Depo. at] 43:8-14. Mr. Howard did not physically threaten the Defendants at any time or make hostile motions. [Franco Depo. at] 43:24-44:2.

Response ¶ 7, at 4. The Court will address materiality in this Memorandum Opinion and Order's ("MOO") Analysis section. In the Reply, the Movants do not specifically controvert the Plaintiffs' assertion that Howard did not threaten or strike the officers. See Reply ¶¶ 10-11, at 2. The portion of the record to which the Plaintiffs cite supports their assertion that Howard never verbally or physically threatened the officers, see Franco Depo. at 44:3-6 (noting that Howard "never said

---

Howard exited the vehicle and fled on foot. See MSJ ¶ 12, at 5 (stating this fact)(citing Franco Depo. at 33:13-22 (Oliveros, Franco); Daffron Lapel Video at 4:30-4:40; Jones Lapel Video at 1:59-2:02).[16] Officers pursued Howard on foot. See MSJ ¶ 13, at 5 (citing Franco Depo. at 34:18-35:10 (Oliveros, Franco)).[17] Franco, Molina, Daffron, and Chafin pursued Howard, with Jones and Floyd following a short distance behind the others. See MSJ ¶ 14, at 5 (stating this fact)(citing Franco Depo. at 34:18-35:10 (Oliveros, Franco); Franco Lapel Video at 6:55-7:03, filed October 4, 2019 (Doc. 104-7); Response ¶ 8, at 4 (stating this fact)(citing Chafin Lapel Video at 2:40-50).[18] Franco was closest behind Howard in the foot pursuit. See MSJ ¶ 14, at 5 (stating this fact)(citing Franco Lapel Video at 6:55-7:03); Response ¶ 9, at 4 (admitting this fact). Howard

---

[16]anything that was threatening"), so the Court adopts as undisputed that Howard did not verbally or physically threaten the officers. See D.N.M.LR-Civ. 56.1(b).

[16]Although the Plaintiffs purport to controvert the text's fact, the Plaintiffs assert that, "[i]mmediately after exiting in a non-threatening manner, Mr. Howard ran in a direction away from the officers." Response ¶ 7, at 4 (citing Chafin Lapel Video at 2:28-30, filed October 4, 2019 (Ex. F to MSJ)). The Court does not adopt this as undisputed fact, because the Court has already adopted as fact that Howard did not verbally threaten the officers, and that Howard fled upon exiting the vehicle, and because "in a non-threatening manner" is a characterization and not a fact.

[17]The Plaintiffs do not controvert, or purport to controvert, the text's fact. See Response at 4 (not addressing or mentioning the MSJ's asserted fact. The Court concludes that, pursuant to rule 56(c), the Plaintiffs have not asserted a genuine dispute to the text's fact, so the Court adopts it as undisputed. See Fed. R. Civ. P. 56(c).

[18]The Movants assert that "Officers pursued Howard westbound." MSJ ¶ 13, at 5. The Plaintiffs purport to dispute this assertion, and argue that is it "incomplete and, therefore, misleading and inaccurate." Response ¶ 8, at 4. The Plaintiffs then assert, however, that Franco, Molina, Daffron, and Chafin "all pursued Howard at a close distance." Reponse ¶ 9, at 4 (citing Chafin Lapel Video at 2:40). The Movants do not controvert specifically the Plaintiffs' assertions as to who pursued Howard. See Reply ¶ 13, at 3. The Court finds support for the text's fact in the record, see Chafin Lapel Video at 2:36-43, and the Movants do not rebut the text's fact with citations to the record, so the Court adopts the text's fact as undisputed. See D.N.M.LR-Civ. 56.1(b).

- 8 -

ran toward a mattress leaning against a chain-link fence.  See MSJ ¶ 15, at 6 (stating this fact)(citing Franco Depo. at 34:18-35-10 (Oliveros, Franco); Franco Lapel Video at 7:03-7:05).[19]

As Franco was closing, Howard stopped in front of the mattress and sat down.  See Response ¶ 10, at 5 (stating this fact)(citing generally Affidavit of Majestic Howard  (taken Nov. 4, 2019), filed November 4, 2019 (Doc. 107-28)("Howard Aff."); Franco Lapel Video at 7:02).[20]

---

[19]The Plaintiffs purport to dispute the text's fact, but do not directly controvert the Movants' assertion that Howard ran toward a mattress leaning against a fence.  See Response ¶ 10, at 5.  The Court finds support for the text's fact in the portions of the record to which the Movants cite.  Accordingly, the Court deems this fact undisputed.  See D.N.M.LR-Civ 56.1(b).

[20]In the MSJ, the Movants asserts that "Howard ran directly into the mattress."  MSJ ¶ 16, at 6 (citing Franco Depo. at 36:17-21 (Franco); Franco Lapel Video at 7:04-7:06).  The Plaintiffs purport to dispute this assertion and assert additional facts: "Mr. Howard did not hit the mattress.  Mr. Howard stops and submits to arrest by kneeling down in front of Officer Franco."  Response ¶ 10, at 5 (citing Howard Aff. ¶ 6, at 1 ("I decided to stop and got on my knees.  I never resisted arrest.")).  Although the Plaintiffs did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes them as additional material facts for the purposes of the MSJ.  In the Reply, the Movants assert that the "Plaintiffs purport to dispute DMF Nos. 15-18 because they are incomplete," and the Movants argue that the Plaintiffs' purported dispute "fails to specifically controvert these facts."  Reply ¶¶ 15-18, at 3.  The Plaintiffs point, however, to evidence to controvert the Movants' assertion that Howard ran into the mattress and did not sit down voluntarily.  See Response ¶ 10, at 5.  In Kephart v. Data Systems International, Inc., 243 F. Supp. 2d 1205 (D. Kan. 2003)(Vratil, J.)("Kephart"), the Honorable Kathryn H. Vratil, United States District Judge for the United States District Court for the District of Kansas, concluded that, to survive summary judgment, the non-movant's affidavits must be based on personal knowledge and set forth facts that would be admissible in evidence.  See 243 F. Supp. 2d at 1209.  Howard's declaration is based on his personal knowledge as to how he came to be on the ground in front of the mattress.  The Plaintiffs also cite the Franco Lapel Video in support of the text's fact, and the Court, in reviewing the Franco Lapel Video, concludes that the Franco Lapel Video corroborates Howard's declaration.  See Franco Lapel Video at 7:02-7:06.  Franco asserts in the Franco Depo. that Howard "ran directly into that mattress" and that Franco "believed he was going to use it to climb over a gate that it was leaning against."  Franco Depo. at 36:13-16 (Franco).

At the summary judgment stage, the Court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  There are, however, limited circumstances in which the Court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  See Scott v. Harris, 550 U.S. at 380-81.  The United States Court of Appeals for the Tenth Circuit has explained: "As with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly

Franco's momentum carried him past Howard, but Franco quickly rounded and reached Howard. See MSJ ¶¶ 17-18 (stating that Franco ran past Howard)(citing Franco Depo. at 37:7-22 (Franco); Franco Lapel Video at 7:04-7:06).[21] Franco had a "clear visual" on Howard and did not see any weapons before he made contact with Howard. Response ¶ 11, at 5 (stating this fact)(citing Franco Depo. at 40:18-41:16).[22] Franco made physical contact with Howard, and as Franco reached Howard, Howard went from a sitting position to a lying position. See MSJ ¶ 17, at 6 (stating that

_____

contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott v. Harris, 550 U.S. at 380).

After reviewing carefully the Franco Lapel Video, and drawing all reasonable inferences in the Plaintiffs' favor, the Court concludes that the Franco Lapel Video shows clearly that Howard did not run into the mattress, but rather sat down in front of the mattress as Franco was closing in behind him. See Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(citing Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished)(noting that, when a court resolves a blatant contradiction in the record, the court's resolution must rely on more than other witnesses' testimony).

[21]The Plaintiffs purport to dispute the Movants' assertion, but the Plaintiffs' factual contentions do not pertain to whether Franco's momentum carried him past Howard, and that Franco then rounded and closed in on Howard. See Response ¶ 10, at 5. The Court concludes that the Plaintiffs have not asserted a genuine dispute to the text's fact, because the Plaintiffs have not cited to particular materials in the record establishing the presence of a genuine dispute. See Fed. R. Civ. P. 56(c)(1)(A). The Court adopts the text's fact as undisputed, having no independent reason to doubt its accuracy. See Franco Depo. at 37:11-12 (stating that Franco "ran a little bit passed him while trying to grab him at the same time").

[22]In the Response, the Plaintiffs also assert that Franco "had a clear visual and he did not see any weapons on Mr. Howard." Response ¶ 11, at 5 (citing Franco Depo. at 40:18-41:16). Although the Plaintiffs do not letter this proffered fact as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes it as a proposed material fact for the purposes of this motion. In the Reply, the Movants do not respond to the proffered fact. See Reply ¶ 19, at 3-4. The record which the Plaintiffs cite supports the Plaintiffs' assertion, and so the Court adopts as undisputed the fact that Franco had a clear visual on Howard and did not see any weapons. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

Franco "grabbed Howard's arm")(citing Franco Depo. at 37:7-22; Franco Lapel Video at 7:05).[23]

Daffron, Chafin, and Molina arrived shortly after Franco brought Howard to a lying position. See

---

[23]The Movants assert that, "[a]s Officer Franco ran past Howard, Officer Franco grabbed Howard's arm" and that "Howard then lay on [the] ground, resting on his stomach." MSJ ¶¶ 17-18, at 6. The Plaintiffs purport to dispute the Movants' assertion in a paragraph disputing four of the Movants' factual assertions. See Response ¶ 10, at 5 ("With respect to UMFs Nos. 15-18, Plaintiffs dispute the allegations"). The Plaintiffs do not, however, specifically mention or refer to whether Franco grabbed Howard's arm or whether Howard lay on the ground on his stomach. The Plaintiffs instead state that "Mr. Howard stops and turns around with his hands open . . . . Mr. Howard is down on the ground with his hands covering his face." MSJ ¶ 10, at 5 (citing Franco Lapel Video at 7:02, 7:04-7:06). The Plaintiffs assert the text's fact not as an additional material fact, but in response to the MSJ's proposed facts 15-18. In purporting to dispute these proposed facts, the Plaintiffs list several additional facts, of which this is one. Although the Plaintiffs did not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, construes them as additional material facts for the purposes of this motion.

Although the Plaintiffs do not controvert directly the Movants' assertion, the Court, for precision's sake, modifies the text's fact to better reflect what the record can support -- that Franco made physical contact with Howard, and brought Howard from a sitting position to a lying position. See Franco Lapel Video at 7:02-7:06. The portion of the record to which the Movants cite does not support the Movants' factual assertion that Franco grabbed Howard's arm. See Franco Depo. at 38:1-5 (stating "I don't know what part of his body I grabbed. It was the side or his back from what I recall"). Having reviewed carefully the Franco Lapel Video, the record gives the Court reasons to doubt the Movants' assertion that Franco grabbed Howard's arm. See Franco Lapel Video at 7:04-7:07. Nonetheless, it is clear that Franco made contact with Howard. See Franco Depo. at 37:14 (stating "I did make contact with Mr. Howard"); Franco Lapel Video at 7:04-7:07.

As to the parties' assertions regarding whether Franco grabbed Howard's arm and how Howard came to be lying down, the Court is presented with contradictory testimony. Compare Franco Depo. at 40:24-41:3 (stating that, when Franco grabbed Howard, "he was standing on his two feet" and that When Franco "got a clear visual" on Howard, "he was on his stomach") with Howard Aff. ¶¶ 6-7, at 1 (stating "I decided to stop and got on my knees. I never resisted arrest . . . . The police started beating me. I was hit on my face, head, body, and back. I was hit all over. I was hit on my head a lot of times"). At the summary judgment stage, the Court cannot decide issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. Further, the Franco Lapel Video shows that Franco punched Howard in the face, which brought Howard to the ground. Although the video appears to show this, the Plaintiffs do not propose as a material fact that Franco struck Howard's face upon reaching Howard. The Court presumes, then, that no parties view this fact as material to the MSJ. As to the parties' proposed facts on this point, the video evidence does not "blatantly contradict[]" any party's assertion such that "no reasonable jury could believe" one party's version. Scott v. Harris, 550 U.S. at 380. The Court, having reviewed the record, concludes

MSJ ¶ 19 (referring to "officers")(citing Franco Depo. at 42:12-18).[24]  When Howard was prone,

one of Howard's hands was underneath his body, and the officers could not see his hand.  See MSJ

¶ 19, at 6 (stating this fact)(citing Franco Depo. at 41:22-23; id. at 42:12-18).[25]  Officers "gave

_____

that there is a genuine dispute as to what kind of force Franco exerted that brought Howard to a lying position.  The Court will address the dispute's materiality in this MOO's Analysis section.

   [24]The Movants imply the text's fact rather than assert it, but the text's fact forms the basis of several of the Movants' and the Plaintiffs' proposed facts.  Beginning with the MSJ's paragraph 19, and continuing through the rest of the Movant's proposed facts, the Movants refer to "Officers," and refer to Daffron, Chafin, and Molina as present.  MSJ ¶¶ 19, 20, 22, at 6-7.  See id. ¶¶ 23-29, at 7.  The Plaintiffs similarly base their proposed facts on each of the other individual Defendants' presence.  See, e.g., Response ¶ 14, at 6 (asserting that "Howard is thrown down by the Defendants with his head in the street.").  Although the parties do not assert specifically as proposed fact that Daffron, Chafin, and Molina arrived to help Franco apprehend Howard, the Court, to be generous to the parties, concludes that they arrived, because the parties' proposed facts imply that they arrived and the record supports that they arrived.  See Franco Depo. at 46:2-4; Daffron Lapel Video at 4:53-5:34; Jones Lapel Video at 2:19-2:24; Franco Lapel Video at 7:07-7:55.

   [25]The Plaintiffs purport to dispute the Movants' proffered fact and assert that "Howard's hands were visible during different points of the encounter."  Response ¶ 11, at 5 (citing generally Daffron Lapel Video, Jones Lapel Video, Chafin Lapel Video, Franco Lapel Video, and Molina Lapel Video).  The Movants reply that they "do not allege they never saw Mr. Howard's hands, but rather during the critical period, they could not see Mr. Howard's hand that was underneath his body."  Reply ¶ 19, at 2-3.  The Movants also note that the "Plaintiffs cite to five . . . lapel videos . . . [that] are a total of forty . . . minutes of footage."  Reply ¶ 19, at 4.  The Movants argue that the "Court should decline Plaintiffs' invitation to sort through this footage to find evidence that supports Plaintiffs' allegations."  Reply ¶ 19, at 4 (citing Hauff v. Petterson, 755 F. Supp. 2d 1138, 1150 (D.N.M. 2010)(Kelly, J.)).
   The Movants assert that "Howard's hands were not visible to the officers, because they were tucked under his body."  MSJ ¶ 19, at 6.  In the portion of the record which the Movants cite, however, Franco says "I could not" see Howard's hands.  The Plaintiffs assert that "Franco can only testify about his own knowledge" and not that of the other Defendants.  Response ¶ 11, at 5 (citing Fed. R. Evid. 602).  At the summary judgment stage, the Court may not rely on statements that are not based on personal knowledge.  See Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995); Kephart, 243 F. Supp. 2d at 1209.  The portion of the Franco Depo. the Movants cite in support of the text's fact is based on Franco's personal knowledge -- he states that he could not see Howard's hands.  The Movants, however, also cite to lapel videos which show, from the Defendants' perspective, that Howard's hand was beneath his body and not visible to the other officers.  See Reply ¶ 19, at 3 (citing Daffron Lapel Video at 7:06-7:10; Jones Lapel Video at 2:10-

Howard multiple commands to show them his hands." MSJ ¶ 20, at 6 (citing Franco Depo. at 45:3-11; Daffron Lapel Video at 4:45-4:51; Jones Lapel Video at 2:10-2:35). See Response ¶ 12, at 5 (stating that the "Plaintiffs admit UMF No. 20"). Despite the officers' commands, the officers were not immediately able to secure both of Howard's hands, and Franco believed that Howard was resisting the officers' commands. See MSJ ¶ 21, at 6 (stating this fact)(citing Franco Depo. at 45:3-11).[26] Officers were able to secure Howard's left hand, but his right hand remained under his body. See MSJ ¶ 22, at 6 (stating this fact)(citing Molina Lapel Video at 2:52-2:55).[27] Using

---

2:35; Chafin Lapel Video at 2:52-2:55). In the lapel videos which the Movants cite, Howard's hand is not visible beneath his body. The Plaintiffs do not, therefore, specifically controvert the proffered fact, and the record supports the proffered fact so the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b).

[26]The Court modifies slightly the Movants' proposed fact to better reflect what the record can support. The Movants assert that "Howard did not comply with their commands." MSJ ¶ 21, at 6. To support this assertion, the Movants cite to the Franco Depo., in which Franco states:

> I see officers trying to grab his arms which are still tucked under his body. I hear other officers giving commands to give his arms and those commands are going -- there's numerous times they're giving these commands, which implies to me that Mr. Howard is not listening and is continuing to hide his hands under his body.

Franco Depo. at 45:5-11. The portion of the record to which the Movants cite does not support the Movant's proposed fact that Howard resisted, but rather that Franco believed Howard was resisting the officers' commands. In the Response, the Plaintiffs purport to dispute the Movants' proposed fact, and argue that "the video footage" generally does not show "that Mr. Howard resisted either verbally or physically after he was on the ground." Response ¶ 13, at 6. The Plaintiffs do not dispute, however, that Franco believed that Howard resisted the officers' commands.

[27]The Plaintiffs purport to dispute the text's fact, but do not refer specifically to the text's fact. See Response ¶ 14, at 6. Instead, Plaintiffs provide over three pages of argument and additional facts that do not correspond with the Movant's proffered fact. See Response ¶ 14, at 6-9. As the Plaintiffs do not controvert specifically the proffered fact, and because the record supports the proffered fact, the Court deems that fact undisputed. See D.N.M.LR-Civ. 56.1(b)

- 13 -

his knee, Daffron struck Howard's shoulder three times. See MSJ ¶ 23, at 7 (stating this fact)(citing Franco Depo. at 46:22-77:9; Daffron Lapel Video at 4:40-4:50; Jones Lapel Video at 2:22-2:26).[28]

---

("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

The Plaintiffs' purported dispute pertains more to Movants' later proffered facts regarding the Defendants' use of force. See Response ¶ 14, at 6-9 (asserting that "Mr. Howard was then held down by four Defendants while being struck multiple times and kneed in the head," noting which of the lapel videos documents the Defendants' use of force, comparing the Defendants' various reports on the use of force, arguing that "APD Officers, including Officer Franco, know that using hand or knee strikes on the head can constitute deadly force," contending that, "[s]hockingly, the Defendants refused to take Mr. Howard to the hospital to be evaluated even though APD and the officers knew that Mr. Howard needed medical attention," and arguing that the lapel videos show that "Mr. Howard was not resisting"). The Movants argue that D.N.M.LR-Civ. 56.1(b) "is more than a 'simple labeling requirement'; it is 'an important tool to identify and address the facts at issue on summary judgment[. A] district court should not have to guess which of the movant's material facts are actually disputed by the non-movant' and which statements are additional facts." Reply ¶ 19, at 5 (quoting Nahno-Lopez v. Houser, 625 F.3d 1279, 1284 (10th Cir. 2010)). "Assuming the Court does consider these improperly submitted facts," the Defendants contend, "these additional facts do not directly rebut DMF No. 22 which does not discuss any force used, but rather simply [asserts] that Howard did show officers his other hand when ordered to do so."

As discussed, the Court is being fair to the Plaintiffs by construing their unlabeled facts as additional material facts despite the Plaintiffs' lack of compliance with D.N.M.LR-Civ. 56.1(b). Although the Court must resolve all reasonable inferences in favor of the Plaintiffs, as non-movants, see Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999), the Court may not allow the Plaintiffs' lack of compliance to prejudice the Movants, see Nahno-Lopez v. Houser, 625 F.3d at 1284 (affirming a district court's granting of summary judgment, because the non-movants did not label additional material facts as the local rule requires). The Plaintiffs' three-page narrative makes it difficult for the Movants to respond to the Plaintiffs' additional proposed facts as rule 56 of the Federal Rules of Civil Procedure and D.N.M.LR-Civ 56.1(b) require. With this in mind, the Court examines carefully the Plaintiffs' three-page narrative and, as the MOO shows, incorporates as fact that which the Plaintiffs' assert and support.

[28]The Plaintiffs purport to dispute the text's fact. In the Response, the Plaintiffs assert that the "video evidence does not show Officer Daffron's use of force against Mr. Howard or the exact times that force was applied." Response ¶ 15, at 9. The Plaintiffs also direct the Court to their response to the Movants' ¶ 22. See Response ¶ 15, at 9. In that portion of the Response, however, the Plaintiffs assert that "Officer Daffron struck Mr. Howard three times with his knee," and notes that Franco "observed that Officer Daffron's strikes were made to Mr. Howard's shoulder, not his torso." Response ¶ 14, at 6 (citing Franco Depo. at 46:22-47:24). The Plaintiffs, accordingly, assert the same fact that the Movants assert: that Daffron struck Howard's shoulder three times with his knee.

- 14 -

Daffron delivered his strikes over a four-second period.  See MSJ ¶ 24, at 7 (stating this fact)(citing

Jones Lapel Video at 2:22-2:26).[29]  Daffron did not use any force against Howard after officers

had secured both of his arms.  See MSJ ¶ 25, at 7 (stating this fact)(citing Daffron Lapel Video at

4:45-4:53; Jones Lapel Video at 2:22-3:08; Franco Lapel Video at 7:02-7:34).[30]  As officers sought

to secure Howard's right hand, Franco, using his knee, struck Howard once in his head.  See MSJ

_____

The Plaintiffs also argue, however, that "Daffron's contention that he delivered three strikes to Howard's shoulder is inconsistent with his statements in his Supplemental Report." Response ¶ 15, at 9 (citing Daffron Supplemental Report, filed November 4, 2019 (Doc. 107-18); Daffron Use of Force Report at 3, filed November 4, 2019 (Doc. 107-19)).  In the Supplemental Report, Daffron states that he "delivered three knee strikes to the right side of [Howard's] torso." Daffron Supplemental Report at 44.  In the Daffron Use of Force Report, Daffron indicated that he struck Howard near his rib cage.  See Daffron Use of Force Report at 3.  The Use of Force Report does not call for a narrative response, but rather directs the officer completing the report to highlight one of thirteen numbered regions of a figure of a body to indicate the region to which the officer applied force.  See Daffron Use of Force Report at 3.  Although Daffron does not indicate, on the Daffron Use of Force Report, that he struck Howard's shoulder, the inconsistency is minor, and the Court deems the fact undisputed for two reasons.  First, the Court may not decide any issues of credibility at the summary judgment stage.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.  Second, the Plaintiffs assert in the Response that Daffron struck Howard's shoulder three times.  See Response ¶ 14, at 6.  The Court, accordingly, deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[29]The Plaintiffs purport to dispute the text's fact.  See Response ¶ 15, at 9 (asserting that "Plaintiffs dispute UMB No. 23, 24 and 25").  Nowhere in the Response, however, do the Plaintiffs indicate or refer to the length of time that elapsed between Daffron's strikes.  The Court, accordingly, deems this fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[30]The Plaintiffs purport to dispute the text's fact.  See Response ¶ 15, at 9 (asserting that "Plaintiffs dispute UMB No. 23, 24 and 25").  The Plaintiffs do not cite to the record to support this purported dispute, however, and nowhere in the Response do the Plaintiffs indicate or refer to whether Daffron continued striking Howard after the officers secured both of Howard's hands.  As the Court sees no reason to doubt the Movants' proffered fact, the Court deems this fact undisputed. See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

¶ 26, at 7 (asserting that Franco "delivered a single knee strike to Howard while officers ordered

Howard to give them his hands")(citing Franco Depo. at 47:28-48:9).[31] Franco did not deliver any

────────────────────

[31]Although the Plaintiffs do not proffer any additional facts, they do question Franco's credibility by noting discrepancies in his reports. See Response ¶ 14, at 7-8. The Plaintiffs note that, in his Supplemental Report, Franco states "that he applied 'three knee strikes to the left side of the males [sic] torso and left shoulder.'" Response ¶ 14, at 7 (citing Franco Supplemental Report at 1, filed Nov. 4, 2019 (Doc. 107-7)). Plaintiffs argue that the Court should be skeptical of Franco's reports, however, because he "reported only torso strikes to his supervisor" in his Use of Force Report. Response ¶ 14, at 7 (citing Franco Use of Force Report at 3, filed Nov. 4, 2019 (Doc. 107-19)). The Court construes the Plaintiffs' purported dispute as not with the number of strikes Franco delivered, but rather where on Howard's body those strikes landed. The Court also construes the Plaintiffs' argument as impeaching Franco's credibility. At the summary judgment stage, however, the Court may not decide issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The Court also observes that the report for the use of force which the Plaintiffs cite is a form report that does not call for narrative responses. See Franco Use of Force Report at 1-3.

The Plaintiffs also contend that "the video shows that Officer Franco Struck Howard in the head at least once," although the Plaintiffs do not cite specific portions of the record to support this contention. Response ¶ 14, at 7. The Movants argue in response that the video evidence "directly contradict[s]" "Howard's version of events," and so the Court should "disregard[]" Howard's contentions. Reply ¶ 22, at 6 (citing Scott v. Harris, 550 U.S. at 380). The Movants argue that, "'[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.'" Reply ¶ 22, at 6 (quoting Scott v. Harris, 550 U.S. at 380).

The Movants are correct that nonmovants cannot posit a genuine factual dispute when video evidence so thoroughly discredits the nonmovant's version that no reasonable jury could believe that version. See Reply ¶ 22, at 6; Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1240 (D.N.M. 2016)(Browning, J.). Nonetheless, rule 56 of the Federal Rules of Civil Procedure dictates that the typical presumption in favor of the nonmovant will give way only when the video evidence is unequivocal. See Rhoads v. Miller, 352 F. App'x at 291-92.

The Court has reviewed carefully each of the Lapel Videos, and concludes that the video evidence regarding where Franco struck Howard is not unequivocal. To support their contention that the video evidence contradicts "directly" Howard's version, Reply ¶ 22, at 6, the Movants cite a two-second portion of the Jones Lapel Video. See MSJ ¶ 26, at 7 (citing Jones Lapel Video at 2:24-2:26). The video shows Franco lining up to knee Howard while Howard's head is clearly visible in the path of Franco's knee. See Jones Lapel Video at 2:23. As Franco begins his strike, however, Franco places his body between Jones' lapel camera and Howard's head, obstructing the lapel camera's view of where Franco struck Howard. See Jones Lapel Video at 2:24. The Court is unable to resolve the ambiguity with the other lapel videos. The Chafin Lapel Video -- the best view of Franco's knee strikes -- shows Franco's knee striking Howard's face. See Chafin Lapel

strikes after officers secured both of Howard's hands.  <u>See</u> MSJ ¶ 27, at 7 (stating this fact)(citing

Jones Lapel Video at 2:22-3:08; Franco Lapel Video at 7:02-7:34).[32]  Chafin never struck Howard.

<u>See</u> MSJ ¶ 28, at 7 (stating this fact)(citing Franco Depo. at 49:5-9; Jones Lapel Video at 2:15-

3:09; Franco Lapel Video at 2:45-3:30).[33]  Molina did not strike Howard.  <u>See</u> MSJ ¶ 29, at 7

("Molina never delivered any strikes against Howard")(citing Franco Depo. at 49:5-9; Jones Lapel

Video at 2:15-3:09; Molina Lapel Video at 2:40-3:35).[34]  Less than a minute elapsed between

---

Video at 2:50-2:53.  Further, in the Reply, the Movants "incorporate their reply in support of DMF Nos. 21-23 as their reply in support of DMF No. 26."  Reply ¶ 26, at 9.  The section which the Movants cite, however, does not address where Franco struck Howard, but rather addresses Daffron's strikes.  <u>See</u> Reply ¶¶ 21-23, at 4-9.  The Movants, accordingly, cite only to the Jones Lapel Video in support of their contention that Franco struck Howard's shoulder.  Although the Chafin Lapel video does not "utterly discredit[]" the Movants' version, <u>Scott v. Harris</u>, 550 U.S. at 379, the test at this stage is whether it has that effect on Howard's version of events.  <u>See</u> Fed. R. Civ. P. 56(c).  Here, the Plaintiffs assert that Franco struck Howard's head, and have presented evidence supporting that assertion.  Because the video evidence does not render incredible Plaintiffs' supported assertion, the Court adopts as fact that Franco administered a knee strike to Howard's head.

[32]The Plaintiffs "admit only that the video footage does not show that Defendant Franco applied strikes to Mr. Howard after he was placed in handcuffs."  Response ¶ 17, at 9.  The Plaintiffs point to no "portions of the record upon which [they] rel[y]" in purporting to dispute the text's fact.  D.N.M.LR-Civ. 56.1(b).  The Court therefore deems the text's fact undisputed and will discuss its relevancy in the Analysis.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[33]In addressing the text's fact, the Plaintiffs "admit only that the video footage does not show that Defendants Molina and Chafin struck Mr. Howard," but argue that the video footage "does not show everything that happened."  Response ¶ 18, at 19.  The Plaintiffs point to no "portions of the record upon which [they] rel[y]," in purporting to dispute the text's fact.  D.N.M.LR-Civ. 56.1(b).  Further, the Plaintiffs must create more than a "metaphysical doubt" in defending against the Movants proffered facts.  <u>Matsushita Indust. Co. v. Zenit Radio Corp.</u>, 475 U.S. 574, 587 (1986).  The Court therefore deems the text's fact undisputed and will discuss its relevancy in the Analysis.  <u>See</u> D.N.M.LR-Civ. 56.1(b).

[34]The Plaintiffs purport to dispute the text's fact, and state that the "Plaintiffs admit only that the video footage does not show that Defendants Molina and Chain struck Howard," but assert that "the video footage does not show everything that happened."  Response ¶ 18, at 9.  The Plaintiffs assert that the diagram of the officers' and Howard's positions during the incident

Howard fleeing the bait vehicle on foot and officers placing him in handcuffs, at which point Chafin told the other officers "alright, alright," and indicated that the officers had neutralized the threat.  See MSJ ¶ 30, at 7 (stating this fact)(citing Jones Lapel Video at 2:00-2:50); Response ¶ 30 (stating that "Plaintiffs admit DMF No. 30).

The lapel videos show a pool of Howard's blood on the street below Howard's head.  See Response ¶ 14, at 7 (stating this fact)(citing Jones Lapel Video at 3:15-3:34).[35]  Howard was

_____

demonstrates that "each body camera, while in motion along with its carrier, only provides a limited perspective."  Response ¶ 18, at 9-10 (citing Incident Diagram, filed November 5, 2019 (Doc. 109-1)).  The Court understands the Plaintiffs' argument to be that the Court should treat the lapel videos with skepticism and keep in mind that they may not be a comprehensive depiction of everything that happened.  The Court may consider, however, only the evidence before it.  See Ysasi v. Brown, 3 F. Supp. 3d 1088, 1166 (D.N.M. 2014)(Browning, J.).  The lapel videos -- that five officers took from five different perspectives -- are the most reliable evidence available to the parties and the Court.  Although the Court views the evidence in the light most favorable to Plaintiffs, the Court should view the facts in the light depicted by the videotape, see Scott v. Harris, 550 U.S. at 378, but to the extent the video does not capture everything that occurred, the Court will review all summary judgment evidence.  As the Movants assert that Molina did not strike Howard, and the Plaintiffs have cited no evidence showing that Molina struck Howard, the Court adopts as undisputed the text's fact.

[35]The Court derives the text's fact from one of the Plaintiffs' additional, non-numbered proposed facts.  Although the Plaintiffs do not comply with D.N.M.LR-Civ. 56.1(b) in proposing the text's fact, the Court, to be fair to the Plaintiffs, construes the proposed facts as additional material facts for the MSJ's purposes.  The Movants do not specifically address the proposed fact in the Reply, but assert that the Plaintiffs "offer no evidence (such as expert medical testimony or forensic testimony) to establish any injuries suffered by Howard."  Reply ¶ 23, at 8.  The Court agrees that the Plaintiffs have not offered expert testimony to establish the nature and extent of Howard's injuries, but the Court concludes that the record supports the text's fact, and expert testimony is not needed to prove the text's fact.  First, the lapel videos show a pool of blood in the street trailing from Howard's head.  See Jones Lapel Video at 3:03-3:06; Chafin Lapel Video at 3:40-3:47; Franco Lapel Video at 7:55; Molina Lapel Video at 3:53.  Second, Franco states in the Franco Depo. that none of the officers were injured in the incident, see Franco Depo. at 87:22-88:11, and none of the officers reported injuries in their reports, see Franco Supplemental Report at 1; Daffron Supplemental Report at 1; Daffron Use of Force Report at 1; Franco Use of Force Report at 1.  The incident reports also reflect that Howard's face was bleeding after the incident.  See Daffron Use of Force Report at 4 (stating that Howard had a "Bloody Nose"); Franco Use of Force Report at 4 (same).  Because the Movants do not controvert the text's fact, and the record

disoriented and in pain after his arrest.  See Response ¶ 14, at 9 (stating that Howard "appeared to be . . . in pain as he is being handcuffed")(citing Franco Depo. at 84:2-84:5; Jones Lapel Video at 2:26-2:31).[36]  Finally, Franco believed, from his police training, that knee strikes to a suspect's head constitute deadly force.  See Response ¶ 14, at 7 (stating this fact)(citing Franco Depo. at 73:12-74:3; id. at 76:6-16).[37]

## PROCEDURAL BACKGROUND

The Plaintiffs filed their original complaint in New Mexico State Court, Second Judicial District, on June 23, 2017.  See Complaint for Violations of Civil Rights Pursuant to §§ 1983 and

---

supports the text's fact, the Court deems the text's fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[36]The Movants purport to dispute this text's fact, and assert that the Plaintiffs "offer no evidence (such as expert medical testimony or forensic testimony) to establish any injuries suffered by Howard."  Reply ¶ 23, at 8.  The Movants accordingly do not specifically controvert the text's fact, but rather argue that the Court should require more evidence from the Plaintiffs before adopting the text's fact.  The Court notes, however, that Howard asserts in his affidavit: "I was hurt and in a lot of pain.  My head was hurting bad."  Howard Aff. ¶ 9, at 2.  Howard's Affidavit is based on his personal knowledge, describing what he felt.  Under Murray v. City of Sapulpa, 45 F.3d at 1422, and Kephart, 243 F. Supp. 2d at 1209, the Court may consider and considers the Howard Aff. to the extent that it is based on his personal knowledge.  The Court accordingly adopts the text's fact as undisputed because the Movants do not specifically controvert it, and the Court has no independent reason to doubt its accuracy.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted").

[37]The Plaintiffs' assert that Franco knew that "using hand or knee strikes on the head can constitute deadly force."  Response ¶ 14, at 7.  The portion of the record to which the Plaintiffs cite supports the text's fact.  See Franco Depo. at 73:12-74:3 (Franco)(asserting that a knee strike to the head "could cause deadly force" and that "being hit in the head can cause death").  In the Reply, the Movants do not controvert specifically the Plaintiffs' additional facts surrounding Franco's view as to the lethality of knee strikes to the head.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").  The Court therefore will deem the text's fact as undisputed.  The Court will address this fact's materiality in this Opinion's Analysis section.

1988 and the New Mexico Tort Claims Act and for Damages at 1, filed August 21, 2017 (Doc. 1-1)("Complaint"). The Complaint's Count I alleges excessive force by Franco, Daffron, Chafin, and Molina in violation of 42 U.S.C. § 1983. See Complaint ¶¶ 41-49, at 7. The Complaint's Count II asserts a claim under Monell v. Department of Social Services, 436 U.S. 658 (1978)("Monell") against Defendant City of Albuquerque. See Complaint ¶¶ 50-56, at 8-9. The Complaint's Count III alleges loss of consortium for Howard's children. See Complaint ¶¶ 57-60, at 9-10. The City of Albuquerque, invoking federal-question jurisdiction, removed this case to federal court on August 21, 2017. See Notice of Removal at 1, filed August 21, 2017 (Doc. 1). Franco, Daffron, Chafin, and Molina each consented to this case's removal. See Notice of Removal ¶¶ 8-10, at 2-3.

### 1. **The MSJ.**

On October 4, 2019, the Movants filed the MSJ, invoking the doctrine of qualified immunity, and asked the Court to grant summary judgment in their favor on Counts I and III. See MSJ at 3. For Count I, the Movants contend that Daffron used objectively reasonable force, entitling him to summary judgment. See MSJ at 3. The Movants further assert that Howard cannot prove that the Movants violated his clearly established rights by failing to intervene and protect Howard from Franco and Daffron, because neither Franco nor Daffron used objectively unreasonable force. See MSJ at 4. The Movants alternatively contend that, even if Franco or Daffron used unconstitutional force, the Movants had no opportunity to intervene. See MSJ at 4. The Movants also question whether the law is clearly established such that intervention is constitutionally required. See MSJ at 4. Finally, the Movants assert that their liability on the Complaint's Count III -- which posits a claim for loss of consortium -- depends on actual

constitutional violations and that, because they did not violate Howard's clearly established rights, they are entitled summary judgment on Count III.

The Movants begin by discussing rule 56 of the Federal Rules of Civil Procedure. The Movants contend that summary judgment is "'an integral part of the Federal Rules as a whole, which are designed "to secure a just, speedy and inexpensive determination of every action."'" MSJ at 8 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986)("Celotex")(quoting Fed. R. Civ. P. 1)). The Movants contend that they carry their burden under rule 56 by establishing that there are no genuinely disputed material facts, and that the Plaintiffs are unable to "'establish the existence of an element essential to [their case], and on which [the Plaintiffs] will bear of burden of proof at trial.'" MSJ at 8 (quoting Celotex, 477 U.S. at 323; citing Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 884-85 (1990)). The Movants argue that, if they meet their rule 56 burden, the Plaintiffs must "establish the existence of a genuine issue for trial." MSJ at 8 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). The Movants also say that facts are material only if they "'might affect the outcome of the suit under governing law.'" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986)("Liberty Lobby"). Although the Movants acknowledge that the Court must view the evidence in the light most favorable to the Plaintiffs, the Court may not "'assume' that a disputed issue of material fact exists if there are insufficient facts to support" the Plaintiffs' allegations. MSJ at 8 (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. at 888). The Movants also contend that the Court "must refuse to adopt a version of the facts 'so utterly discredited by the record that no reasonable jury could have believed [it].'" MSJ at 9 (quoting Scott v. Harris, 550 U.S. 372 (2002)).

The Movants next discuss qualified immunity. See MSJ at 10. The Movants argue that qualified immunity is more "'than a mere defense to liability'" and is instead "'immunity from suit.'" MSJ at 10 (quoting Brown v. Montoya, 662 F.3d 1152, 1162 (10th Cir. 2011)). The Movants contend that qualified immunity serves to balance the public's right to hold officials accountable and the need to insulate those officials from baseless, distracting litigation. See MSJ at 10 (citing Pearson v. Callahan, 555 U.S. 223, 231 (2009)). The Movants therefore contend that qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" MSJ at 10 (quoting Malley v. Briggs, 475 U.S. 335, 343 (1986)).

The Movants aver that, because they assert qualified immunity, the Plaintiffs carry the burden to establish that the Movants violated a clearly established right. See MSJ at 10 (citing Saucier v. Katz, 533 U.S. 194, 200 (2001)). The Movants acknowledge that the Supreme Court of the United States of America, in Saucier v. Katz, directed courts to first consider whether the defendant violated a constitutional right, but assert that "courts may [now] address either prong of the Saucier test first." MSJ at 10 (citing Pearson v. Callahan, 555 U.S. at 236).

Turning to their legal argument, the Movants begin by contending that "Daffron is entitled to qualified immunity as to his use of force." MSJ at 11. The Movants argue that Howard "was a non-compliant, felony suspect," which renders Daffron's use of force objectively reasonable. MSJ at 11. The Movants argue that the Fourth Amendment governs the Plaintiffs' claims, and requires only that law enforcement use force that is objectively reasonable in light of the surrounding context. See MSJ at 11 (citing Graham v. Connor, 490 U.S. 386, 397 (1989)). The Movants assert that an officer's intent or motivation is irrelevant, and that courts focus instead on the "'severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the

officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  MSJ at 11 (quoting Graham v. Connor, 490 U.S. at 396).  This standard, the Movants contend, reflects that officers must often "'make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation.'"  MSJ at 12 (quoting Graham v. Connor, 490 U.S. at 397).

The Movants assert that "all three Graham[ v. Connor] factors support Officer Daffron's use of force."  MSJ at 12.  First, the Movants argue, Daffron suspected Howard of a felony offense.  See MSJ at 12 (citing N.M. Stat. Ann. § 30-16D-1).  Second, according to the United States, the officers did not know whether Howard was armed, because he "did not show officers his hands and instead kept his hands tucked under his body."  MSJ at 12.  The Movants contend that, because the officers could not see one of Howard's hands, they reasonably believed he was "potentially armed."  MSJ at 12 (citing United States v. Harris, 313 F.3d 1228, 1236 (10th Cir. 2002); United States v. Peterson, No. 1:06-CR-94 TS, 2007 WL 1390362, at *2 (D. Utah May 9, 2007)(Stewart, J.)).  Third, the Movants argue that "Howard was attempting to evade and resist arrest," because he did not stop the bait vehicle when officers initiated their sirens and then ran from officers when the vehicle stopped.  MSJ at 12-13.

The Movants contend that the United States Court of Appeals for the Tenth Circuit, in unpublished cases, "has found that the use of strikes such as those delivered by Officer Daffron was objectively reasonable where the suspect was non-compliant with officers' attempts to bring the suspect into custody."  MSJ at 13 (citing Serrano v. United States, 776 F. App'x 561, 569 (10th Cir. 2019)(unpublished); Youbyoung Park v. Gaitan, 680 F. App'x 724, 739-40 (10th Cir. 2017)(unpublished)).  The Movants argue that such force may be constitutionally permissible even

where police injure the noncompliant suspect.  See MSJ at 13 (citing Yadon v. Hilton, 516 F. App'x 694, 695 (10th Cir. 2013)(unpublished)).  The Movants say that, in Yadon v. Hilton, the Tenth Circuit concluded that officers were justified in using force that resulted in injuries when a suspect physically struggled against the officers' attempts to arrest him.  See MSJ at 13 (citing Yadon v. Hilton, 516 F. App'x at 695).  The Movants analogize that case to argue that Howard's non-compliance justified -- and therefore rendered constitutionally permissible -- Daffron's three knee strikes against Howard.  See MSJ at 14.

Next, the Movants argue that, even if Daffron violated Howard's Fourth Amendment rights, those rights are not clearly established.  See MSJ at 14.  The Movants argue that a right is clearly established if a reasonable officer is on notice of the right's existence.  See MSJ at 14.  The Movants aver that this step of the qualified immunity inquiry is fact-specific, and that a given right is only clearly established when it is defined with specificity.  See MSJ at 14 (citing White v. Pauly, 137 S. Ct. 548, 552 (2017)).  The Movants assert that the right to objectively reasonable force is defined too generally to defeat qualified immunity for all but the most obvious cases.  See MSJ at 15-16 (citing White v. Pauly, 137 S. Ct. at 552).  Without such a rule, the Movants contend, "'[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging a violating of extremely abstract rights.'"  MSJ at 14 (quoting White v. Pauly. 137 S. Ct. at 552)(alteration and omission in MSJ).  The Movants contend that courts apply the rule more stringently in cases involving excessive force allegations, because it "'is sometimes difficult for an officer to determine how the relevant legal doctrine . . . will apply to the factual situation the officer confronts.'"  MSJ at 15 (quoting Kisela v. Hughes, 138 S. Ct. 1148, 1153 (2018)).

The Movants argue that "Howard cannot carry his clearly established burden simply by claiming Officer Daffron was on notice [that] he should not use excessive force," or by asserting that officers should not use force "on compliant and non-dangerous suspects." MSJ at 15 (citing City of Escondido, Cal. v. Emmons, 139 S. Ct. 500, 503 (2019); Kisela v. Hughes, 138 S. Ct. at 1153). "Instead," the Movants argue, "Howard must point to a Tenth Circuit or Supreme Court case establishing that under the factual circumstances present in this case, a reasonable officer in Daffron's position should have known the use of three knee strikes against Howard in order to gain control of his hidden hand was excessive." MSJ at 15. The Movants aver that Howard cannot make such a showing. See MSJ at 15.

The Movants turn to Howard's failure-to-intervene claim. See MSJ at 16. The Movants contend that neither Chafin nor Molina used any "distraction techniques or knee strikes against Howard," and so failure to intervene is the only possible basis for their liability. MSJ at 16. As Daffron used force, the Movants surmise that Howard alleges that Daffron "should have intervened to stop Officer Franco." MSJ at 16. The Movants acknowledge that a law enforcement officer's failure to intervene to prevent another's use of excessive force may give rise to § 1983 liability. See MSJ at 16 (citing Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996)). The Movants argue, however, that "mere presence is not enough." MSJ at 16 (citing Lusby v. T.G. & Y. Stores, Inc., 749 F.2d 1423, 1433 (10th Cir. 1984)). The Movants contend that § 1983 liability attaches for failure to intervene only when an officer sees or has reason to anticipate a constitutional violation, and has the ability to intervene to stop the violation from occurring. See MSJ at 16 (citing Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008)).

The Movants first address Chafin's and Molina's liability, and argue that they are not liable, because Daffron did not use excessive force or, alternatively, because Chafin and Molina did not have a realistic opportunity to intervene. See MSJ at 17. "The law is clear," the Movants contend, "that failure-to-intervene claims cannot survive absent an underlying use of unconstitutional force." MSJ at 17 (citing Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015)). The Movants further assert that, even if Daffron used excessive force, Chafin and Molina had no opportunity to intervene because Daffron "delivered his strikes in rapid succession in less than four [] seconds total." MSJ at 17. The Movants assert that courts "have consistently held there is no opportunity to intervene [when] the force takes place suddenly or occurs within a brief time frame." MSJ at 18 (citing Savannah v. Collins, 547 F. App'x 874, 877 (10th Cir. 2013)(unpublished); Wallin v. Dycus, 381 F. App'x 819, 823-24 (10th Cir. 2010)(unpublished); Thompson v. Boggs, 33 F.3d 847, 857 (7th Cir. 1994); Gaudreault v. Municipality of Salem, 923 F.2d 203, 207 n.3 (1st Cir. 1990); O'Neill v. Krzeminski, 839 F.2d 9, 11 (2nd Cir. 1988); Tanner v. San Juan Cty. Sheriff's Office, 864 F. Supp. 2d 1090, 1156 (D.N.M. 2012)(Browning, J.)). The Movants contend that Daffron's force was so brief that Chafin and Molina had no opportunity to intervene, and, accordingly, did not violate Howard's Fourth Amendment rights. See MSJ at 18.

Next, the Movants apply the same arguments to Franco's use of force. The Movants assert that it "is undisputed that Officer Franco delivered a single knee strike to Howard prior to Howard being handcuffed." MSJ at 19. The Movants "acknowledge," however, "that a dispute of fact exists at this stage regarding whether Officer Franco's strike was to Howard's shoulder or his head." MSJ at 19. "It is certainly arguable," the Movants posit, that Franco did not use excessive force "even if Officer Franco's knee did hit Howard in the head." MSJ at 19 (citing Serrano v.

United States, 776 F. App'x at 569). The Movants argue that the Court need not resolve where Franco struck Howards or whether Franco's force was excessive for the MSJ's purposes. See MSJ at 19. The Movants assert that they had no opportunity to intervene regardless of the constitutionality of Franco's strikes and so the Movants did not violate Howard's constitutional rights. See MSJ at 19-20. Turning to qualified immunity's next prong, the Movants contend that their lack of intervention does not violate any clearly established rights. See MSJ at 20. The Movants depict Howard's burden as "heavy," and contend that "Howard will be unable to sustain this burden," because of "the significant amount of case law showing that officers do not have a duty to intervene where there is no underlying unconstitutional force and/or where the force is used suddenly or briefly." MSJ at 20-21.

Finally, the Movants contend that the Court must dismiss the Plaintiffs' loss of consortium claim, because the claim "is derivative of other injuries and not an injury in and of itself." MSJ at 21 (citing Fitjerell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, ¶ 12, 79 P.3d 836, 840-41). The Movants contend that, under New Mexico caselaw, the Plaintiffs may not recover on the Complaint's Count III unless they first prove a direct constitutional violation. See MSJ at 21 (citing Weise v. Washington Tru Sols., L.L.C., 2008-NMCA-121, ¶ 30, 192 P.3d 1244, 1255). The Movants assert that the Court must dismiss the Plaintiffs' loss of consortium claim, "because Howard himself is not entitled to any recovery against" the Movants. MSJ at 21. Accordingly, the Movants request that the Court grant summary judgment on all of the Plaintiffs' claims against Daffron, Chafin, and Molina. See MSJ at 21.

2.    **The Response**.

The Plaintiffs respond.  <u>See</u> Response at 1.  The Plaintiffs begin by asserting that summary

judgment is "premature" because the Plaintiffs require additional discovery to respond properly to

the MSJ.  Response at 1.  The Plaintiffs acknowledge that they stipulated to a stay when the

Movants filed the MSJ, "as long as Plaintiff was not precluded from submitting a Fed. R. Civ. Pro.

56(d) Affidavit."  Response at 1.  The Plaintiffs acknowledge that the lapel videos "illuminate[] a

fair portion of the facts" necessary for the Court to resolve the MSJ, but assert that "the videos do

not capture everything."  Response at 1-2.  Specifically, the Plaintiffs contend that they must

depose the rest of the Defendants, as well as Gorden Eden, Jim Jury, and Joseph Viers[38] "to capture

a full picture of the force" which the Movants and Franco used, and which APD sanctioned.

Response at 2.  The Plaintiffs aver that the Movants' reports present inconsistent narratives, so the

Plaintiffs must "depose specific witnesses and the remaining Defendants and challenge the

veracity of their statements."  Response at 2.  The Plaintiffs argue, alternatively, that the parties

dispute material facts, and so summary judgment is improper.  <u>See</u> Response at 2.

Turning to the case's procedural posture, the Plaintiffs assert that, typically, courts may not

weigh evidence and "must resolve genuine disputes of material fact in favor of the nonmoving

party."  Response at 10 (citing <u>Tolam v. Cotton</u>, 572 U.S. 650 (2014)(per curiam)).  The Plaintiffs

---

[38]Gorden Eden is the former Chief of the APD.  <u>See</u> Matthew Reisen, "APD Chief Gorden Eden announces retirement," Albuquerque Journal, Nov. 4, 2017, https://www.abqjournal.com/1088088/abq-police-chief-eden-announces-his-retirement.html (last visited Feb. 18, 2020).  Jim Jury is an internal affairs investigator to the APD.  <u>See</u> Plaintiffs' Response in Opposition to Officer Franco's Motion for Summary Judgment Based on Qualified Immunity at 2, filed January 31, 2020 (Doc. 126).  Joseph Viers is a sergeant in the APD who supervised Daffron, Chafin, and Molina on October 30, 2015.  <u>See</u> Affidavit of Louren Oliveros ¶ 4, at 1 (taken Nov. 4, 2019), filed Nov. 4, 2019 (Doc. 107-29)("Oliveros Aff.").

assert, however, that this presumption shifts partially when the moving party asserts qualified immunity.  See Response at 10.  The Plaintiffs assert that, when a party moves for summary judgment based on qualified immunity, the nonmoving party must demonstrate that the official violated a clearly established right.  See Response at 10-11 (citing Quinn v. Young, 780 F.3d 998, 1004 (10th Cir. 2015)).  The Plaintiffs agree with the Movants that the Court may address "the two prongs of the qualified-immunity standard in either order," because the Movants prevail if the Plaintiffs fail to establish both prongs.  Response at 10 (citing A.M. v. Holmes, 830 F.3d 1123, 1134-35 (10th Cir. 2016)).

The Plaintiffs next discuss the standard for Fourth Amendment excessive force claims.  See Response at 10.  The Plaintiffs assert that the Fourth Amendment "'guarantees citizens the right to be secure in their persons against unreasonable seizures of the person.'"  Response at 10 (citing Graham v. Connor, 490 U.S. at 386).  The Plaintiffs say that courts analyze excessive force claims under an objective standard, closely scrutinizing the "'facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"  Response at 10 (citing Casey v. City of Federal Heights, 509 F.3d 1278, 1281 (10th Cir. 2007)).  The Plaintiffs contend that these factors are not exclusive, and that courts may consider other factors to gauge the reasonableness of the officials' actions.  See Response at 11 (citing Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1249 (10th Cir. 2013).  The Plaintiffs assert that the Tenth Circuit has

> identified other relevant factors: "(1)[ ]whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon toward the officers; (3) the distance

separating the officers and the suspect; and (4) the manifest intention of the suspect."

Response at 12 (quoting <u>Mullenix v. Luna</u>, 136 S. Ct. 305, 308 (2015)). The Plaintiffs note that courts examine excessive force claims based on the information officers had when the conduct occurred, and not based on facts discovered in hindsight. <u>See</u> Response at 10 (citing <u>City of L.A., Cal. v. Mendez</u>, 137 S. Ct. 1539 (2017)). The Plaintiffs accordingly note that summary judgment is appropriate where an officer mistakenly, but reasonably, believes that the suspect posed a danger. <u>See</u> Response at 11 (citing <u>Saucier v. Katz</u>, 533 U.S. at 205).

The Plaintiffs then turn to the clearly-established prong and assert that the Supreme Court of the United States of America "has emphasized that the clearly established-law inquiry must be guided by the 'specific context of the case.'" Response at 12 (quoting <u>Mullenix v. Luna</u>, 136 S. Ct. at 308.). The Plaintiffs assert, however, that "[t]here is no question that the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer in the officer's position would have had probable cause to believe that there was a threat of serious physical harm to himself or others." <u>See</u> Response at 12 (citing <u>Graham v. Connor</u>, 490 U.S. at 396; <u>Cordova v. Aragon</u>, 569 F.3d 1183, 1192 (10th Cir. 2009)).

The Plaintiffs turn to Daffron's liability and assert that he is not entitled to qualified immunity. <u>See</u> Response at 12. The Plaintiffs note that Daffron "concedes that he struck Mr. Howard in the shoulder area two to three times." Response at 12. The Plaintiffs argue, however, that, in the light most favorable to the Plaintiffs, "Daffron is seen on video administering strikes to Mr. Howard's head." Response at 12. To support this contention, the Plaintiffs say that the left side of Howard's face was bruised and bloody after his arrest. <u>See</u> Response at 12. The Plaintiffs assert that Howard's injuries prove that Daffron struck Howard in the head. <u>See</u> Response at 12.

Such force was not reasonable, the Plaintiffs argue, because Howard was unarmed, and "was not verbally or physically resisting arrest in the video footage." Response at 12. The Plaintiffs argue accordingly that Howard "was not a danger to the officer, himself or the public [when] that force, including deadly force, was used on him." Response at 12. The Plaintiffs assert further that, although Howard "was visibly injured on his head, in obvious pain, . . . the Defendants refused to take him to the hospital." Response at 12. Although the Plaintiffs note that "Howard had committed a serious crime," they assert that Daffron's use of force was unreasonable under the Graham v. Connor test. Response at 13. Applying the additional factors from Casey v. City of Federal Heights, 509 F.3d 1278, the Plaintiffs assert that Howard was unarmed, "never made hostile motions with a weapon," and "intended to submit to arrest." Response at 13. "In weighing all of these facts," the Plaintiffs contend, "it was clearly established that the Defendants were not justified in using deadly force or striking Mr. Howard in the face or head." Response at 13.

The Plaintiffs next distinguish the cases that the Movants cite. See Response at 13. The Plaintiffs contend that the plaintiff in Youbyoung Park v. Gaitan, 680 F. App'x 724, "fought back 'forcefully' by tensing his arms, bracing his legs, and attempting to pull away from the officers." Response at 13 (quoting Youbyoung Park v. Gaitan, 680 F. App'x at 739-40). The Plaintiffs assert that the Tenth Circuit concluded that the officers' force in that case was proportional "given the nature of Mr. Park's 'forceful[]' physical resistance." Response at 13 (quoting Youbyoung Park v. Gaitan, 680 F. App'x at 739)(alteration in Response). That case is distinguishable, the Plaintiffs argue, because "the only evidence of resistance is Officer Franco's testimony that Mr. Howard was concealing his hands." Response at 13. The Plaintiffs aver that "there is no testimonial or video evidence that supports even an inference that Mr. Howard was fighting back." Response at

14.  Instead, the Plaintiffs argue that, in the light most favorable to them, Howard ultimately submitted to arrest before Daffron exerted lethal force.  See Response at 14.  To support this contention, the Plaintiffs note that the crime Howard was suspected of committing -- car theft -- is "a felony, but not a crime of violence."  Response at 14.  Although Howard did not immediately respond to the officers' demands that he stop, the Plaintiffs assert that Howard did not exceed speed limits.  See Response at 14.  The Plaintiffs say that, when Howard exited the vehicle, he did so "with his arms in plain view and open as if to surrender."  Response at 14.  The Plaintiffs note that Howard "was eluding initially," but contend that he "then crouched down in [the] fetal position with his hands, not hidden, but in plain sight protecting his head."  Response at 14.  It was then, the Plaintiffs assert, that the Movants and Franco used deadly force.  See Response at 14.  The Plaintiffs assert that "[a]t no time did Mr. Howard fight back or physically threaten the Defendants during the melee-like use of force applied against him."  Response at 14.

The Plaintiffs also distinguish Yadon v. Hilton, 516 F. App'x 694.  See Response at 14.  The Plaintiffs note that Yadon v. Hilton, along with several cases which the Movants cite, is unpublished and "not binding on this Court."  Response at 14.  The Plaintiffs say that, in Yadon v. Hilton, the suspect "struggled for several minutes before being handcuffed," yelled, and "pulled his arm away several times," justifying officers' use of force.  Response at 14 (citing Yadon v. Hilton, 2013 WL 160445, at *4 (D. Kan. Jan. 15, 2013)(Rogers, J.)).  The Plaintiffs assert that, [u]nlike the Plaintiff in Yadon, Mr. Howard was not overtly threatening the Defendants," and "never yelled . . . or sw[u]ng his arms around at the officers."  Response at 15.  The Plaintiffs also distinguish Serrano v. United States, 766 F. App'x 561.  See Response at 15.  In that case, the Plaintiffs argue, officers knew that the plaintiff was prone to fleeing, assaulting police officers,

and carrying weapons.  See Response at 15 (citing <u>Serrano v. United States</u>, 766 F. App'x at 563, 566-67).  The Plaintiffs say that, when the officers tried to arrest the plaintiff in that case, the plaintiff "appeared to be reaching in his console for what could have been a firearm after being shot by other defendants," which justified the officers' force, "including repeatedly striking the back of his head."  Response at 15 (citing <u>Serrano v. United States</u>, 766 F. App'x at 566).  The Plaintiffs assert that <u>Serrano v. United States</u> is distinguishable because the Movants did not know Howard's criminal history or suspect him "to be armed [or] have a history fleeing and being combative with law enforcement."  Response at 15.  The Plaintiffs accordingly request that the Court deny the MSJ as to Daffron.  See Response at 15.

The Plaintiffs turn to their argument that Chafin and Molina are not entitled to qualified immunity.  The Plaintiffs contend that an "'officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.'"  Response at 16 (quoting <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1163 (10th Cir. 2008)).  The Plaintiffs note that an officer must have the opportunity to intervene for liability to arise.  See Response at 16 (citing <u>Fogarty v. Gallegos</u>, 523 F.3d at 1136).  The Plaintiffs dispute the Movants' contention that Franco "delivered a single knee strike" before the officers handcuffed Howard.  Response at 16.  Instead, the Plaintiffs assert that Franco and Daffron "both administered multiple knee strikes to Mr. Howard, including his head and face, while all Defendants held him down."  Response at 16.  The Plaintiffs contend that Chafin and Molina had the opportunity to intervene, because, "not only" were they "in the immediate vicinity of where force was being used, but Defendants Molina and Chafin also participated in the use of force on Mr. Howard to hold him down."  Response at 16.  The Plaintiffs argue that they need to depose Chafin and Molina "to determine how much force each used against Mr. Howard."

Response at 16. The Plaintiffs nonetheless contend that, "[b]ased on the record to date, a jury could logically and reasonably infer that Defendants had an opportunity to intervene and failed to do so." Response at 16. Finally, the Plaintiffs argue that their loss of consortium claims are viable, because they derive from valid § 1983 claims against the Movants. Response at 16. The Plaintiffs accordingly request that the Court deny the MSJ.

### 3. **The Reply.**

The Movants reply. See Reply at 1. The Movants begin by contending that there are no disputed material facts. See Reply ¶¶ 1-30, at 1-9. The Movants contend that the "Plaintiffs attempt to muddy the waters by alternatively relying on the video and officers' statements." Reply at 9. Although the Movants argue that the Court should not rely on any statements that the lapel videos contradict, they "ask the Court to review the video portions specifically identified by the Defendants to determine whether [proposed facts] are disputed or not." Reply at 9. The Movants request that the Court "reject any attempt by Plaintiffs to dispute clear video evidence by using officers' statements or testimony." Reply at 9.

Turning to their legal argument, the Movants begin by asserting that Daffron is entitled to qualified immunity as to his use of force. See Reply at 9. The Movants agree that the Court must view the evidence in the light most favorable to the Plaintiffs, but argue that this standard "does not mean the Court has to see evidence in the video which is simply not there []or disregard what is clearly depicted in the video." Reply at 9 (citing Navarro v. New Mexico Dep't. Pub. Safety, No. Civ. 16-1180-JMC, 2018 WL 4148452, at *3, n.3 (D.N.M. Aug. 30, 2018)(Carson, J.)). The Movants also aver that the Plaintiffs "conflate the concept of non-compliance with commands with overt physical or verbal threats towards officers." Reply at 10. The Movants assert that the lapel

videos show that "Howard's hands are not visible, he is ordered to show his hands and does not, during which time Officer Daffron uses force." Reply at 10. The Movants contend that the Plaintiffs are mistaken in their assertions that Howard "was trying to surrender" when Daffron used force. Reply at 10. Even if, at some point, Howard attempted to surrender, the Movants argue, "officers did not know what Howard had in his waistband or accessible in the hand that was concealed under his body" when Daffron used force. Reply at 10. The Movants assert that courts conclude consistently that force, including deadly force, is reasonable "where a suspect places his or her hands in his/her waistband area as Howard did when his hand was underneath his body after being placed on the ground." Reply at 10 (citing Cruz v. City of Anaheim, 765 F.3d 1076, 1079 (9th Cir. 2014)). The Movants also argue that, although the Plaintiffs seek to distinguish the Defendant's cited cases, they "did not cite any case law establishing that Officer Daffron's actions were objectively unreasonable." Reply at 10. The Movants accordingly contend that, even if Daffron's force amounted to a constitutional violation, the law on which the Plaintiffs rely is not clearly established. See Reply at 10-11.

The Movants turn to the Plaintiffs' failure-to-intervene claim. See Reply at 11. The Movants characterize the Plaintiffs' argument as asserting that, "simply by being close enough to help hold Howard down, Officers Chafin and Molina are subject to liability." Reply at 11. Although the Movants maintain that Daffron's and Franco's force was constitutionally permissible, the Movants argue that, because Franco and Daffron's force was brief and sudden, Chafin and Molina had no opportunity to intervene. See Reply at 11. The Movants also argue that the Plaintiffs have not demonstrated that the Movants' lack of intervention violates Howard's clearly established rights. See Reply at 12. The Movants contend that the Plaintiffs cite only

"general propositions regarding failure-to-intervene claims, ignoring the Supreme Court's repeated admonitions that the clearly established analysis, especially in the Fourth Amendment context, is extremely fact-intensive." Reply at 12 (citing <u>Kisela v. Hughes</u>, 138 S. Ct. at 1153). The Movants summarize their argument: "Plaintiffs have failed to cite to a factually analogous case, even relying on their own version of the facts, which demonstrates a reasonable officer would have known he/she would violate Howard's Fourth Amendment rights by failing to intervene." Reply at 12. The Movants accordingly request that the Court grant the MSJ.

### 4.    The Rule 56(d) Response.

On November 26, 2019, the Movants filed a separate response to the Plaintiffs' discovery request.[39]   <u>See</u> Defendants Daffron, Chafin, and Molina's Amended Response to Plaintiffs'

---

[39]As discussed <u>supra</u>, the Plaintiffs have not filed a separate motion for additional discovery under rule 56(d) of the Federal Rules of Civil Procedure, but rather include a rule 56(d) request in their Response to the MSJ. <u>See</u> Response at 1-2. The Plaintiffs attach to the Response an affidavit from Plaintiffs' counsel, in which the Plaintiffs' counsel noted that they had scheduled depositions for each of the individual Movants before the Movants filed their Motion for Protective Order Staying Discovery Pending the Court's Disposition of Defendants' Motion for Summary Judgment on the Basis of Qualified Immunity, filed October 4, 2019 (Doc. 103)("Motion to Stay"). <u>See</u> Affidavit of Louren Oliveros ¶ 7, at 2 (taken November 4, 2019), filed November 4, 2019 (Doc. 107-29)("Oliveros Aff."). The Plaintiffs' counsel, Louren Oliveros, attests that Plaintiffs stipulated to a discovery stay pending the Court's ruling on the MSJ, but "reserved the right to submit a Rule 56(d) affidavit as a part of the agreement." Oliveros Aff. ¶ 8 at 2. Ms. Oliveros attests that the Plaintiffs seek to depose each of the Movants and their Sergeant, Joseph Viers, as well as the City of Albuquerque's rule 30(b)(6) witness. <u>See</u> Oliveros Aff. ¶¶ 4-5, at 1. Ms. Oliveros states that these depositions are "necessary for Plaintiffs to establish their *Monell* claims of a pattern and practice by APD of perpetuating the unconstitutional use of force," Oliveros Aff. ¶ 9, at 2, and that the Movants' depositions are necessary "to obtain admissible evidence and information not available from the video footage and discovery . . . about what transpired from each of the Defendant's [sic] individual perspectives," Oliveros Aff. ¶ 10, at 2. Finally, Ms. Oliveros asserts that

> the depositions of the individual Defendants and other APD employees and managers . . . are necessary in order to gain a complete picture about the use of force policies at APD at the time of Mr. Howard's arrest, to question the named

Request for Discovery Pursuant to Fed. R. Civ. P. 56(D), filed November 26, 2019 (Doc. 117)("Rule 56(d) Response").  The Movants argue that the Court should deny the Plaintiffs' discovery request, because the Plaintiffs have failed to comply with rule 56(d) of the Federal Rules of Civil Procedure.  See Rule 56(d) Response at 2.  The Movants contend that the Plaintiffs do not adequately justify their request and instead assert conclusory statements about additional discovery's necessity.  See Rule 56(d) Response at 2.  "More importantly," the Movants assert, the parties and the Court can rely on "clear" video evidence which negates the need for additional testimony.  Rule 56(d) Response at 2.  The Movants note that the Plaintiffs wish to depose officers and city officials who were not present at Howard's arrest and argue that these witnesses' testimony is "irrelevant as a matter of law" to the Movants' alleged constitutional violations.  Rule 56(d) Response at 2.  The Movants also aver that the Plaintiffs have not demonstrated that the rights which Howard asserts are clearly established and so additional discovery will be futile to the Plaintiffs in defending against the MSJ.  See Rule 56(d) Response at 2.

The Movants contend that rule 56(d) requires that a party seeking additional discovery to defend against a motion for summary judgment must identify with specificity all unavailable facts, demonstrate why those facts are presently inaccessible, discuss what the party has done to obtain the facts, and show how those facts are material to the summary judgment motion.  See Rule 56(d) Response at 2-3 (citing Valley Forge Ins., Co. v. Health Care Mgmt. Partners, 616 F.3d 1086, 1096

---

Defendants and other relevant witnesses about their knowledge of this case, and to question parties and witnesses about the inconsistent statements that have been provided by the police reports, use of force reports and other internal investigations related to the force used on Mr. Howard and their knowledge of his injuries.

Oliveros Aff. ¶ 11, at 2-3.

(10th Cir. 2010); Price ex rel. Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000)). The Movants also contend that courts should be skeptical of rule 56(d) motions that amount to stalling tactics or fishing expeditions. See Rule 56(d) Response at 3 (citing Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993)). The Movants further assert that, when the summary judgment movant asserts qualified immunity, the non-movant's rule 56(d) affidavit "must also 'demonstrate a connection between the information he would seek in discovery and the validity of the [defendant's] qualified immunity assertion.'" Rule 56(d) Response at 3 (quoting Guiterrez v. Cobos, 841 F.3d 895, 908 (10th Cir. 2016))(alteration in Rule 56(d) Response).

Turning to their argument, the Movants assert that the "Plaintiffs have not adequately shown the probable facts they hope to gain with additional discovery and how these facts will impact the summary judgment ruling." Rule 56(d) Response at 4. The Movants argue that the Plaintiffs' rule 56(d) affidavit does not assert with particularity the facts that the Plaintiffs seek and does not describe adequately the efforts that the Plaintiffs have taken to obtain those facts. See Rule 56(d) Response at 4-5. The Movants primarily attack the relevancy of the Plaintiffs' requested evidence. The Movants characterize the Plaintiffs' request as seeking information on Chafin's and Molina's use of force, but the Movants assert that "these officers' use of force is not even at issue in the motion." Rule 56(d) Response at 4. The Movants also dispute the Plaintiffs' assertion that Franco's deposition testimony differs from his reporting on whether Daffron used force. See Rule 56(d) Response at 4. The Movants contend that, at his deposition, "Franco simply agreed with counsel's commentary that upon reviewing the video 'we just can't see [] exactly what he's doing; is that right.'" Rule 56(d) Response at 4 (quoting Franco Depo. at 81:1-19)(alteration

in Rule 56(d) Response).  The Movants argue that "counsel's commentary," on which the Plaintiffs

rely for their rule 56(d) request, is not evidence and so cannot serve as the basis for the Plaintiffs'

request.  Rule 56(d) Response at 4.

The Movants also assert that the Plaintiffs' requested discovery is not necessary to defend

against the MSJ.  See Rule 56(d) Response at 4-5.  The Movants argue that the depositions which

the Plaintiffs seek to take pertain to the Plaintiffs' Monell claim and not to the Movants, and so

are irrelevant to the MSJ.  See Rule 56(d) Response at 4.  "The most significant flaw in the

Plaintiffs' request," the Movants assert, "is that the video as a matter of law controls the factual

record."  Rule 56(d) Response at 5 (citing Scott v. Harris, 550 U.S. at 378-80; Carabajal v. City of

Cheyenne, 847 F.3d 1203, 1207 (10th Cir. 2017); Roybal-Mack v. N.M. Dep't of Pub. Safety, 286

F. Supp. 3d 1226, 1236-37 (D.N.M. 2017)(Johnson, J.)).  The Movants contend that video evidence

trumps all other forms of evidence, including testimonial evidence, so the Plaintiffs cannot locate

any further evidence to create genuine factual disputes.  See Rule 56(d) Response at 6.  The

Movants argue that courts routinely deny rule 56(d) requests in similar situations.  See Rule 56(d)

Response at 6 (citing Martin v. Cty. of Santa Fe, No. CIV 13-0575 KBM/RHS, 2014 WL

11398752, at *5 (D.N.M. July 21, 2014)(Molzen, M.J.), aff'd, 626 F. App'x 736 (10th Cir. 2015);

Valencia v. De Luca, No. 13 CIV 930 JAP/WPL, 2014 WL 11430951, at *11 (D.N.M. Aug. 26,

2014)(Parker, J.), aff'd, 612 F. App'x 512 (10th Cir. 2015); F.M. v. Labarge, No. CIV 12-0074

RCB/ACT, 2012 WL 13070072, at *5 (D.N.M. Dec. 7, 2012)(Torguson, M.J.)).  The Movants

then allege that the Plaintiffs seek the officers' subjective impressions of Howard's arrest, which,

the Movants argue, are not relevant to the "objective reasonableness test" that the MSJ involves.

Rule 56(d) Response at 7.  Finally, the Movants s argue that the Plaintiffs have not demonstrated

how additional discovery will reveal facts related to the Movants' assertion of qualified immunity. See Rule 56(d) Response at 8.

**5.    The Rule 56(d) Reply.**

The Plaintiffs reply. See Plaintiffs' Reply to Defendants Daffron, Chafin and Molina's Amended Response to Plaintiffs' Request for Discovery Pursuant to Fed.R.Civ.P.56(D), filed December 10, 2019 (Doc. 120)("Rule 56(d) Reply"). The Plaintiffs argue that their "request for additional discovery complies with Fed.R.Civ.P.56(D) [sic] and is necessary to establish [their] claims." Rule 56(d) Reply at 1. The Plaintiffs assert that their rule 56(d) affidavit states that the Plaintiffs "seek[] to take depositions in order to establish Plaintiffs['] claims . . . due to Plaintiff's inability to rely solely on the video evidence in this case" in defending against the MSJ." Rule 56(d) Reply at 2 (citing generally Oliveros Aff.). The Plaintiffs disagree with the Movants' characterization of the Plaintiffs' cited support for the rule 56(d) request. See Rule 56(d) Reply at 2. The Plaintiffs assert that, contrary to the Movants' contentions, Franco agrees in the Franco Depo. that the Lapel Videos do not demonstrate clearly where Daffron struck Howard, and the Plaintiffs argue that Franco's agreement is evidence on which the Plaintiffs are permitted to rely in their rule 56(d) request. See Rule 56(d) Reply at 2-3. The Plaintiffs note that Franco agreed that the lapel videos show Daffron "applying distraction techniques . . . 'towards the head of Mr. Howard,'" but that Franco then "agreed with counsel's statement that "'we just can't see in the video exactly what he's doing.'" Rule 56(d) Reply at 2-3 (quoting Franco Depo. at 81:1-19). The Plaintiffs argue that Franco's "responses from this line of questioning confirm[] that while there is video evidence of the incident, not all the strikes inflicted on Mr. Howard by Officer Daffron and the other officers were fully captured in the video and further depositions from the other

officers are essential." Rule 56(d) Reply at 3. The Plaintiffs also argue that, because "multiple officers" crouched over Howard during the incident, "the view of the Plaintiff on the ground is partially obstructed," and so the Plaintiffs need "further discovery to question each Defendant about their precise locations, the force each used and their respective observations." Rule 56(d) Reply at 3.

The Plaintiffs next assert that, to survive the MSJ, they must "demonstrate that the Defendants violated a clearly established constitutional right that the reasonable person would have known." Rule 56(d) Reply at 4. The Plaintiffs argue that, because they carry such a burden, "[a]t a minimum, Plaintiff must have access to all pertinent information as set forth in the Affidavit of Louren Oliveros," including "the additional requested depositions and any related discovery stemming from those depositions." Rule 56(d) Reply at 4. The Plaintiffs assert that, if the Court denies the rule 56(d) request, the Court will be left with "an incomplete picture as to what occurred at the time of the arrest," unfairly prejudicing the Plaintiffs. Rule 56(d) Reply at 4.

### 6.    <u>The Hearing.</u>

The Court held a hearing on January 10, 2020. <u>See</u> Draft Transcript of Hearing at 1 (held January 10, 2020)("Tr.").[40] The Court began by indicating that it perceived the "crux" of the parties' factual dispute to be whether Daffron and Franco struck Howard's torso, or whether they struck his head. Tr. at 4:4-12 (Court). The Movants responded that, although that issue is the central disagreement, the Movants argue that the video evidence shows clearly that Daffron struck Howard's torso and that Franco's strikes are irrelevant for the MSJ's purposes. <u>See</u> Tr. at 5:1-15

---

[40]The Court citation to the hearing transcript refers to the unedited draft transcript. Accordingly, page and line numbers are subject to slight change in the final transcript.

(Roman). The Movants contended that, if the only factual dispute is whether Franco struck Howard's head, then the Movants cannot be liable for failure to intervene to prevent Franco's force, because everything happened so quickly. See Tr. at 5:15-6:5 (Roman). The Court asked the Movants which video they believe depicts most clearly the incident, and the Movants responded that the Jones Lapel Video provides the clearest depiction. See Tr. at 6:5-11 (Court, Roman). Although the Movants asserted that Daffron did not strike Howard's head, the Movants asserted that, even if Daffron struck Howard's head, "the clearly established law wouldn't demonstrate to a reasonable officer that . . . that was excessive force under the circumstances." Tr. at 8:1-7 (Roman). The Movants further asserted that the Court need not resolve where Franco struck Howard for the MSJ's purposes. See Tr. at 8:7-10 (Roman).

The Movants also characterized the incident's context, and argued that "this is an arrest of someone who was fleeing after having been in a car that he stole for approximately two minutes, seen moving around in the car and the officers did not have any way of knowing what he had in his hand that was underneath his body." Tr. at 8:17-22 (Roman). The Movants asserted that, in that context, Daffron's and Franco's force was "simply an attempt to free [Howard's] second hand to get him under control in handcuffs." Tr. at 8:23-25 (Roman). The Movants accordingly asserted that "it is not against the clearly established law to use knee strikes . . . under these circumstances." Tr. at 9:21-24 (Roman). The Movants contended that the Plaintiffs carry the burden to identify factually similar cases to demonstrate that his asserted rights are clearly established and argued that the Plaintiffs attempt only to distinguish the cases on which the Defendants rely in their MSJ. See Tr. at 10:1-7 (Roman). The Movants asserted that, by only distinguishing the Movants' cases,

the Plaintiffs seek to shift the burden "to the defendants to demonstrate the clearly established law." Tr. at 10:14-16 (Roman).

The Movants then turned to the Plaintiffs' request for additional discovery. See Tr. at 10:19 (Roman). The Movants argued that the affidavit which the Plaintiffs' counsel submits in support of the Plaintiffs' discovery request "largely concerned the Monell claim against the city, which is not at issue in this motion." Tr. at 10:25-11:2 (Roman). The Movants argued that the Plaintiffs do not identify specifically the information they would secure through further discovery. See Tr. at 11:2-5 (Roman). Citing rule 56 of the Federal Rules of Civil Procedure, the Movants asserted that, to be entitled to further discovery, the Plaintiffs must demonstrate with specificity the facts or issues that further discovery would resolve, and that the Plaintiffs have not made such a demonstration. See Tr. at 11:9-13 (Roman). The Movants also contended that the Plaintiffs "already ha[ve] sworn testimony regarding each officer's action in the form of detailed accounts of the incident, provided in interrogatory responses from each of the individual defendants." Tr. at 11:12-16 (Roman). The Movants argued accordingly that further depositions' burden on the Defendants outweighs any utility to the Plaintiffs. See Tr. at 11:23-25 (Roman).

The Court then asked the Plaintiffs which video they believe best captures their allegations, and the Plaintiffs agreed with the Defendants that the Jones Lapel Video provides the clearest depiction of Franco's use of force. See Tr. at 14:9-12 (Roman). The Court asked the Plaintiffs whether the lapel videos depict how many strikes Franco deployed, and the Plaintiffs responded that the video evidence shows one strike clearly, but asserted that Franco's "initial reports" listed three strikes. Tr. at 15:18-16:2 (Court, Oliveros). The Plaintiffs contended, however, that Franco said in his deposition that the lapel videos do not capture all of Daffron's strikes, and so "it stands

to reason . . . that the different officers' videos would not necessarily capture everything that is important in this case." Tr. at 16:15-18 (Oliveros). When asked whether they had a theory as to which of the officers' strikes hit Howard's head, the Plaintiffs responded that they did not have a theory and said that further depositions would inform such a theory. <u>See</u> Tr. at 16:23-17:8 (Court, Oliveros). The Plaintiffs opined, however, that the lapel videos capture Franco striking Howard's head. <u>See</u> Tr. at 17:12-16 (Oliveros).

The Court asked the Plaintiffs "how [they] would describe what [Franco] did as excessive force." Tr. at 18:7-10 (Court). The Plaintiffs responded that, although the officers suspected that Howard committed a felony, Howard was not a threat to the officers. <u>See</u> Tr. at 18:12-15 (Oliveros). The Plaintiffs noted that, when officers arrested Howard, "there were no folks around and there wasn't any traffic around," and "this wasn't a high-speed chase," minimizing any threat Howard might pose to the public. Tr. at 18:21-23 (Oliveros). The Plaintiffs also contend that the Franco Lapel Video shows that Howard exited the vehicle "with his hands up and there is nothing in his hands." Tr. at 18:25-19:2 (Oliveros). Howard "is never seen with a firearm" and "never threatens the officers." Tr. at 19:7-9 (Oliveros). The Plaintiffs assert accordingly that Howard did not pose a threat to the officers, and so the only permissible force was that reasonably necessary "to subdue" Howard. Tr. at 19:15-18 (Oliveros). "So we are focused on the head strikes," the Plaintiffs said, "because that is deadly force," which, under the circumstances, was excessive. Tr. at 18:21 (Oliveros). The Court asked whether the Plaintiffs' analysis would change if, instead of striking Howard's head, the officers struck his shoulder. <u>See</u> Tr. at 19:22-20:1 (Court). The Plaintiffs responded that, given the shoulder's "close proximity to the head" and the risk of misplacing a strike, "that would be excessive force." Tr. at 20:6-10 (Oliveros). The Plaintiffs

further asserted that Howard "was not resisting," to which the Court responded: "He was resisting as soon as he got out of the car and started running, and he never quit resisting."  Tr. at 20:16-22 ((Oliveros, Court).  The Plaintiffs agreed that, when Howard fled, "that was a sign of resistance," but argued that Howard stopped resisting before the officers "subdued him on the ground."  Tr. at 20:23-21:1 (Oliveros).  The Plaintiffs asserted that, although the officers commanded Howard to yield both hands, he was unable to do so, because one hand was pinned underneath him as officers held him down, and so he was not resisting.  See Tr. at 21:10-13 (Oliveros).  The Plaintiffs conceded, however, that the officers "had a right to arrest" Howard.  Tr. at 21:21-22 (Oliveros).

Turning to the Plaintiffs' claims against Chafin and Molina, the Court asked for the Plaintiffs' "theory as to what they should have done with Franco."  Tr. at 22:13-17 (Court).  The Plaintiffs acknowledged that events unfolded quickly, but noted that "there were several officers there, . . . all within hand's length of one another," and so the Movants "could easily have deflected the knee strike."  Tr. at 22:5-15 (Oliveros).  The Plaintiffs also contended that, "based on the case law[,] they understood they had a duty to intervene."  Tr. at 22:15-17 (Oliveros).  The Court indicated its skepticism and noted that "it's kind of difficult to deflect a knee strike if you don't know it's coming," and the officers had no warning that Franco might strike Howard's head.  Tr. at 23:18-22 (Court).  The Court asked how much time elapsed "from the first knee strike to the last knee strike," and the Plaintiffs responded that they needed more discovery to be certain, but said that "we are talking about less than a minute and even most likely less than 30 seconds."  Tr. at 24:8-18 (Court, Oliveros).  The Plaintiffs later acknowledged that "it would have been seconds, rather than minutes."  Tr. at 24:21-23 (Oliveros).  The Plaintiffs also distinguished this case from those that the Movants cite, because, in those cases, the video evidence "blatantly" contradicts the

plaintiffs' claims, whereas in this case, "the video evidence regarding the head strike at least by Officer Franco is obvious." Tr. at 25:7-11 (Oliveros). The Plaintiffs later asserted that Cordova v. Aragon and Tennessee v. Garner are the two most factually apposite cases supporting the Movants' duty to intervene. See Tr. at 28:1 (Oliveros). The Plaintiffs also pointed to Lusby v. T.G. & Y. Stores, Inc. and Mick v. Brewer as clearly establishing that duty. See Tr. at 28:3-5 (Oliveros).

Turning to their claims against Daffron, the Plaintiffs said that they "don't have a good video as to Officer Daffron's knee strikes, because . . . they were [not] necessarily captured on [] video . . . [a]nd so in that case we're relying on the testimony of the officers." Tr. at 25:17-22 (Oliveros). The Plaintiffs averred that Daffron's statements and reporting from the incident are inconsistent regarding where he struck Howard. See Tr. at 26:10-13 (Oliveros). The Plaintiffs asserted that, "because of the inconsistencies in Officer Daffron's testimony . . . the Court can infer that he actually struck Mr. Howard in the head on the right side, which is also corroborated by Mr. Howard's injuries." Tr. at 26:15-22 (Oliveros). The Plaintiffs acknowledged that the lapel videos do not depict clearly that Daffron struck Howard's head, but asserted that this lack of clarity justifies permitting the Plaintiffs to depose Daffron. See Tr. at 26:23-25 (Oliveros).

The Court turned its attention to the Plaintiffs' discovery request. See Tr. at 28:11 (Court). The Court indicated that it has had many cases before it in which the plaintiffs, facing motions for summary judgment on qualified immunity, have "a whole lot less" evidence than the Plaintiffs have. Tr. at 28:12-12 (Court). The Court opined that the "Defendants have been fairly generous so far," and that the Plaintiffs are perhaps "beginning to fish a little bit hoping something would turn up." Tr. at 28:19-23 (Court). The Plaintiffs disagreed that they have abundant evidence, but

the Court countered that the parties have presented "a pretty robust record as far as these cases go." Tr. at 29:10-15 (Court). See id. at 29:4-5. The Plaintiffs argued that more discovery is necessary, because the Franco Depo. yielded "a lot more information than was put in his report and than was gleaned from the interviews." Tr. at 29:11-14 (Oliveros). The Plaintiffs expressed skepticism that the officers' reports are reliable and noted that the lapel videos "are not covering everything." Tr. at 30:5-14 (Oliveros). The Plaintiffs accordingly requested limited discovery to depose the other officers to develop a more accurate record. See Tr. at 30:24-31:1 (Oliveros).

Franco responded that, in his deposition, he said that he "delivered only one knee strike and it was to the left shoulder." Tr. at 31:14-15 (Martinez). Franco acknowledged that he indicated in his reports that he delivered three strikes to Howard's torso, but said that "was his initial recollection," but, "upon watching the video, he could see that he only delivered one knee strike." Tr. at 31:18-21 (Martinez). Franco also contended that "the physical evidence" corroborates his testimony that he struck Howard once in his shoulder, because the post-incident photographs of Howard do not show any injuries on the left side of his head, which is where Franco would have struck Howard had he hit Howard's head. Tr. at 32:6-10 (Martinez). The Court later asked Franco how Howard injured his face if none of the officers struck him there, see Tr. at 37:1-2 (Court), and Franco speculated that "those are contusion from just being face down on the pavement and resisting," Tr. at 37:3-5 (Martinez). Franco also asserted that Howard "did not request any medical attention," so "there is not physical evidence to corroborate the allegation that Officer Franco gave him a knee strike to the head." Tr. at 32:22-25 (Martinez).

At that point, the Court asked the Plaintiffs whether their allegation, in the Response, that the Movants refused medical care to Howard is part of their excessive force claim, or whether the

allegation is "just an interesting fact." Tr. at 33:8-11 (Court). The Plaintiffs responded that, although the Plaintiffs do not "expressly state a claim that [Howard] didn't get medical care," the allegation "corroborates . . . that Mr. Howard was injured." Tr. at 33:12-16 (Oliveros). The Plaintiffs also assert that the Howard Aff. contradicts the officers' assertion that Howard refused medical care, and that this shows that the officers "were not forthright with the information regarding the use of force that was administered to Mr. Howard." Tr. at 33:23-34:4 (Oliveros).

Responding to the Plaintiffs' arguments, the Movants asserted that it is irrelevant, for the MSJ's purposes, how many times Franco struck Howard, because "it is very clear that this entire incident took place in three to four seconds." Tr. at 38:19-23 (Roman). The Movants also disagreed with the Plaintiffs' contention that Howard did not threaten the officers, and argued instead that the officers reasonably feared for their safety when they could not see or secure one of Howard's hands. See Tr. at 39:3-8 (Roman). The Movants asserted that the officers reasonably feared that Howard was reaching for his waistband and that they "are simply not required to assume that he has nothing that could harm them on his person that could be accessed through having his hand under his body." Tr. at 39:11-16 (Roman). The Movants analogized to Serrano v. United States to argue that, when police secure one of a suspect's hands but not the other, the police do not have control over the suspect and are justified in taking measures to ensure safety. See Tr. at 39:21-25 (Roman). The Movants also agreed with Franco that Howard injured himself by resisting facedown on the pavement and that the officers' strikes did not injure him. See Tr. at 41:20-24 (Roman). The Movants argued that "[t]his man was running head long into a mattress, came down hard on the pavement, and you're going to have some strawberry burns and things like that, just from asphalt contact." Tr. at 42:1-4 (Roman).

Finally, the Movants asked that the Court deny the Plaintiffs' discovery request. See Tr. at 41:1-2 (Roman). The Movants disagreed with the Plaintiffs' assertion that inconsistency in the Movants' reporting justifies deposing them, because the Movants have provided interrogatory responses that "are completely consistent with the report[s]." Tr. at 41:2-10 (Roman). Replying, the Plaintiffs asserted that Daffron's reports are inconsistent regarding the number of strikes he used and where his strikes landed, but could not cite those inconsistencies specifically, and said that they "might need to supplement." Tr. at 44:3-4 (Oliveros). See id. at 43:16-44:3 (Oliveros). The Plaintiffs averred that it is necessary to depose Chafin, Daffron, and Molina, because, "when pressed, officers sometimes do change their stories," and "it's possible that when pressed, Officers Chafin and Molina might also have more to add." Tr. at 44:8-19 (Oliveros).

The Court then indicated that it was inclined to deny the Plaintiffs' request for more discovery, because the Plaintiffs have a relatively robust record. See Tr. at 47:1-4 (Court). The Court said that its opinion could change if, as it writes the undisputed facts, it identifies something necessary to resolve the issues. See Tr. at 47:7-10 (Court). The Court noted that the parties have presented factual disputes, but told the parties that it would not identify materiality until it writes this opinion. See Tr. at 47:21-25. The Court indicated, however, that it is inclined to grant the MSJ, at least in part, because the law on which the Plaintiffs rely is not clearly established. See Tr. at 48:6-10 (Court).

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the

initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)).  See Celotex Corp., 477 U.S. at 323.

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323-25.  On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." *Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added).  "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[41]  Once the movant meets this burden, rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Liberty Lobby., 477 U.S. at 256.  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M.

---

[41]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law.  See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727, at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims. See 184 F. Supp. 3d at 1075-78. The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided. See 184 F. Supp. 3d at 1067, 1073, 1075, 1079. Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial." 184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1). Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment. See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d 1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the

movant notes a lack of evidence for an essential element of the claim).  See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."  (internal quotation marks omitted)).  Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings."  Liberty Lobby, 477 U.S. at 259.  See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."  (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008

WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); <u>Argo v. Blue</u> <u>Cross & Blue Shield of Kan., Inc.</u>, 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)). "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'" <u>Colony Nat'l Ins. v. Omer</u>, 2008 WL 2309005, at *1 (quoting <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." <u>Liberty Lobby</u>, 477 U.S. at 250. A mere "scintilla" of evidence will not avoid summary judgment. <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539 (citing <u>Liberty Lobby</u>, 477 U.S. at 248). Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 251 (quoting <u>Schuylkill & Dauphin Improvement Co. v.</u> <u>Munson</u>, 81 U.S. (14 Wall.) 442, 448 (1871)("<u>Schuylkill</u>")); <u>Vitkus v. Beatrice Co.</u>, 11 F.3d at 1539. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." <u>Liberty Lobby</u>, 477 U.S. at 249 (citations omitted). Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v.</u> <u>Zenith Radio Corp.</u>, 475 U.S. at 587 (quoting <u>First Nat'l Bank of Ariz. v. Cities Service Co.</u>, 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles. First, the court's role is not to weigh the evidence, but to assess the threshold issue

whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment, such that, when ruling on a summary judgment motion, the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999); Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . .  When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable

jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

        That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon

v. Aramark Corp., 728 F. Supp. 2d at 1249.

## LAW REGARDING RULE 56(d)

Rule 56(d) of the Federal Rules of Civil Procedure states:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

    (1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(3) issue any other appropriate order.

Fed. R. Civ. P. 56(d). The Tenth Circuit reviews a district court's denial of a rule 56(d) motion for abuse of discretion. See Comm. for First Amendment v. Campbell, 962 F.2d 1517, 1522 (10th Cir. 1992). "A prerequisite to granting relief . . . is an affidavit furnished by the nonmovant." Comm. for First Amendment v. Campbell, 962 F.2d at 1522 (citing Pasternak v. Lear Petroleum Exploration, Inc., 790 F.2d 828, 832 (10th Cir. 1986)). "Unless dilatory or lacking in merit," a party's rule 56(d) application "should be liberally treated." Jensen v. Redevelopment Agency of Sandy City, 998 F.2d at 1553-54 (internal quotation marks omitted). "The general principle of Rule 56(f) is that summary judgment should be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition." Price v. W. Res., Inc., 232 F.3d 779, 783 (10th Cir. 2000)(internal quotation marks omitted). "Rule 56(f) does not require, however, that summary judgment not be entered until discovery is complete." Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., Nos. 02-1146, 03-1185, 2007 WL 2461629, at *3 (D.N.M. June 5, 2007)(Browning, J.)(citing Price v. W. Res., Inc., 232 F.3d at 784).

To invoke the shelter that rule 56(d) provides, a party must: (i) file an affidavit, see Pasternak v. Lear Petroleum Exploration Inc., 790 F.2d at 832-33; (ii) identify the probable facts not available, their relevance, and what steps have been taken to obtain those facts, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; (iii) explain why facts precluding summary judgment cannot be presented, see Comm. for the First Amendment v. Campbell, 962 F.2d at 1522; and (iv) state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment, see Comm. for the First Amendment v. Campbell, 962

F.2d at 1522. "Rule 56([d]) may not be invoked based solely upon the assertion that discovery is incomplete or that the specific facts necessary to oppose summary judgment are unavailable." Schaefer v. Antill, No. 06-0460, 2007 WL 709046, at *9 (D.N.M. Jan. 31, 2007)(Browning, J.). "Rule 56 ( [d] ) is not a license for a fishing expedition." Lewis v. City of Ft. Collins, 903 F.2d 752, 759 (10th Cir. 1990).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)). Under § 1983, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights. To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635 (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. at 205. When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

### 1.     Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan, 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an

essentially academic exercise." 555 U.S. at 237. The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable." 555 U.S. at 241 (alterations omitted). See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[42] the clearly established prong of the qualified immunity analysis: when (i) the first, constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad

---

[42]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707. In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances. See Kerns v. Bader, 663 F.3d at 1180-81. The Supreme Court, however, has not stressed the seven circumstances as mandatory. Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim." District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018). This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when " 'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'" Kerns v. Bader, 663 F.3d at 1180-81 (quoting Pearson v. Callahan, 555 U.S. at 236-42). Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context. Camreta v. Greene, 563 U.S. at 706-07. See Kerns v. Bader, 663 F.3d at 1181.[43] "Courts

---

[43]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer. 663 F.3d at 1183. In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question. And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84. See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)(unpublished)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established." (citing Kerns v. Bader, 663 F.3d at 1180)). The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.

The Tenth Circuit does not always undertake the qualified immunity analysis before the constitutional violation analysis.  See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir. 2019)(unpublished); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir. 2019)(unpublished); Serrano v. United States, 766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances,  Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S. [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565.  In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not establish a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims."  Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention. On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:
>
> > Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment."  The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
> > [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the

Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. <u>See</u> E. Clarke, <u>Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975). In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test. <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights."). It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it

should think carefully before expending 'scarce judicial resources' to resolve difficult and novel

questions of constitutional or statutory interpretation that will 'have no effect on the outcome of

the case.'" Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S.

at 236-37).[44]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and

---

held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  See 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized by Ysasi v. Brown, 3 F. Supp. 3d 1088, 1130-31 n.24 (D.N.M. 2014)(Browning, J.).  See Richard E. Myers, Fourth Amendment Small Claims Court, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since Kerns v. Board of Commissioners, the Court has also observed:

> The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

> A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

[44]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but

then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand

a case to the district court for further consideration when the district court has given only cursory

treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182;

Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

### 2.       Clearly Established Rights.

To determine whether a right was clearly established, a court must consider whether the

right was sufficiently clear that a reasonable government employee would understand that what he

or she did violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327

(10th Cir. 2007).   "A clearly established right is generally defined as a right so thoroughly

developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and

'unquestioned.'"    Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir.

2011)(unpublished)[45](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

---

it does not work well in practice.  The clearly established prong is a comparison between the case
before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare
before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

[45]Lobozzo v. Colo. Dep't of Correction, is an unpublished opinion, but the Court can rely
on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.
See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited
for their persuasive value").  The Tenth Circuit has stated: "In this circuit, unpublished orders are
not binding precedent, ... and ... citation to unpublished opinions is not favored.... However, if an
unpublished opinion ... has persuasive value with respect to a material issue in a case and would
assist the court in its disposition, we allow a citation to that decision." United States v. Austin. 426
F.3d 1266, 1274 (10th Cir.2005). The Court finds that Serrano v. United States, 776 F. App'x 561,
569 (10th Cir. 2019)(unpublished); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir.
2019)(unpublished) Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir. 2019)(unpublished);
Choate v. Huff, 773 F. App'x 484, 487-88, at *2 (10th Cir. 2019)(unpublished); Perry v.
Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88
(10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x
552, 555-56 (10th Cir. 2017)(unpublished);  Youbyoung Park v. Gaitan, 680 F. App'x 724, 739-
40 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923. "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 563 U.S. at 741. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741). "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" Mullenix v. Luna, 136 S. Ct. at 308 (quoting Malley v. Briggs, 475 U.S. at 341).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified." Anderson v. Creighton, 483 U.S.

Cir. 2017)(unpublished); Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)(unpublished) Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013)(unpublished); Yadon v. Hilton, 516 F. App'x 694, 695 (10th Cir. 2013)(unpublished); Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished); Wallin v. Dycus, 381 F. App'x 819, 823-24 (10th Cir. 2010)(unpublished); and Hall v. Burke, 12 F. App'x 856, 861 (10th Cir. 2001)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

at 639. The Supreme Court has stated: "[T]he clearly established right must be defined with specificity." City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019). "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742. "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. 548, 552 (2017)(quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances"). See Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'" (quoting Mullenix v. Luna, 136 S. Ct. at 308)); District of Columbia v. Wesby, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances." A.N. by & through Ponder v. Syling, 928 F.3d 1191, 1198 (10th Cir. 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness'

of their conduct is 'apparent' from the pre-existing law." A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (quoting White v. Pauly, 137 S. Ct. at 552).  According to the Tenth Circuit, "In other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.'  And this is so 'even though the very action in question has not previously been held unlawful.'" A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (first quoting Halley v. Huckaby, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting Hope v. Pelzer, 536 U.S. 730 (2002)).  The Tenth Circuit has cautioned that such an approach is inappropriate where a case involves "relevant ambiguities." Colbruno v. Kessler, 928 F.3d 1155, 1165 (10th Cir. 2019)(citing Aldaba v. Pickens, 844 F.3d 870, 879 (10th Cir. 2016)("Aldaba II"); Wilson v. City of Lafayette, 510 F. App'x 775, 778 (10th Cir. 2013)(unpublished); Thomson v. Salt Lake Cty., 584 F.3d at 1315-17).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, see Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("We have therefore adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba v. Pickens, 844 F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777 F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . .  by relying on excessive-force cases markedly different from this one.  Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off our clearly-established-law discussion, we did not just repeat its general rule and conclude that the officers' conduct had violated it.  Instead, we turned to our circuit's sliding-scale approach measuring degrees of egregiousness in affirming the denial of qualified immunity.  We also relied on several cases resolving

excessive-force claims. But none of those cases remotely involved a situation as
here.

Aldaba II, 844 F.3d at 876. The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case. See Aldaba II, 844 F.3d at 874 n.1. See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017). The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances." *Id.* at 741
> . . . . This calls to mind our sliding-scale approach measuring the egregiousness of
> conduct. *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012). But the
> Supreme Court has vacated our opinion here and remanded for us to reconsider our
> opinion in view of *Mullenix*, which reversed the [United States Court of Appeals
> for the] Fifth Circuit after finding that the cases it relied on were "simply too
> factually distinct to speak clearly to the specific circumstances here." 136 S. Ct.
> at 312. We also note that the majority opinion in *Mullenix* does not cite *Hope v.
> Pelzer* . . . . As can happen over time, the Supreme Court might be emphasizing
> different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1. Since Aldaba II, the Supreme Court has reversed, per curiam,

another Tenth Circuit qualified immunity decision. See White v. Pauly, 137 S. Ct. at 551. In

White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly

established' analysis: It failed to identify a case where an officer acting under similar

circumstances as Officer White was held to have violated the Fourth Amendment." White v.

Pauly, 137 S. Ct. at 552.[46] The Supreme Court's per curiam reversals appear to have the Tenth

---

[46]The Supreme Court signals to the lower courts that a factually identical or a highly similar
factual case is required for the law to be clearly established, and the Tenth Circuit is now sending
those signals to the district courts. See Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707
F. App'x 552, 556 (10th Cir. Sept. 8, 2017)(unpublished)(reversing the Court's judgment that the
case should proceed where a deceased plaintiff was backing away from the police and was not

raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies"). Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's view of the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong. See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

　　The Court disagrees with the Supreme Court's approach. The most conservative, principled decision is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88, at *2 (10th Cir. 2019)(unpublished); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibited

_____

Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Federal Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colorado Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

treating the juvenile differently than similarly situated juveniles); <u>Matthews v. Bergdorf</u>, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); <u>McCoy v. Meyers</u>, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." <u>Graham v. Connor</u>, 490 U.S. at 394. The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard. <u>See</u> <u>Graham v. Connor</u>, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ."). The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." <u>Graham v. Connor</u>, 490 U.S. at 397. Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." <u>Saucier v. Katz</u>, 533 U.S. at 205. When an officer moves for qualified immunity on an excessive-

force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

## 1.  **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case."  Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

## 2.  **Least- or Less-forceful Alternatives in Excessive-Force Cases**.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under <u>Graham v. Connor</u>. The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives. <u>Graham v. Connor</u>, 490 U.S. at 397.

In <u>Michigan Department of State Police v. Sitz</u>, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that <u>Brown v. Texas</u>, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But for purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with government officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers.

496 U.S. at 453-54. <u>See</u> <u>Illinois v. Lafayette</u>, 462 U.S. 640, 647 (1983)("[T]he reasonableness of any particular government activity does not necessarily turn on the existence of alternative 'less intrusive' means."). To avoid unrealistic second guessing, the Fourth Amendment does not require that an officer use the least-intrusive alternative available to protect himself or others so long as the method chosen is reasonable.

In <u>United States v. Sokolow</u>, 490 U.S. 1 (1989), the Supreme Court examined the <u>Terry</u>[47] stop of a suspected drug courier in an airport. The Supreme Court rejected Sokolow's contention

---

[47]<u>Terry v. Ohio</u>, 392 U.S. 1 (1968).

that the arresting officers were "obligated to use the least intrusive means available to dispel their suspicions that he was smuggling narcotics." 490 U.S. at 11. Instead, the Supreme Court held: "The reasonableness of the officer's decision to stop a suspect does not turn on the availability of less intrusive investigatory techniques. Such a rule would unduly hamper the police's ability to make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing." United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted). Similarly, in United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of police might have been accomplished. But "[t]he fact that the protection of the public might, in the abstract, have been accomplished by less intrusive means does not, by itself, render the search unreasonable."

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards" and rejected the plaintiff's argument that district the testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force." 399 F.3d at 1222. In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994). Similarly, "violations of state law and police procedure generally do not give rise to a [42 U.S.C. §] 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force). Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a

reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [(10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052

Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cty. Comm'rs of Cty. Lake, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive

alternative would require them to exercise superhuman judgment . . . . Officers thus need not avail themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under *Garner v. Tennessee* [sic] and *Graham v. Connor*.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); Jiron v. City of Lakewood, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable). See also Roy v. Inhabitants Lewiston, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); Diaz v. Salazar, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.). Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means." Illinois v. Lafayette, 462 U.S. 640, 647-48, (1983). The Court has also rejected the consideration of a less intrusive alternative to end a threat.

See Chamberlin v. City of Albuquerque, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## ANALYSIS

The Court grants the MSJ. First, the Court concludes that the undisputed facts do not establish a genuine question whether Daffron violated Howard's Fourth Amendment rights as the Plaintiffs assert in Count I. Second, the Court concludes that, because Daffron did not violate Howard's clearly established Fourth Amendment rights, Chafin and Molina did not violate Howard's Fourth Amendment rights by failing to intervene to protect Howard, because failure-to-intervene claims require an underlying constitutional violation. Third, the Court concludes that, even assuming that Daffron used objectively unreasonable force in violation of Howard's Fourth Amendment rights, Chafin and Molina did not violate Howard's Fourth Amendment rights by failing to intervene, because they had no reaslistic opportunity to do so. Fourth, the Court concludes that, assuming Franco used objectively unreasonable force in violation of Howard's Fourth Amendment rights, Daffron, Chafin, and Molina did not violate Howard's Fourth Amendment rights by failing to intervene, because they had no realistic opportunity to do so. Finally, the Court concludes that the Plaintiffs are not entitled to additional discovery, because the requested discovery is not necessary to defend against the MSJ. Accordingly, the Court grants summary judgment in the Movants' favors as to Counts I and II.

## I.    DAFFRON IS ENTITLED TO QUALIFIED IMMUNITY ON HOWARD'S EXCESSIVE FORCE CLAIM.

The Court concludes that Daffron did not use excessive force in kneeing Howard's shoulder. Howard was a fleeing felony suspect. When Daffron arrived, one of Howard's hands

was underneath his body and not visible to Daffron. Officers commanded Howard to show his hands, yet one remained out of sight near his waistband. Daffron administered three knee strikes to Howard's shoulder. Although knee strikes are "capable of injuring an arrestee," see Martin v. City of Albuquerque, 147 F. Supp. 3d 1298, 1331 (D.N.M. 2015)(Browning, J.)(quoting Myser v. Spokane Cty., 2008 WL 4833294, at *8 (E.D.Wash. Nov. 3, 2008)(Van Sickle, J.)), they do not amount to deadly force. An officer in Daffron's position could reasonably conclude that Howard's hidden hand posed a threat to himself and to other officers, justifying the use of kee strikes to Howard's shoulder. Accordingly, under the Graham v. Connor factors, Daffron did not use excessive force. Further, even if Daffron used excessive force in striking Howard's shoulder, Howard has not demonstrated that Daffron's strikes violated Howard's clearly established Fourth Amendment rights.

### A. DAFFRON DID NOT USE EXCESSIVE FORCE IN KNEEING HOWARD'S SHOULDER.

In the MSJ, the Movants asks the Court to grant summary judgment in Daffron's favor on the Plaintiffs' excessive force claims. See MSJ at 11. The Movants assert that Daffron did not violate Howard's Fourth Amendment rights, because Daffron used objectively reasonable force "given that Howard was a non-compliant, felony suspect." MSJ at 11. The Movants assert that Daffron "delivered three (3) knee strikes to Howard's shoulder while officers ordered Howard to give them his hands." MSJ ¶ 23, at 7 (citing Franco Depo. at 46:22-47:9; Daffron Lapel Video at 4:40-4:50; Jones Lapel Video at 2:22-2:26). Although the Plaintiffs do not propose as fact, in their Response's proposed fact section, that Daffron struck Howard's shoulder, see Response ¶ 15, at 9, the Plaintiffs assert in their argument section that Daffron "is seen on video administering strikes to Mr. Howard's head," Response ¶ 15, at 9 (directing the Court to another portion of the Response,

in which the Plaintiffs assert that "Officer Daffron struck Mr. Howard three times with his knee," and noting that Franco "observed that Officer Daffron's strikes were made to Mr. Howard's shoulder, not his torso"). The Court, supra, adopts as an undisputed fact that Daffron used his knee to strike Howard's shoulder three times. See supra n.28 and accompanying text, at 14-15. The Court accordingly analyzes whether Daffron violated Howard's Fourth Amendment rights when he delivered three knee strikes to Howard's shoulder.

The Tenth Circuit has made clear that, although officers may use force to apprehend a suspect, the level of force they use must be necessary to accomplish their objectives. See Buck v. City of Albuquerque, 549 F.3d 1269, 1289-90 (10th Cir. 2008). The Tenth Circuit has concluded that the Fourth Amendment "does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor." James v. Chavez, 830 F. Supp. 2d 1208, 1273 (D.N.M. 2011)(Browning, J.). See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001). Accordingly, officers may use more force to apprehend a fleeing felon than they may use to arrest a submissive misdemeanant. See Casey v. City of Fed. Heights, 509 F.3d at 1282. Courts consider knee strikes a significant use of force. See Martin v. City of Albuquerque, 147 F. Supp. 3d at 1331 ("[K]nee strikes to other parts of a suspect's body are inherently dangerous, are intended to inflict severe pain, and are 'capable of injuring an arrestee.'" (quoting Myser v. Spokane Cty., 2008 WL 4833294, at 8)); Lopez v. City of Imperial, 2015 U.S. Dist. LEXIS 87441, 2015 WL 4077635, at *7 (S.D. Cal. July 2, 2015); Aranda v. City of McMinnville, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013). "If a particular use of force is considered deadly force, then an officer's use of that force is reasonable only 'if a reasonable officer in Defendants' position would have had probable cause to believe that there was

a threat of serious physical harm to themselves or to others.'" Thomson v. Salt Lake Cty., 584 F.3d at 1313 (emphasis omitted)(quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260).

The Tenth Circuit uses a nonexclusive list of factors to ascertain "the degree of threat the suspect poses to the officers," which includes "'(1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.'" Thomson v. Salt Lake Cty., 584 F.3d at 1313 (quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d at 1260). "In determining the objective reasonableness of an officer's conduct[, the Tenth Circuit] look[s] to the totality of the circumstances, viewing the situation 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Zia Trust Co. ex rel. Causey v. Montoya, 597 F.3d at 1154 (quoting Graham v. Connor, 490 U.S. at 396).

An officer in Daffron's position could reasonably conclude that force was necessary to effect the arrest, and to protect himself and the other officers. In Myser v. Spokane Cty., officers justifiably tackled and administered knee strikes to the torso of a man they suspected of a misdemeanor offense and who was not responding to the officers' commands. See 2008 WL 4833294, at *8. The Honorable Fred Van Sickle, Senior United States District Judge for the United States District Court for the Eastern District of Washington, noted that officers are not required to wait for a suspect to throw a punch or draw a weapon when officers reasonably believe a suspect might present a threat. See Myser v. Spokane Cty., 2008 WL 4833294, at *8. Here, officers suspected Howard of committing a felony as they pursued the bait vehicle that he was driving.

See N.M. Stat. Ann § 30-16D-1; supra n.11 and accompanying text, at 6. When the bait vehicle stopped, Howard remained in the vehicle for two minutes while officers shouted for him to exit with his hands raised. See supra n.14 and accompanying text, at 7. Howard eventually exited the car and ran. See supra n.16 and accompanying text, at 8. Eventually Howard stopped fleeing and sat, but when Daffron reached Howard, Howard was on the ground with his hand out of sight under his body, while officers shouted commands that he yield both of his hands. See supra nn.26-27 and accompanying text, at 12-14. Although officers discovered ultimately that Howard was unarmed, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham v. Connor, 490 U.S. at 396. Similarly, although the Plaintiffs assert that Howard decided, at some point during his sprint away from the officers, that he would submit peaceably, that information was not readily apparent to an officer in Daffron's position. Howard asserts that he was not resisting arrest, but rather that multiple officers pinned him and that he was trying only to protect himself. See Response at 14. From Daffron's position, however, a felony suspect was resisting arrest and not complying with officers' commands that he yield his hands and show that he was unarmed. Courts must evaluate an officer's conduct based on the facts and circumstances known to the officer at the time they acted. See White v. Pauly, 137 S. Ct. at 550; Saucier v. Katz, 533 U.S. at 205. The three Graham v. Connor factors thus support Daffron's use of force. See Graham v. Connor, 490 U.S. at 396. An objective officer in Daffron's position could reasonably conclude that force was necessary to effect the arrest, and to protect himself and the other officers.

## B. EVEN IF DAFFRON VIOLATED HOWARD'S CONSTITUTIONAL RIGHTS, THESE RIGHTS WERE NOT CLEARLY ESTABLISHED AT THE TIME OF HOWARD'S ARREST.

Even if the Court could, on the record before it, conclude, as a matter of law, that Daffron violated Howard's constitutional rights, the law was not clearly established such that a reasonable officer in Daffron's position would have recognized his actions' unlawfulness regarding Howard's arrest. Qualified immunity provides broad protection for government officials where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (internal quotation marks omitted)(quoting Harlow v. Fitzgerald, 457 U.S. at 818). The Supreme Court requires district courts "not to define clearly established law at a high level of generality" and requires that they focus on "whether the violative nature of particular conduct is clearly established." Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added). "A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he "contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" Ashcroft v. al-Kidd, 563 U.S. at 741 (emphasis added)(alterations in Ashcroft v. al-Kidd)(quoting Anderson v. Creighton, 483 U.S. at 640). It operates to protect officials from the law's "sometimes 'hazy border'" and shields officers with "reasonable, but mistaken beliefs." Saucier v. Katz, 533 U.S. at 205 (quoting Priester v. City of Riviera Beach, 208 F.3d at 926-27). "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d at 923.

As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference." Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in Kerns v. Bader). For example, in Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification." Kerns v. Bader, 663 F.3d at 1183.

The Plaintiffs have not directed the Court to any analogous case which could support a finding that Daffron's action in arresting Howard violated any clearly established rights. The Plaintiffs insist that Daffron struck Howard's head, rather than his shoulder, but still do not point to factually on-point cases involving head or shoulder strikes. See Response at 12. Instead, the Plaintiffs assert that "the *Graham* factors weigh in favor of the Plaintiffs," because Howard "intended to submit to arrest," and "did not actively resist or attempt to evade arrest at the time that force was used on him." Response at 13. This high level of generality contradicts the Supreme Court's holding on qualified immunity and does not elucidate a right that "every 'reasonable official would have understood.'" Ashcroft v. al-Kidd, 563 U.S. at 741 (Anderson v. Creighton, 483 U.S. at 640). The Court cannot dispense with this specificity requirement, as it serves, according to the Supreme Court and the Tenth Circuit, a central policy behind the judicially-crafted doctrine of qualified immunity. The level of generality at which the legal rule is defined is important, because the Supreme Court says that qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates "to protect officers from the sometimes 'hazy border[s]'" of the law. Saucier v. Katz, 533 U.S. at 205.

Instead of pointing to factually on-point cases, the Plaintiffs seek only to distinguish the Movants' cited cases. <u>See</u> Response at 12-15. The Plaintiffs note that several of the Movants' cited cases are unpublished Tenth Circuit cases. <u>See</u> Response at 14. It is the Plaintiffs' burden, however, to show that the law which they alleged Daffron violated is clearly established. <u>See</u> <u>Saucier v. Katz</u>, 533 U.S. at 200; <u>Holland ex rel. Overdorff v. Harrington</u>, 268 F.3d at 1185. Nonetheless, the Court, to be fair to the Plaintiffs, discusses the Plaintiffs' distinguished cases to determine whether they provide Howard a clearly established right.

The Plaintiffs first seek to distinguish <u>Youbyoung Park v. Gaitan</u>. <u>See</u> Response at 13. In that case, the Tenth Circuit considered an appeal from a district court's determination, in relevant part, that the officer's use of force -- delivering a knee strike to the plaintiff's torso -- did not violate the plaintiff's clearly established rights. <u>See</u> <u>Youbyoung Park v. Gaitan</u>, 680 F. App'x at 726. Investigating a nearby stabbing, the officer sought to view the security footage from the plaintiff's business. <u>See</u> F. App'x at 727. The plaintiff refused, so the officer later returned with a search warrant to view the footage. <u>See</u> F. App'x at 727. Immediately after the officer's arrival, the officer "forcibly escorted" the plaintiff out of his business. F. App'x at 727-28. As they approached the exit, the plaintiff "began to tense his arms, brace his legs, and attempt to pull away from the officers." F. App'x at 728. The defendant officer "forcibly took Mr. Park to the Ground by giving him a knee strike to the side of his body." F. App'x at 728 (internal quotations omitted). The district court concluded that the first two <u>Graham v. Connor</u> factors "(the severity of the crime at issue and whether Mr. Park posed a threat to Defendants' safety) favored Mr. Park, while the third heavily favored Defendants." F. App'x. at 739. The Tenth Circuit panel agreed with the district court and concluded that there was no constitutional violation. <u>See</u> F. App'x at 739. The

plaintiff "tense[d] his arms, brace[d] his legs, and tr[ied] to pull his arms away from" the officers, which amounted to "physical resistance" against arrest. F. App'x at 739. The Tenth Circuit noted that "officers may employ the amount of force necessary to complete the arrest, and -- if they believe (even mistakenly) that the arrestee will continue to fight back -- they may use 'more than in fact' necessary." F. App'x at 739-40 (quoting Saucier v. Katz, 533 U.S. at 205). "Guided by the third Graham factor, and considering the totality of the circumstances," the Tenth Circuit concluded that the officer's "use of force -- including a knee strike to Mr. Park's torso and taking him to the ground -- was proportional and reasonable given the nature of Mr. Park's forceful physical resistance." F. App'x at 740 (internal quotation marks and alterations omitted).

The Plaintiffs seek to distinguish Youbyoung Park v. Gaitan, arguing that "there is no . . . evidence that supports even an inference that Mr. Howard was fighting back." Response at 14. The Plaintiffs contend that Howard "drove at a slow rate or normal rate of speed in a stolen car," and say that, "[a]lthough he was eluding initially, he stopped, turned toward Officer Franco with his arms in plain view and open as if to surrender." Response at 14. "At no time," the Plaintiffs argue, "did Mr. Howard fight back or physically threaten the Defendants during the melee-like use of force applied against him." Response at 14. The Court disagrees with the Plaintiffs' argument. In the light most favorable to the Plaintiffs, the undisputed material facts show that Howard, who was suspected of committing a felony and had ignored tailing police sirens, sat in a dimly lit vehicle for two minutes as officers shouted commands for him to exit the vehicle and surrender. Howard then fled on foot through a dimly lit street. Daffron arrived to see officers struggling with Howard, and commanding him to yield both hands, one of which was beneath his body near his waistband. Howard did not comply. Using an objective standard, the Court can conclude that an officer in

Daffron's position could reasonably decide that Howard was resisting an arrest -- which he first tried to avoid by fleeing -- and reasonably fear that Howard's hidden hand might hold a weapon. In such a situation, Daffron was entitled to use "'more force than in fact' necessary." Youbyoung Park v. Gaitan, 680 F. App'x at 740 (quoting Saucier v. Katz, 533 U.S. at 205). The plaintiff in Youbyoung Park v. Gaitan was arrested for obstructing an officer, a misdemeanor, and the defendant officer could see he was unarmed. See 680 F. App'x at 740. Nonetheless, when he resisted arrest, officers did not violate the plaintiff's Fourth Amendment rights by delivering a knee strike to the plaintiff's torso. Here, Howard was arrested for a felony offense, and officers reasonably feared that he was hiding a weapon under his body. Daffron did not violate Howard's Fourth Amendment rights by delivering knee strikes to Howard's shoulder.

The Plaintiffs next distinguish Yadon v. Hilton. See Response at 14. In that case, officers sought to arrest the plaintiff for disorderly conduct when the "plaintiff several times yelled and flailed his arms in the vicinity of the defendants," as the plaintiff "was apparently disturbed because he thought" the defendants were acting outside their regional jurisdiction. Yadon v. Hilton, No. 11-4164-RDR, 2013 WL 160445, at *2 (D. Kan. Jan. 15, 2013)(Rogers, J.). The defendant eventually told the plaintiff he was under arrest for disorderly conduct and ordered him to place his hands behind his back. See 2013 WL 160445, at *2. Instead of complying, the plaintiff fled the officers and tried to get into his van. See 2013 WL 160445, at *2. The defendant officer "grabbed plaintiff's arm (or neck, according to plaintiff) and tried to pull him away from the van," but the plaintiff "struggled for several minutes before being handcuffed." 2013 WL 160445, at *2. To gain control of the plaintiff, one defendant pinned the plaintiff to the ground by placing his elbow underneath the plaintiff's shoulder, fracturing the plaintiff's ribs, and, although the plaintiff

continued to struggle, the plaintiff complained that he could not breathe.  See 2013 WL 160445,

at *2.  The Tenth Circuit agreed with the district court that the officers' conduct did not constitute

excessive force.  See Yadon v. Hilton, 516 F. App'x at 695.  The Tenth Circuit agreed that the first

two Graham v. Connor factors -- the crime's severity and the extent to which the suspect poses an

immediate threat to the officer's or others' safety -- weighed in the plaintiff's favor, but concluded

that the plaintiff's active resistance justified the officer's use of force.  See 516 F. App'x at 695.

Instead of complying with the officers' demand to yield, the plaintiff fled and then struggled

against the officers as they tried to arrest him.  See 516 F. App'x at 695.  "This behavior justified

the officers' use of force which unfortunately resulted in injuries to Mr. Yadon who was diagnosed

with contusions and abrasions about the face and arms, a sprained elbow, and two non-displaced

rib fractures."  516 F. App'x at 696.

      The Plaintiffs argue that, unlike in Yadon v. Hilton, "Howard was not overtly threatening

the Defendants," as he "never yelled at the Defendants or swung his arms around at the officers"

and "never pulled his arms away from the Defendants."  Response at 15.  The Court disagrees with

the Plaintiffs' proposed factual distinction.  The police defendants in Yadon v. Hilton sought to

arrest the plaintiff for disorderly conduct -- a misdemeanor -- and were justified in using force

when the plaintiff struggled against the officers.  See 2013 WL 160445, at *2.  That struggle lasted

several minutes, during which the plaintiff sustained numerous injuries.  See 2013 WL 160445, at

*2.  Here, police suspected Howard of a felony and did not know whether he was armed.  Unlike

the Plaintiffs' characterization, Howard resisted arrest the moment he fled the bait vehicle and

continued resisting until officers secured both of his hands.  Although the Plaintiffs assert that

Howard eventually decided to submit, from the perspective of an objectively reasonable officer in

Daffron's position, it appeared that Howard was continuing to resist as he kept one hand underneath his body, near his waistband, despite officers commanding him to yield his hands. Although the Plaintiffs contend that Howard had decided to submit to arrest, a reasonable officer in Daffron's position would see a felony suspect still resisting arrest and hiding a hand underneath his body.  See White v. Pauly, 137 S. Ct. at 550 (instructing courts to "consider[] only the facts that were knowable to the defendant officers").  If the officers did not violate Yadon's Fourth Amendment rights in Yadon v. Hilton, Daffron did not violate Howard's here.

Last, the Plaintiffs distinguish Serrano v. United States.  See Response at 15.  In that case, the Tenth Circuit reviewed an encounter in which defendant United States Marshals, executing an arrest warrant, struck repeatedly and shot a noncompliant suspect.  See 766 F. App'x at 563-64. The defendant Marshals were aware of the plaintiff's criminal history, which included "aggravated fleeing a law enforcement officer . . . and battery on a police officer."  766 F. App'x at 563.  The defendant Marshals blocked and surrounded the plaintiff's vehicle, guns drawn.  See 766 F. App'x at 563-64.  One defendant Marshal saw the plaintiff "fumbling for something underneath the dash" before turning the steering wheel to point the vehicle at the defendant Marshal.  766 F. App'x at 64.  Fearing that the plaintiff was going to run the Marshal down, the Marshal shot the plaintiff "in the head, creasing his skull, but he remained conscious and moving."  766 F. App'x at 564.  The plaintiff's car "started moving backward, pushing [the defendant Marshal's] vehicle out of the way and crossing curbs, sidewalks, and street before coming to rest."  766 F. App'x at 564.  The Marshals then ordered the plaintiff to exit the vehicle, but the plaintiff did not comply, instead apparently searching around for something in the car.  See 766 F. App'x at 564.  Although the plaintiff later claimed he was looking for a cigarette, the defendant Marshals feared that he might

have a weapon, so they "yanked Serrano out of the truck and took him to the ground." 766 F. App'x at 564. The plaintiff fell with his hands underneath his chest, and one defendant Marshal struck the plaintiff "repeatedly on the back of the head" after the plaintiff did not comply with the defendant Marshal's demands that he put his hands behind his back. 766 F. App'x at 564. The plaintiff testified that his injuries from the gunshot wound prevented him from complying with the defendant Marshal's commands, as he had "lost control of the left side of his body." 766 F. App'x at 564. The plaintiff sued one Marshal for shooting him and another Marshal for pulling him out of his truck and hitting him in the head. 766 F. App'x at 564.

Although only the claim against the second Marshal is relevant, the Court discusses the Tenth Circuit's treatment of each claim because the Plaintiffs assert that Daffron struck Howard in the head. See Response at 14. The Tenth Circuit concluded that none of the Marshals violated the plaintiff's Fourth Amendment rights. See 766 F. App'x at 566-70. The defendant Marshal that shot the plaintiff did not violate his Fourth Amendment rights, as an objective officer in the same position would reasonably fear that the plaintiff intended to weaponize his vehicle, justifying the use of deadly force in defense. See 766 F. App'x at 567. The defendant Marshal knew of the plaintiff's history of fleeing and being violent with law enforcement, making his fear more objectively reasonable. See 766 F. App'x at 567. The Tenth Circuit also concluded that the second defendant Marshal acted reasonably in "pulling Serrano from the truck and in striking him," because the plaintiff was "not compliant with demands to put his hands behind his back." 766 F. App'x at 568. The Tenth Circuit's analysis turned on the defendant Marshal's reasonable belief that the plaintiff had something in his hands and was purposefully not complying; "there was no evidence that Aragon was, or should have been, aware that Serrano's injuries meant that he could

not control the left side of his body." 766 F. App'x at 568. The Tenth Circuit rejected the plaintiff's argument that "'[i]t is clearly established that a law enforcement officer may not use force on a compliant suspect, under the officer's control and not resisting arrest.'" 766 F. App'x at 568 (quoting Serrano v. United States, Aplt. Opening Br. at 21, 766 F. App'x 561 (10th Cir. 2019)). The Tenth Circuit concluded that the plaintiff failed to establish a genuine dispute about whether he was compliant and under control when the Marshal struck him and noted that the plaintiff acknowledged that he did not follow the defendant Marshal's "demands to present his left arm." 766 F. App'x at 568-69. Notably, the Tenth Circuit asserted that an officer's securing one of a suspect's hands does not render that "arrestee totally under an officer's control." 766 F. App'x at 569.

The Plaintiffs attempt to distinguish Serrano v. United States by arguing that, unlike in that case, "Howard's criminal history was not known to the Defendants and Mr. Howard was not known to be armed and have a history of fleeing and being combative with law enforcement." Response at 15. The Court agrees that those factors were relevant to the Tenth Circuit's analysis, but the Tenth Circuit's conclusion regarding the second defendant Marshal -- the one whose use of force is most analogous to that used in this case -- turned on the fact that the Marshal reasonably believed the plaintiff was armed and not complying with his demands to yield both of his hands for arrest. See 766 F. App'x at 567-8. The Tenth Circuit refers to the plaintiff's criminal history only when discussing whether he reasonably pulled the plaintiff out of his truck; the plaintiff's apparent resistance and the defendant Marshal's reasonable fear that the plaintiff was hiding a weapon in the hand which he withheld justified the defendant Marshal's striking the plaintiff in the head. See 766 F. App'x at 567-69. Here, although there is no evidence that the Movants were

aware of Howard's criminal history, they sought to arrest him for committing a felony and, before

Howard fled the bait vehicle, officers saw him moving about inside the vehicle.  The Plaintiffs

assert that Howard attempted to submit to his arrest and was unable to immediately yield his left

hand.  Just as one defendant Marshal feared the plaintiff in Serrano v. United States, however,

Daffron reasonably feared that Howard may have been armed and reasonably believed he was

resisting arrest.

Although the Plaintiffs do not cite to specific caselaw in the Response, the Plaintiffs

asserted at the hearing that "Cordova v. Aragon and Tennessee v. Garner are two cases that support

my position with regard to the failure to intervene, [and] the Lusby case and the Mick v. Brewer

case also support[] that the law was clearly established."  Tr. at 27:25-28:5 (Oliveros).   In

Tennessee v. Garner, the Supreme Court held that it is unconstitutional to use deadly force against

a fleeing suspect when there is no probable cause that the suspect poses a threat of serious physical

harm to the officer or to others.  See 471 U.S. at 11.  In that case, an officer responded to a "prowler

inside call," and, when he arrived at the scene, saw the suspect trying to climb a fence to evade

arrest.  471 U.S. at 3.  The officer "saw no sign of a weapon, and, though not certain," was

reasonably sure that the suspect was unarmed.  471 U.S. at 3.  The officer identified himself as

police and called for the suspect to halt.  See 471 U.S. at 3.  When the suspect continued to climb

the fence, the officer shot the suspect in the back of his head.  See 471 U.S. at 4.  The Supreme

Court concluded that deadly force was not justified, as there was no reason to believe that the

fleeing suspect posed a threat to the officer or to others.  See 471 U.S. at 11.  The Supreme Court

has asserted that Tennessee v. Garner and Graham v. Connor "do not by themselves create clearly

established law outside 'an obvious case.'"  White v. Pauly, 137 S. Ct. at 552 (quoting Brousseau

v. Haugen, 543 U.S. at 199). The Supreme Court stated in Tennessee v. Garner that "if the suspect threatens the officer with a weapon . . . , deadly force may be used if necessary to prevent escape, and if where feasible, some warning has been given." 471 U.S. at 11. The Tenth Circuit construed this statement to be "merely . . . an example, and not a limitation, on the type of circumstances that would justify an officer's belief that the suspect was threatening immediate harm." Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987). The Tenth Circuit concluded that "whether a particular seizure is reasonable is dependent on the 'totality of the circumstance,' and not simply on whether the suspect was actually armed." Ryder v. City of Topeka, 814 F.2d at 1419 n.16 (quoting Tennessee v. Garner, 471 U.S. at 9). Here, an officer in Daffron's position could reasonably conclude that Howard might have held a weapon in his hidden hand, and Daffron acted accordingly -- using significant but nondeadly force -- to subdue that threat. Tennessee v. Garner is so factually dissimilar that it cannot establish clearly Howard's asserted constitutional right.

In Cordova v. Aragon, the Tenth Circuit held that police officers may not use deadly force against a fleeing suspect merely because he or she is driving recklessly. See 569 F.3d at 1191-92. There, police officers began pursuing the suspect who was driving a stolen truck that was pulling a trailer with heavy excavation equipment in it. See 569 F.3d at 1183. During the pursuit, the suspect nearly rammed a patrol car, twice drove off the road to avoid spike strips, ran multiple red lights, refused to stop for patrol cars that had their lights and sirens activated, and drove at speeds between thirty and fifty miles per hour. See 569 F.3d at 1186. Eventually, the suspect entered a highway and began driving on the highway's wrong side. See 569 F.3d at 1186. Two officers drove ahead of the suspect in an attempt to deploy stop sticks. See 569 F.3d at 1186-87. The suspect drove the truck too close to the officers for them to deploy the stop sticks, so one officer

drew his firearm and fired at the truck, killing the suspect.  See 569 F.3d at 1187.  Of the four to

five shots the officer fired, only one hit the front of the truck -- the remaining hit the side of the

truck -- and the fatal shot hit the suspect in the back of his head.  See 569 F.3d at 1187.  The officer

argued that he shot the suspect, because he was in immediate danger, and because the truck was

about to run over him.  See 569 F.3d at 1187.

The Tenth Circuit held that the officer's conduct in shooting the suspect was unreasonable.

See Cordova v. Aragon, 569 F.3d at 1192.  The Tenth Circuit first concluded that the suspect did

not pose an imminent threat to other motorists.  See 569 F.3d at 1190.  The Tenth Circuit noted

that, even though the suspect was driving recklessly on the wrong side of a highway, the record

did not contain any facts showing that, at that time, there were any motorists in the vicinity.  See

569 F.3d at 1190.  The Tenth Circuit held that the mere possibility that the suspect's behavior

could endanger motorists who might come along was insufficient to justify killing the suspect.

See 569 F.3d at 1190 ("Mr. Cordova's behavior did, of course, create risks for other motorists who

might come along, but that risk of future harm was not enough to justify the near certainty of Mr.

Cordova's death.").  The Tenth Circuit held that "the general risks created by a motorist's fleeing

from the police are, without more, [not] enough to justify a shooting that is nearly certain to cause

that suspect's death."  569 F.3d at 1190.  The Tenth Circuit next held that the suspect did not pose

an imminent threat to the officers.  See 569 F.3d at 1191.  The Tenth Circuit focused on the fact

that several shots hit the side of the truck and that the fatal shot struck him in the back of his head

to conclude that a reasonable jury could find that the officer was not "in immediate danger when

he fired the fatal shot."  569 F.3d at 1191.   The Plaintiffs' reliance on Cordova v. Aragon is

misplaced.  In that case, the parties did not dispute that the officer was in no immediate danger.

See 569 F.3d at 1187.  Here, in contrast, the undisputed facts show that Daffron reasonably feared that Howard's hidden hand might have posed a danger to himself and the other officers.  Further, unlike in <u>Cordova v. Aragon</u>, Daffron did not use lethal force in subduing the danger that he perceived.  <u>See</u> <u>Thomson v. Salt Lake Cty.</u>, 584 F.3d 1304, 1312 (10th Cir. 2009)(stating that "deadly force is such force that 'create[s] a substantial risk of causing death or serious bodily harm." (quoting <u>Jiron v. City of Lakewood</u>, 392 F.3d 410, 415 n.2 (10th Cir. 2004)).

The Plaintiffs have not pointed to any caselaw clearly establishing Howard's asserted Fourth Amendment rights, and the cases which they seek to distinguish are similar to the present case.  While "[t]he degree of physical coercion that law enforcement officers may use is not unlimited[,] . . . the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case."  <u>Cortez v. McCauley</u>, 478 F.3d at 1125-26.  Courts must also consider, however, that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  <u>Graham v. Connor</u>, 490 U.S. at 396.  Further, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  <u>Graham v. Connor</u>, 490 U.S. at 396.  The rights that the Plaintiffs assert are not clearly established.

## II.    DAFFRON, CHAFIN, AND MOLINA ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' FAILURE-TO-INTERVENE CLAIM.

The Movants assert that they are entitled to summary judgment on the Plaintiffs' failure-to-intervene claim, because the Plaintiffs have not made out an underlying constitutional violation or, alternatively, if there is an underlying violation, because the Movants had no realistic opportunity to intervene.  <u>See</u> MSJ at 16.  The Movants direct this argument at both Daffron's and

Franco's alleged excessive force.  See MSJ at 16, 18.  The Plaintiffs allege that two of the Defendants used excessive force: Daffron and Franco.[48]  The Court accordingly conducts separate analyses for each alleged violation, discussing whether the undisputed facts support the Plaintiffs' Fourth Amendment claim against the Movants.

### A. CHAFIN AND MOLINA ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' FAILURE-TO-INTERVENE CLAIM REGARDING DAFFRON'S USE OF FORCE.

"[A] law enforcement official who fails to intervene to prevent another law enforcement official's use of excessive force may be liable under § 1983."  Mick v. Brewer, 76 F.3d 1127, 1136 (10th Cir. 1996).  The Tenth Circuit has noted that, "'for there to be a failure to intervene, it logically follows that there must exist an underlying constitutional violation[.]'"  Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015)(quoting Harper v. Albert, 400 F.3d 1052, 1064 (7th Cir. 2005)).  In considering the issue, the Tenth Circuit indicated that it was "unaware of any failure to intervene case in which this court has reversed either a grant of summary judgment or qualified immunity to a government actor without first finding at least a genuine issue of material fact as to an underlying constitutional violation."  Jones v. Norton, 809 F.3d at 576.  The Court has previously analyzed a

---

[48]In the Complaint, the Plaintiffs allege that "Daffron, Chafin, and Molina were in close proximity to the striking and did nothing to protect Mr. Howard from the violation of his constitutional rights."  Complaint ¶ 44, at 7.  The Plaintiffs further allege that "Daffron, Chafin, and Molina['s] failure to intervene violated Mr. Howard's Fourth Amendment rights."  Complaint ¶ 45, at 7.  In the Response, the Plaintiffs advance their failure-to-intervene claim against Chafin and Molina.  See Response at 16 (asserting that "Chafin and Molina are not entitled to qualified immunity," because they failed to prevent Daffron's and Franco's use of force).  The Movants reply that the Plaintiffs "concede[] they are only asserting failure-to-intervene claims against Officers Chafin and Molina."  Reply at 11.  The Court agrees that the Plaintiffs direct their argument almost exclusively towards Chafin and Molina, but the Plaintiffs also include the following sentence: "Officer Daffron was likewise in a position to intervene and stop Officer Franco from using force against Mr. Howard."  Response at 16.  The Court accordingly addresses the Plaintiffs' failure-to-intervene claim against Daffron, Chafin, and Molina.

failure-to-intervene claim by determining whether an objective officer in the defendant's position would perceive that the other officer's force was excessive.  See Tanner v. San Juan Cty. Sheriff's Office, 864 F. Supp. 2d at 1145.  In that case, the Court concluded that an officer's duty to intervene arose only when the underlying constitutional violation became apparent to an objective officer in the defendant's position.  See 864 F. Supp. 2d at 1145.  Accordingly, because the undisputed facts demonstrate that Daffron did not violate Howard's clearly established rights, Chafin and Molina cannot be liable on a failure to intervene theory for Daffron's use of force.

The Court nonetheless determines that, even if Daffron violated Howard's Fourth Amendment rights by delivering three knee strikes to his shoulder, Chafin and Molina did not violate Howard's clearly established rights by not preventing Daffron's alleged violation.  The Movants contend that Chafin and Molina did not have a realistic opportunity to intervene, and note that "Daffron delivered his strikes in rapid succession in less than four (4) seconds."  MSJ at 17.  The Plaintiffs do not dispute that Daffron's strikes came in rapid succession, but argue that Chafin and Molina were close enough to stop any violation.  See Response at 16.  The Plaintiffs assert that Chafin and Molina "also participated in the use of force on Mr. Howard to hold him down" while "Daffron . . . administered multiple knee strikes to Mr. Howard, including to his head and face."  Response at 16.  The Movants reply that "it is undisputed from the video that the entire encounter after Howard left the vehicle was less than one (1) minute and Officer Daffron used force in a four (4) second period," so Chafin and Molina had no knowledge that a constitutional violation was imminent or an opportunity to prevent it from happening.  Reply at 11.

"An officer who fails to perform a duty may be liable under § 1983 if that failure causes deprivation of protected rights."  Lusby v. T.G. & Y. Stores, Inc., 749 F.2d at 1433 (citing

McClelland v. Facteau, 610 F.2d 693 at 696 (10th Cir. 1979)), judgement vacated on other grounds by City of Lawton, Okla. v. Lusby, 474 U.S. 805 (1985). "It is 'clearly established that . . . '[a]n officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know[] . . . that excessive force is being used.'" Vondrak v. City of Las Cruces, 535 F.3d at 1210 (quoting Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994)). For liability to attach, "'there must have been a realistic opportunity to intervene to prevent the harm from occurring.'" Vondrak v. City of Las Cruces, 535 F.3d at 1210 (quoting Anderson v. Branen, 17 F.3d at 557). "'Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise.'" Mata v. City of Farmington, 791 F. Supp. 2d 1118, 1156 (D.N.M. 2011)(Browning, J.)(quoting Hall v. Burke, 12 F. App'x 856, 861 (10th Cir. 2001)(unpublished)). In Mick v. Brewer, the Tenth Circuit concluded that the district court erroneously awarded the defendant qualified immunity at the summary judgment stage, because there was a genuine issue of material fact whether the defendant "observed the interaction and failed to intervene to prevent [the other defendant] from using allegedly excessive force." 76 F.3d at 1137. In Fogarty v. Gallegos, the Tenth Circuit held that the district court was correct to deny summary judgment on the grounds that there was an issue of fact whether the officer could be liable for failing to intervene in the alleged excessive use of force when the plaintiff described the arrest as lasting between three and five minutes, and when the district court found that the officer was present for the arrest, which, together, supported a "conclusion that [the officer] had the opportunity to prevent [the plaintiff's] injuries." 523 F.3d at

1164 (citing <u>O'Neill v. Krzeminski</u>, 839 F.2d at 11; <u>Lusby v. T.G. & Y. Stores, Inc.</u>, 749 F.2d at 1433).

The opportunity to intervene must be realistic, and summary judgment is appropriate where no reasonable jury could conclude that an officer was forewarned of the violation or had the ability to stop it once in progress. <u>See</u> <u>Hall v. Burke</u>, 12 F. App'x at 861. Some courts gauge liability by determining whether the officer's inaction amounts to the underlying violation's proximate cause.

In <u>O'Neill v. Krzeminski</u>, the United States Court of Appeals for the Second Circuit stated:

> In this case, the claim that Conners became liable for use of excessive force by failing to intercede must be addressed separately with respect to the acts of Fiorillo and Krzeminski in striking O'Neill and the act of Krzeminski dragging O'Neill across the floor by his throat. Even when the evidence is viewed in the light most favorable to the plaintiff, there is insufficient evidence to permit a jury reasonably to conclude that Conners' failure to intercede was a proximate cause of the beating. The three blows were struck in such rapid succession that Conners had no realistic opportunity to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator. With respect to subsequent dragging of O'Neill across the floor, however, the case against Conners is adequate to create an issue of fact for the jury. Having seen the victim beaten, he was alerted to the need to protect O'Neill from further abuse. Though not a guarantor of O'Neill's safety in the face of brutality administered by the other officers, Conners can be found liable for deliberately choosing not to make a reasonable attempt to stop Krzeminski.

839 F.2d at 11-12. Similarly, courts also hold, as a matter of law, that no duty to intervene exists "when a government official would have to place themselves in danger to intervene." <u>Tanner v. San Juan Cty. Sheriff's Office</u>, 864 F. Supp. 2d at 1144. For instance, the United States Court of Appeals for the Fifth Circuit held that a district court should have entered summary judgment in favor of some unarmed prison guards who allegedly failed to intervene in a prisoner's beating, because "no rule of constitutional law required unarmed officials to endanger their own safety in

order to protect a prison inmate threatened with physical violence" by other inmates. <u>Longoria v.</u> <u>Texas</u>, 473 F.3d 586, 593 (5th Cir. 2006).

There is no genuine issue of material fact whether Chafin and Molina had a realistic opportunity to intervene. It is undisputed that Chafin and Molina arrived shortly after Franco brought Howard to the ground. <u>See</u> <u>supra</u> n.14 and accompanying text, at 11-12; Molina Lapel Video at 2:45-2:48. Ten seconds elapsed from when Chafin and Molina arrived to when officers had secured both of Howard's hands. <u>See</u> <u>supra</u> nn.29-30 and accompanying text, at 14-15; Molina Lapel Video at 2:46-2:56. Less than four seconds elapsed between Daffron's first strike and his third. <u>See</u> <u>supra</u> n.29 and accompanying text, at 14-15; Jones Lapel Video at 2:21-2:25. While Daffron struck Howard, Chafin and Molina were trying to secure Howard's right hand to effect the arrest and ensure that Howard was not hiding a weapon. <u>See</u> Jones Lapel Video at 2:20-2:26. Once Daffron secured both hands, Officer Chafin told the other officers "alright, alright," and indicated that the officers had neutralized the threat. Jones Lapel Video at 2:24-2:26. Daffron's rapid strikes did not leave Chafin and Molina a realistic opportunity to intervene. In the Plaintiffs' only cited case, <u>Fogarty v. Gallegos</u>, fact issues precluded summary judgment on the plaintiff's failure-to-intervene claim, but there the plaintiff "described the arrest as lasting between three and five minutes." 523 F.3d at 1164. Here, the effort to place Howard in handcuffs lasted ten seconds, and Daffron's strikes came in rapid succession in four seconds. In the light most favorable to the Plaintiffs, no reasonable jury could conclude that Chafin and Molina had a realistic opportunity to intervene.

Similarly, the Plaintiffs have not clearly established a Fourth Amendment right for nearby officers to anticipate and prevent sudden use of force while struggling against an apparently

resisting felony suspect. In the Plaintiffs' lone cited case, <u>Fogarty v. Gallegos</u>, the plaintiff was arrested for disorderly conduct during an antiwar protest. <u>See</u> 523 F.3d at 1152. The arresting officers used tear gas and a nonlethal "pepper ball device," tore the plaintiff's wrist tendons by placing the plaintiff in a "hyperflexion position" to arrest the plaintiff, and dragged him down a street, all while the plaintiff suffered an asthma attack, although there was no evidence that the plaintiff resisted arrest. 523 F.3d at 1152. After realizing that the plaintiff was suffering from an asthma attack, they stopped to let him catch his breath before continuing the arrest. <u>See</u> 523 F.3d at 1152.

> After reviewing the record, the district court found that "[n]o police officer notified [Fogarty] that he was under arrest, nor did they ask him to come along peacefully." It concluded that "[t]here is no indication, even by Defendants' version, the Plaintiff ever resisted arrest or attempted to evade arrest, which would have called for the use of a higher degree of force."

523 F.3d at 1160. The Tenth Circuit held that the district court was correct to deny summary judgment on the plaintiff's failure-to-intervene claim, because there was an issue of fact whether the officer could be liable for failing to intervene in the alleged excessive use of force when the plaintiff described the arrest as lasting between three and five minutes, and when the district court found that the officer was present for the arrest, which, together, supported a "conclusion that [the officer] had the opportunity to prevent [the plaintiff's] injuries." 523 F.3d at 1164 (citing <u>O'Neill v. Krzeminski</u>, 839 F.2d at 11 (holding that defendant had no duty to intervene when "three blows were struck in such rapid succession that had no realistic opportunity to attempt to prevent them")). The Tenth Circuit stated that, under clearly established law, if an officer is present at an arrest, "with an opportunity to prevent the excessive use of force, he would have had a duty to intervene." 523 F.3d at 1163. The district court properly withheld qualified immunity, because the defendant

"set the wheels of the alleged constitutional deprivation in motion and . . . he may have stood by and witnessed Fogarty's arrest and resultant injuries." 523 F.3d at 1163.

The Plaintiffs do not analogize to <u>Fogarty v. Gallegos</u>, but rather quote it for the proposition that "'[a]n officer who fails to intervene to prevent a fellow officer's excessive use of force may be liable under § 1983.'" Response at 16 (quoting <u>Fogarty v. Gallegos</u>, 523 F.3d at 1163). The Supreme Court has instructed "repeatedly" that district courts may not "define clearly established law at a high level of generality." <u>Ashcroft v. al-Kidd</u>, 563 U.S. at 742. Courts must conduct the clearly-established inquiry "in light of the specific context of the case, not as a broad general proposition." <u>Brosseau v. Haugen</u>, 543 U.S. 194, 198 (2004)(per curiam). The Court considers this principle particularly important to failure-to-intervene claims, which are highly fact-dependent. <u>See</u> <u>Fogarty v. Gallegos</u>, 523 F.3d at 1164 (citing <u>O'Neill v. Krzeminski</u>, 839 F.2d at 11). The Plaintiffs have not cited, and the Court has not found, any cases establishing a constitutional violation when an officer, engaged in subduing a resisting and potentially armed defendant, does not prevent the use of sudden, rapid force -- even when excessive -- to effect the arrest. The right that the Plaintiffs assert is not clearly established.

**B.      DAFFRON, CHAFIN, AND MOLINA ARE ENTITLED TO QUALIFIED IMMUNITY ON THE PLAINTIFFS' FAILURE-TO-INTERVENE CLAIM REGARDING FRANCO'S USE OF FORCE.**

The Court discusses, in the previous section, the law applicable to the Plaintiffs' failure-to-intervene claim and does not repeat it here. Unlike the Plaintiffs' claim regarding Daffron's use of force, however, the Court has noted that there are genuine factual disputes regarding Franco's

use of force.  <u>See</u> <u>supra</u> n.31 and accompanying text, at 15-16.[49]  Specifically, the parties presented contradictory testimony whether Franco delivered a knee strike to Franco's head while the other officers tried to secure both of Howard's hands, and the video evidence does not "blatantly contradict[]" either party's version.  <u>Scott v. Harris</u>, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Accordingly, the Court views Franco's use of force in the light most favorable to the Plaintiffs.  Franco reached Howard first and brought him to the ground.  The other officers arrived and straddled Howard to gain control over Howard's hands.  Franco shouted for Howard to yield his hands, but the other officers continued to struggle to gain Howard's right hand.  Franco then delivered a single knee strike to Howard's head.  These events occurred within a ten-second window, with Franco's hand strike happening before the other officers' arrival, and his knee strike coming four seconds into the incident.  The question, then, is whether, in the light most favorable to the Plaintiffs, Daffron, Chafin, and Molina had a duty, and realistic opportunity to intervene to prevent Franco's use of force.

Franco is not a party to the MSJ and does not join it.  Viewing the evidence in the light most favorable to the Plaintiffs, the Court assumes, for the MSJ's purposes, that Franco's knee strike violated Howard's Fourth Amendment rights.  Nonetheless, the undisputed material facts,

---

[49]As the Court noted in the factual background section, the Court concludes that the Franco Lapel Video shows Franco striking Howard's face immediately upon reaching Howard, before the other officers' arrival.  Although the video evidence shows this fact, neither party alleges this fact for the MSJ's purposes.  The Court infers, then, that neither party deems this fact material to the MSJ.  The Court agrees that Franco's hand strike, before the other officers' arrival, is not material to the Plaintiffs' contention that Daffron, Chafin, and Molina violated Howard's Fourth Amendment rights by failing to intervene to prevent Franco's knee strike.

in the light most favorable to the Plaintiffs, do not make out a constitutional violation for failure to intervene to prevent Franco's knee strike. The Plaintiffs argue that the Movants held Howard down, and that their close proximity to Franco gave them the opportunity to prevent Franco's knee strike. See Tr. at 23:4-5 (Oliveros). The Plaintiffs assert that the Movants "could have easily deflected the knee strike." Tr. at 23:13-14 (Oliveros).

As discussed above, to be liable under a nonfeasance theory, the defendants must have had a realistic opportunity to intervene. See Fogarty v. Gallegos, 523 F.3d at 1163. A bystander officer's nonfeasance cannot give rise to liability where the underlying constitutional violation that occurs "in a matter of seconds." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 207 n.3 (1st Cir. 1990). Such an officer's inaction is not a proximate cause of the underlying violation. See O'Neill v. Krzeminski, 839 F.2d at 12. The Plaintiffs have offered no "evidence suggesting that [the Movants] could have prevented or stopped" Franco's knee strike. Lusby v. T.G. & Y. Stores, Inc, 749 F.2d at 1433. The undisputed material facts show that Franco struck Howard once, about four seconds into a ten second incident. When Franco struck Howard, the Movants were working to secure both of Howard's hands and effect the arrest. The Plaintiffs contend that the Movants' proximity to Franco afforded them the opportunity to stop his strike before it happened. Despite their proximity, the Movants could not stop a single strike that they did not see coming. The Plaintiffs allege no facts suggesting that the Movants were warned of Franco's strike before it happened. The Movants "had no reason to expect the use of excessive force until after it had occurred." Fundiller v. City of Cooper City, 777 F.2d 1436, 1142 (11th Cir. 1985). Accordingly, the Movants' inaction did not proximately cause Franco's violation, and so the

Movants cannot be liable on a nonfeasance bystander liability theory. The Movants are entitled to summary judgment on the Complaint's Count I.

## III. THE MOVANTS ARE ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' LOSS-OF-CONSORTIUM CLAIM.

The Complaint's Count III alleges that Howard's biological children, Majesty Howard, Majestic Howard, Jr., and Karisma Strong, "have suffered and will continue to suffer emotional distress and loss of love, companionship, guidance and comfort." Complaint ¶ 60, at 10. The Movants argue that a claim for loss of consortium derives from other torts and is "not an injury in and of itself." MSJ at 21 (quoting Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, ¶ 12, 79 P.3d 836). The Movants contend that they are liable for the Plaintiffs' loss of consortium only if they are directly liable to Howard for the underlying injury. See MSJ at 21 (citing Weise v. Wash. Tru Sols., L.L.C., 2008-NMCA-121, ¶ 30, 192 P.3d 1244). The Movants assert that, because Howard is not entitled to recovery against the Movants, the Court must dismiss his children's claim for loss of consortium against the Movants. See MSJ at 21. The Plaintiffs concede that, if there is not an underlying claim, there cannot be a derivative loss of consortium claim." Response at 16.

Loss-of-consortium damages are consequential or special damages, and so "are contingent upon the injured person's entitlement to general damages." Archer v. Roadrunner Trucking, Inc., 1997-NMSC-003, ¶ 11, 930 P.2d 1155. "Where the defendant is not liable to the injured person for physical injuries there can be no derivative claim for consequential damages by the injured person's" dependents. Archer v. Roadrunner Trucking, Inc., 1997-NMSC-003, ¶ 12. Here, the Court has concluded that the undisputed facts show that Daffron, Chafin, and Molina did not violate Howard's constitutional rights. The Movants, accordingly, are not liable to Howard for his

injuries. Howard's children thus have no derivative claim against the Movants, and so the Movants are entitled to summary judgment on Count III.

## IV. THE COURT DENIES THE PLAINTIFFS' RULE 56(d) REQUEST, BECAUSE THE REQUESTED DISCOVERY IS NOT NECESSARY TO DEFEND AGAINST THE MSJ.

In the Response, the Plaintiffs argue that they need discovery to adequately defend against the MSJ. <u>See</u> Response at 1-2. Specifically, the Plaintiffs want to depose Daffron, Chafin, and Molina about their perceptions and memories of the Howard arrest, as well as Eden, Jury, and Viers about APD policies, custom, and practices. <u>See</u> Rule 56(d) Reply at 2. According to the Plaintiffs, the lapel videos are insufficient, because the Movants have been inconsistent about their reporting of the Howard arrest, and because Franco acknowledges in the Franco Depo. that the lapel videos do not always show clearly Daffron's and Howard's use of force. <u>See</u> Response at 1-2; Rule 56(d) Reply at 2-3. The Plaintiffs also seek to take rule 30(b)(6) depositions for APD regarding "[p]olicies, practices, and procedures regarding the use of force" and incident reporting when the Movants arrested Howard. Oliveros Aff. ¶ 5, at 1-2. The Court denies the rule 56(d) request. The Plaintiffs do not identify the specific probable facts that they anticipate discovering in these depositions, so the Court cannot soundly say that the requested discovery is necessary for the Plaintiffs to defend against the MSJ.

Rule 56(d) of the Federal Rules of Civil Procedure states:

(d) When Facts Are Unavailable to the Nonmovant. If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:

(1) defer considering the motion or deny it;

(2) allow time to obtain affidavits or declarations or to take discovery; or

(2)     issue any other appropriate order.

Fed. R. Civ. P. 56(d).  The Court notes the tension between rule 56(d) and qualified immunity.  Although the general principle behind rule 56(d) is that "summary judgment should be refused when the nonmoving party has not had the opportunity to discovery information that is essential to his opposition," Price v. W. Res., Inc., 232 F.3d at 783, the Supreme Court has directed that "insubstantial lawsuits 'against government officials [should] be resolved *prior to discovery and on summary judgment* if possible,'" Lewis v. City of Ft. Collins, 903 F.2d at 758 (quoting Anderson v. Creighton, 483 U.S. 635)(emphasis and alterations in Lewis v. City of Ft. Collins and not in Anderson v. Creighton).  The Court does not believe that additional discovery regarding the constitutional claims against the Movants is appropriate.  First, the Plaintiffs have not demonstrated with specificity the facts that additional discovery will yield and which are necessary to defend against the MSJ.  The Plaintiffs appear, instead, to be on a fishing expedition.  There is little difference between the discovery the Plaintiffs seek and what they would seek if the Movants had not raised a qualified immunity defense.  Second, additional discovery is unnecessary, because the Plaintiffs seek evidence unrelated to the issues that the MSJ raises.

To survive the MSJ, either partially or wholly, the Plaintiffs must prove that Daffron or Franco violated Howard's Fourth Amendment rights by using objectively unreasonable force when they arrested him.  The Plaintiffs must also prove that Howard's asserted Fourth Amendment rights are clearly established.  To survive the MSJ on the failure-to-intervene claim, the Plaintiffs must establish that both that Franco or Daffron violated Howard's clearly established rights, and that Chafin and Molina had the opportunity to intervene to prevent the violation.  Beginning with the Plaintiffs' claim that Daffron used excessive force in violation of the Fourth Amendment, the

Plaintiffs concede, in the Response, that the video evidence shows Daffron using his knee to strike Howard's shoulder three times.  See supra n.28 and accompanying text, at 13-14; Response ¶ 14, at 6 (citing Franco Depo. at 46:22-47:24)(asserting that "Officer Daffron struck Mr. Howard three times with his knee," and noting that Franco "observed that Officer Daffron's strikes were made to Mr. Howard's shoulder, not his torso").  The Plaintiffs assert, however, that the videos may not depict all of Daffron's strikes, and that additional testimony may produce evidence that Daffron struck Howard elsewhere in addition to his strikes to Howard's shoulder.  At the hearing, the Plaintiffs argued that more discovery is necessary, because "it's possible . . . that when pressed Officers Chafin and Molina might . . . have more to add" about Daffron's use of force.  Tr. at 44:17-19 (Oliveros).  This is a fishing expedition.  A party seeking rule 56(d) shelter must specify "the probable facts not available."  Gutierrez v. Cobos, 841 F.3d at 895.  The Plaintiffs do not specify probable facts, but only facts that might possibly exist.  To invoke rule 56(d), the Plaintiffs must "state with specificity how the desired time would enable the nonmoving party to meet its burden in opposing summary judgment."  Todd v. Montoya, 877 F. Supp. 2d 1048, 1083 (D.N.M. 2012)(Browning, J.)(citing Comm. for the First Amendment v. Campbell, 962 F.2d at 1522).  The Plaintiffs' assertion that additional testimony might yield evidence suggesting that Daffron: (i) struck Howard; (ii) in the head; and (iii) while not in any of the lapel videos' line of sight is too general and too speculative to meet the rule 56(d) standard, particularly in light of qualified immunity's policy goals.  See Jones v. City and Cty. of Denver, Colo., 854 F.2d 1206, 1211 (10th Cir. 1988)).

Nor will additional discovery better assist the Plaintiffs in defeating the MSJ on the Plaintiffs' failure-to-intervene claims.  To prevail on their failure-to-intervene claims, the Plaintiffs

must establish that: (i) Daffron or Franco committed an underlying violation of Howard's clearly established Fourth Amendment rights; (ii) the Movants had a duty and opportunity to intervene to protect Howard from Franco's or Daffron's violations; (iii) the Movants' failure proximately caused Howard's injuries; and (iv) the Movants' failure to intervene violated Howard's clearly established rights. See Mick v. Brewer, 76 F.3d at 1137. The Plaintiffs seek to depose APD officials to learn about their policies, practices, and procedures regarding the use of force and incident reporting. See Oliveros Aff. ¶¶ 5, 11, at 1-3. None of this evidence affects the Plaintiffs' ability to establish their failure-to-intervene claims or defend against the Movants' assertion of qualified immunity on the failure-to-intervene claims. This information is relevant to the Plaintiffs' Monell claim against the City of Albuquerque, but has no bearing on whether the Movants violated Howard's clearly established rights by failing to prevent Daffron's and Franco's alleged use of excessive force. The Plaintiffs aver that the Movants' reports present inconsistent narratives, so the Plaintiffs must "depose specific witnesses and the remaining Defendants and challenge the veracity of their statements." Response at 2. The Plaintiffs plan to use these inconsistencies to impeach the Movants on their incident reporting. At the hearing, the Plaintiffs asserted that Daffron provided "inconsistent reports of his use of force . . . and the number of strikes and the places on the body, which is important, because when pressed . . . officers sometimes do change their stories." Tr. at 44:5-9 (Oliveros). The Plaintiffs do not explain, however, how this evidence will help them defend against summary judgment given that the Court cannot decide issues of credibility on summary judgment. See Liberty Lobby, 477 U.S. at 255. Finally, the Plaintiffs identify the discovery -- the depositions -- but not the specific probable facts that the depositions may reveal nor how those facts will help the Plaintiffs defeat the MSJ. It is

possible that depositions could reveal evidence that, if disclosed in the use-of-force reports, could establish excessive force, but the Plaintiffs do not state or even hint what that evidence might be. See Lewis v. City of Ft. Collins, 903 F.2d at 758 ("Rule 56[(d)] is not a license for a fishing expedition . . . ."). Because the Plaintiffs have not demonstrated that additional discovery is necessary to defend against the MSJ, and because the undisputed material facts do not make out any constitutional violations by the Movants, summary judgment is proper as to Daffron, Chafin, and Molina.

**IT IS ORDERED** that: (i) the Plaintiffs' rule 56(d) request for additional discovery is denied; and (ii) Defendants Daffron, Chafin, and Molina's Motion for Summary Judgment on the Basis of Qualified Immunity, filed October 4, 2019 (Doc. 102), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Louren Oliveros
Robert J. Gorence
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

    *Attorneys for the Plaintiffs*

David Roman
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

    *Attorney for Defendants Ben Daffron, Joshua Chafin, and Sonny Molina*

Jonlyn M. Martinez
Law Firm of Jonlyn M. Martinez
Albuquerque, New Mexico

*Attorney for Defendant Jonathan Franco*

Stephanie Griffin, Esq.
   Deputy City Attorney
Albuquerque, New Mexico

*Attorney for Defendant City of Albuquerque*