# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

TERRICIA A. STEVENSON, as
Guardian ad Litem and Conservator
of MAJESTIC HOWARD, Individually,
and as Guardian of MAJESTIC HOWARD,
JR., and KARISMA STRONG,

       Plaintiff,

vs.                                                                                    No. CIV 17-855 JB\LF

CITY OF ALBUQUERQUE,
OFFICER JONATHAN FRANCO,
individually, OFFICER BEN DAFFRON,
individually, OFFICER JOSHUA CHAFIN,
individually, OFFICER SONNY MOLINA,
individually,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Officer Franco's Motion for Summary

Judgment Based on Qualified Immunity, filed January 15, 2020 (Doc. 122)("MSJ"). The Court

held a hearing on February 19, 2020. <u>See</u> Clerk's Minutes at 1, filed February 19, 2020 (Doc.

132). The primary issue is whether Defendant Jonathan Franco violated Majestic Howard's clearly

established rights under the Fourth Amendment to the Constitution of the United States when he

administered a knee strike to Howard's head while arresting Howard. The Court concludes that,

although Franco violated Howard's Fourth Amendment rights, the Plaintiff Terricia A. Stevenson,

as guardian ad litem and conservator of Majestic Howard, and guardian of Majestic Howard, Jr.,

and Karisma Strong ("Plaintiffs"), has not demonstrated that those rights are clearly established.

Accordingly, the Court grants the MSJ.

## FACTUAL BACKGROUND

The Court draws the factual background from the parties' undisputed material facts in: (i) the MSJ; (ii) Plaintiffs' Response in Opposition to Officer Franco's Motion for Summary Judgment Based on Qualified Immunity [Doc. 122], filed Jan. 31, 2020 (Doc. 126)("Response")[1]; and (iii) Officer Franco's Reply to Plaintiff's Response to Defendant's Motion for Summary Judgment Based on Qualified Immunity, filed February 15, 2020 (Doc. 129)("Reply").

On October 30, 2015, Howard attempted to steal a bait vehicle[2] that Defendant City of Albuquerque owns.  See MSJ ¶ 1, at 2 (asserting that, on "October 30, 2015, the Plaintiff attempted to steal an . . . APD[] bait car")(citing Incident Report of October 30, 2015, at 2 filed Jan. 15, 2020 (Doc. 122-4)("Incident Report").[3]  With Albuquerque Police Department ("APD") officers

---

[1]The local rules provide that the "Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion.  Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies."  D.N.M.LR-Civ. 56.1(b).

[2]A bait car, also called a hot car, is a vehicle that law enforcement agencies "use to capture car thieves or thieves who steal items from cars."   "Bait Car," Wikipedia.org, http://en.wikipedia.org/wiki/Bait—car (last visited February 20, 2020)(footnote omitted).  "The vehicles are modified with audio/video surveillance technology, and can be remotely monitored and controlled.  Those set up to catch car thieves may include GPS tracking.  A 'kill switch' may be installed in the vehicle allowing police to remotely disable the engine and lock all doors remotely, preventing escape."  Bait Car.  The Court offers this information solely as background for the reader's edification, and does not present these facts as the truth or as facts material to the issues in this opinion.

[3]The Plaintiffs purport to dispute the text's fact.  In the Response, the Plaintiffs assert that they "deny [Franco's Undisputed Material Fact] No.1".  Response ¶ 1, at 2.  The Plaintiffs then state, however, that they "concede that Mr. Howard was stealing a bait car."  Response ¶ 1, at 2.  The Plaintiffs, accordingly, have not shown a genuine dispute as to whether Howard attempted to steal a bait car on October 30, 2015.  The Court therefore deems the text's fact undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

pursuing, APD Dispatch eventually disabled the bait vehicle on Hazeldine Avenue in Southwest

Albuquerque, New Mexico.  See MSJ ¶ 2, at 2 (citing Incident Report at 3).[4]  Howard exited the

---

[4]Franco asserts several facts in the MSJ's ¶ 2, at 2.  Franco asserts that, "[a]fter APD was able to disable the vehicle," the Plaintiff hid a firearm and heroin in the vehicle.  MSJ ¶ 2, at 2 (citing Incident Report at 3).  The Plaintiffs do not controvert specifically this assertion, but argue, first, that "the facts alleged regarding heroin and weapons are immaterial to the excessive force analysis because such facts were unknown to Officer Franco at the time of his use of force."  Response ¶ 2, at 2 (citing Deposition of Officer Jonathan Franco at 22:18-23:8 (taken Sept. 12, 2019), filed Jan. 15, 2020 (Doc. 122-5)("Franco Depo.").  A materiality issue is not a factual dispute.  See SEC v. Goldstein, No. Civ. 12-0257 JB/GBW, 2015 WL 5138242, at *27 n.95 (D.N.M. Aug. 22, 2015)(Browning, J.).  The Court will address materiality in this opinion's Analysis section.

The Plaintiffs also argue that the Incident Report "constitutes inadmissible hearsay."  Response ¶ 2, at 2.  Hearsay is a statement, other than one the declarant made while testifying at the trial or hearing, offered for the truth of the matter asserted.  See Fed. R. Evid. 801.  "Hearsay testimony is generally inadmissible."  United States v. Christy, No. CR 10-1534, 2011 WL 5223024, at *5 (D.N.M. Sept. 21, 2011)(Browning, J.)(citing Fed. R. Evid. 802).  As a general rule, the court cannot rely on evidence that will not be admissible at trial.  See Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)("It is well settled in this circuit that we can consider only admissible evidence in reviewing an order granting summary judgment.  Hearsay testimony cannot be considered because '[a] third party's description of [a witness'] supposed testimony is not suitable grist for the summary judgment mill.'"  (alterations in original)(citations omitted)(quoting Thomas v. IBM, 48 F.3d 478, 485 (10th Cir. 1995)).  The Court can rely, however, on evidence submitted in a form that would be inadmissible at trial as long as the Court determines that evidence will be presented in an admissible form:

> This does not mean that evidence must be submitted in "a form that would be admissible at trial."  Celotex Corp. v. Catrett, 477 U.S. 317 . . . (1986).  Indeed, parties may submit affidavits even though affidavits are often inadmissible hearsay at trial on the theory that the same facts may ultimately be presented at trial in an admissible form.  Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir. 2005).  However, "[t]o determine whether genuine issues of material fact make a jury trial necessary, a court necessarily may consider only the evidence that would be available to the jury" in some form.  Argo v. Blue Cross and Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(citing Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence")).

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006)(alterations in original).  Rule 803(8) of the Federal Rules of Evidence excepts from the hearsay rule factual findings from a public office's "legally authorized investigation" or "a matter observed while under a legal duty to report."  Fed.

R. Evid. 803(8)(A)(ii)-(iii).  Here, APD Detective Phetamphone Pholphiboun wrote the Incident Report as part of his investigation into Howard's bait-vehicle theft and subsequent arrest.  See Incident Report at 2.

"Police reports are generally excludable as hearsay."  Dorato v. Smith, 108 F. Supp. 3d 1064, 1071 n.6 (D.N.M. 2015)(Browning, J.)(citing United States v. Jimenez, 275 F. App'x 433, 438 (5th Cir. 2008)(unpublished)).  "In a civil case, police reports may be admissible as public records under rule 803(8)(A)(ii) of the Federal Rules of Evidence."  Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (citing Dortch v. Fowler, 588 F.3d 396, 402 (6th Cir. 2009); Foster v. Gen. Motors Corp., 20 F.3d 838, 839 (8th Cir. 1994)).  Despite rule 803(8)'s exception, rule 805's prohibition of hearsay within hearsay still applies, so rule 803(8)(A)(ii) "covers only information that the officer observed and recorded in the police report, and not information that the officer received from third parties."  Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6.  "It is well established that entries in a police report which result from the officer's own observations and knowledge may be admitted but that statements made by third persons under no business duty to report may not."  Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (citing Walker v. City of Okla. City, 203 F.3d 837, 2000 WL 135166, at *8 (10th Cir. Feb. 7, 2000)(unpublished table opinion)).  See Dorato v. Smith, 108 F. Supp. 3d at 1071 n.6 (refusing to admit information in a police report when the Court deemed unlikely "that the officer observed, first hand" a vehicle's registration information).  The Court cannot determine, from the Incident Report itself, what information Pholphiboun observed first-hand.  The Incident Report attributes some information to "officers on scene" but does not attribute the information it contains either to Pholphiboun's first-hand observations or two other officers' reporting.  Accordingly, the Court is hesitant to admit the Incident Report under rule 803(8), because the Court cannot determine readily where Pholphiboun relies upon his own observations and where he relies on other officers' observations.

Police reports recording officers' observations, but not third parties' statements, may be admissible under rule 803(6).  See Fed. R. Evid. 803(6), advisory committee's notes ("An illustration is the police report incorporating information obtained from a bystander: the officer qualifies as acting in the regular course but the informant does not.").  The central question for police reports under rule 803(6) is whether the officer gathered the information from those who have a duty to report, as this duty forms the reports' trustworthiness.  "Under the business duty requirement, the record is not admissible unless the party reporting the information to the recorder of the information had a business duty to do so; i.e., was reporting the information in the regular course of regularly conducted activity."  Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 803.02[7][c] (11th ed. 2015))  Accordingly, "it is well established that although entries in a police or investigating officer's report which result from the officer's own observations and knowledge may be admitted, statements made to the officer by third parties under no business duty to report may not."  United States v. Snyder, 787 F.2d 1429, 1439 (10th Cir. 1986)(citing United States v. Pazsint, 703 F.2d 420, 424 (9th Cir. 1983); Meder v. Everest & Jennings, Inc., 637 F.2d 1182, 1186-87 (8th Cir. 1981); United States v. Yates, 553 F.2d 518, 521 (6th Cir. 1977); United States v. Smith, 521 F.2d 957, 964 (D.C. Cir. 1975)).  See United States v. DeLeon, 316 F. Supp. 3d 1303, 1307 (D.N.M. 2018)(Browning, J.)("Law-enforcement officials, as part of their ordinary duties, passed information received from confidential human sources to other officials who, as part of their ordinary duties, recorded that information," but stating that the Court lacked "enough information to determine whether the confidential human sources were acting in the ordinary

vehicle and briefly placed his hands in the air, before fleeing from the officers on foot.  See MSJ

¶ 4, at 3 (asserting this fact)(citing Bait Car Video at 2:00).[5]  Howard placed something into his

---

course when they provided information to law enforcement"); Maples v. Vollmer, No. CIV 12-0294, 2013 WL 1681234, at *18 (D.N.M. March 31, 2013)(Browning, J.)(concluding that a "911 call recording appears to fit within 803(6)'s hearsay exception"); Lunsford v. Howard, No. CIV 11-0169 LH/LAM, 2012 WL 13081663, at *6 (D.N.M. March 31, 2012)(Hansen, J.)(admitting 911 calls, police report, and booking records under 803(6)); United States v. Goad, 739 F. Supp. 1459, 1461 (D. Kan. 1990)(Theis, J.)(deeming inadmissible witness statements in a police report).

The Incident Report's admissibility, then, hinges on the extent to which it is derived from sources under a duty to report.  There is nothing in the Incident Report that suggests that Pholphiboun relied on any third-party witnesses in writing the report.  Instead, the report derives from information that "AutoNITe Detectives received" from APD dispatch, as well as responding officers' firsthand observations of the incident.  Incident Report at 2-3.  These sources reported to Pholphiboun "in the regular course of a regularly conducted activity."  Stephen A. Saltzburg, et al., Federal Rules of Evidence Manual § 803.02[7][c].  The Incident Report is, accordingly, potentially admissible under rule 803(6) as a report of a regularly conducted activity.  The Court notes, however, that Franco has not laid the foundation for this exception.  See United States v. Ary, 518 F.3d 775, 786 (10th Cir. 2008)("The proponent of the document must also lay this foundation for its admission.").  Franco can establish this foundation with evidence admissible at trial, however, as Franco discusses APD's reporting practice in the Franco Depo.  See Franco Depo. at 50:5-21; id. at 53:2-25.  The Court concludes that the Incident Report is admissible for the truth it asserts.

The Court concludes that the report supports that APD dispatch disabled the vehicle on Hazeldine Avenue, where it came to a stop.  See MSJ ¶ 2, at 2 (citing Incident Report at 2 (stating that "the vehicle was eventually disabled via dispatch where it came to a slow stop at Hazeldine and Broadway")).  As the Plaintiffs do not controvert specifically the text's fact, the Court adopts the fact as undisputed.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted.").

[5]Franco asserts as undisputed material fact that the "Plaintiff then runs from the vehicle and attempts to escape from law enforcement."  MSJ ¶ 4, at 3 (citing Bait Car Video at 2:00).  The Plaintiffs purport to dispute Franco's proposed fact, arguing that the "Plaintiffs deny [Franco's proposed fact].  Mr. Howard exited the car *with his hands in the air*."  Response ¶ 4, at 2 (citing Chafin Lapel Video at 2:24-2:26 (taken October 30, 2015), filed October 4, 2019 (Doc. 104-6)(emphasis in original)).  The Plaintiffs, therefore, do not controvert specifically Franco's proposed fact that Howard fled from the officers on foot.  The record supports Franco's proposed fact, so the Court adopts as undisputed that Franco fled from the bait vehicle on foot.  See D.N.M.LR-Civ. 56.1(b).  The Plaintiffs' objection that Howard exited the vehicle with his hands raised is an additional proposed fact.  Although the Plaintiffs do not letter these facts as D.N.M.LR-Civ. 56.1(b) requires, see D.N.M.LR-Civ. 56.1(b)("The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the Motion.  Each additional fact must be lettered and must refer with

mouth before fleeing.  See MSJ ¶ 3, at 3 (citing Bait Car Video at 2:42); Response ¶ 3, at 3 (stating

that the Plaintiffs "admit[] Undisputed Fact No. 3").  Officers pursued Howard on foot, with Franco

closest to Howard.  See MSJ ¶ 6, at 3 (asserting that Franco reached Howard before the other

officers)(citing Franco Depo. at 40:2-6).[6]

Just as Franco was closing, Franco shouted "Stop or you'll get shot!," and Howard stopped

and sat or knelt.  See Response ¶ 5, at 2 (citing Franco Lapel Video at 7:08-7:13).[7]  Less than two

---

particularity to those portions of the record on which the non-movant relies."), the Court, to be fair
to the Plaintiffs -- the non-movants -- construes it as additional material facts for the MSJ's
purposes.  In the Reply, Franco does not controvert the Plaintiffs' assertion in the Response that
Howard raised his hands as he exited the vehicle.  Instead, Franco asserts that the Plaintiffs
"attempt[] to create a material dispute of fact by claiming that [Howard] exited the vehicle with
his hands in the air.  However, [Howard] then runs from the vehicle and attempts to escape from
law enforcement.  Thus, the Plaintiff[s] failed to create a material dispute[.]"  Reply ¶ 4, at 3.
Franco does not posit that Howard did not raise his hands, and so does not controvert specifically
the Plaintiffs' proposed fact.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the
Response will be deemed undisputed unless specifically controverted.").  The Court modifies
slightly the proposed fact, however, to better reflect what the record can support and for clarity.
The Court adds only that Howard raises his hands briefly before fleeing, as the portion of the
record which the Plaintiffs cite shows that Howard raised his hands for fewer than four seconds
before turning and fleeing from the officers.  See Chafin Lapel Video at 2:23-2:27.

[6]Franco and the Plaintiffs imply the text's fact rather than assert it, but the text's fact forms
the basis of the parties' proposed facts.  Franco describes Howard's flight and the officers' ensuing
efforts to arrest him, see MSJ ¶¶ 5-6, at 3, and the Plaintiffs describe Franco catching up to Howard
before the other officers, see MSJ ¶ 5, at 2.  Although the parties do not assert specifically as
proposed fact that the officers pursued Howard on foot, with Franco closest behind Howard, the
Court, to be generous to the parties, concludes that the parties considered this fact material, because
the parties' proposed facts imply that the officers so acted, and the record supports that they so
acted.  See Franco Depo. at 40:2-6; Franco Lapel Video at 7:00-7:13 (taken October 30, 2015),
filed Oct. 4, 2019 (Doc. 104-7).

[7]Franco contends that Howard "attempted to jump over a wall and was grabbed before he
could jump over the wall and then landed on the pavement."  MSJ ¶ 5, at 3 (citing Jones Lapel
Video (taken Oct. 30, 2015, filed October 4, 2019 (Doc. 104-5)).  The Plaintiffs purport to dispute
Franco's assertion and argue that Howard "turns around and lowers to the ground into a kneeling
position."  Response ¶ 5, at 2 (citing Franco Lapel Video at 7:08-7:13).  Although the Plaintiffs do
not letter this fact as D.N.M.LR-Civ. 56.1(b) requires, the Court, to be fair to the Plaintiffs, as non-
movants, construes it as an additional material fact for the MSJ's purposes.  Accordingly, Franco

seconds after Howard stopped running, Franco reached Howard and immediately struck Howard's face, and Howard went from a sitting or a kneeling position to a lying position. See MSJ ¶ 6, at 3 (citing Franco Depo. at 40:2-6); Response ¶ 5, at 2 (citing Franco Lapel Video at 7:08-7:13).[8]

cites his deposition testimony, and the Plaintiffs cite the Franco Lapel Video. In the Reply, Franco asserts that he "agrees that the video speaks for itself." Reply ¶ 5, at 3.

The Court may rely upon video evidence and disregard one party's factual assertion where the video evidence "'blatantly contradict[]' that party's assertion such "'that no reasonable jury could believe it.'" York v. City of Las Cruces, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting Scott v. Harris, 550 U.S. 372, 380 (2007)). After reviewing carefully the Franco Lapel Video, and drawing all reasonable inferences in the Plaintiffs' favor, the Court concludes that the Franco Lapel Video shows that Howard did not attempt to climb a fence, but rather sat down as Franco was closing in behind him. See Lymon v. Aramark Corp., 728 F. Supp. 2d 1222, 1249 (D.N.M. 2010)(Browning, J.), aff'd, 499 F. App'x 771 (10th Cir. 2012)(citing Rhoads v. Miller, 352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished)(noting that, when a court resolves a blatant contradiction in the record, the court's resolution must rely on more than other witnesses' testimony)).

[8]Franco asserts that he "arrived at the scene and attempted to apprehend the Plaintiff, but instead was able to grab the Plaintiff and then ran past him." MSJ ¶ 6, at 3. The Plaintiffs purport to dispute the text's fact, but the Plaintiffs' factual contentions do not pertain to whether Franco's momentum carried him past Howard, and that Franco made contact with Howard. See Response ¶¶ 5-6. In responding to the MSJ's paragraph 6, the Plaintiffs refer the Court to their denial of the MSJ's paragraph 5. In that denial, the Plaintiffs do not address whether Franco ran past Howard. As the Franco Lapel Video shows Franco's momentum carrying him past Howard, the Court deems that fact undisputed. See D.N.M.LR-Civ. 56.1(b).

The Plaintiffs then refer to an interview that APD Internal Affairs Detective Jim Jury conducted of Franco, in which Jury opines that the Franco Lapel Video shows that Franco "'is either pushed to the ground by Officer Franco or assumes a fetal position on his own as the other officers arrive.'" Response ¶ 5, at 2 (quoting APD Internal Affairs Report by Detective Jim Jury Filed Under Seal at 3, filed January 31, 2020 (Doc. 127-1)("Jury Report")). Franco does not object, under the best-evidence rule, to the Plaintiffs' use of Jury's commentary on the Franco Lapel Video to prove that Howard sat down before Franco reached him. See Reply ¶ 6, at 3. Had Franco objected, the Court likely would not rely on the Jury Report. The best-evidence rule states: "To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required." Fed. R. Evid. 1002. Because the Plaintiffs cite to a portion of the record in which Jury is summarizing the contents of the Franco Lapel Video to prove what the Franco Lapel Video shows, had Franco objected, the Court would conclude that rule 1002 precludes its reliance on the Jury Report to determine what the Franco Lapel Video shows. Because Franco did not object, however, the Court relies upon its independent impression of what the Franco Lapel Video shows as well as Jury's assessment. As shown in the text's fact, the Court's assessment and Jury's assessment are similar.

When Howard was prone, several officers surrounded him immediately, and Howard's right hand

was pinned underneath his body such that the officers could not see his hand.  See MSJ ¶ 7, at 3

(citing Franco Depo. at 41:16-19); Response ¶¶ 7, 14 at 3, 5 (citing Jones Lapel Video at 2:20-

---

Although the Plaintiffs did not initially controvert Franco's assertion, the Plaintiffs later requested that the Court "clarify the record" to reflect their belief that the Franco Lapel Video, "when played in slow motion," shows Franco striking Howard's face.  Motion to Clarify Record at 2, filed Feb. 25, 2020 (Doc. 134).  As to the parties' assertions regarding how Howard came to be lying down, the Court is presented with contradictory testimony.  Compare Franco Depo. at 40:24-41:3 (stating that, when Franco grabbed Howard, "he was standing on his two feet" and that, when Franco "got a clear visual" on Howard, "he was on his stomach"), with Affidavit of Majestic Howard  ¶¶ 6-7, at 1 (taken Nov. 4, 2019), filed November 4, 2019 (Doc. 107-28)("Howard Aff.")(stating "I decided to stop and got on my knees.  I never resisted arrest . . . .  The police started beating me").  At the summary judgment stage, the Court cannot decide issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Further, the Franco Lapel Video shows, in the Court's view, that Franco punched Howard in the face, which brought Howard to the ground.  As to the parties' proposed facts on this point, the video evidence does not "blatantly contradict[]" any party's assertion such that "no reasonable jury could believe" one party's version.  Scott v. Harris, 550 U.S. at 380.  The Court, having reviewed the record, concludes that there is a genuine dispute as to what kind of force Franco exerted that brought Howard to a lying position.  Accordingly, in the light most favorable to the Plaintiffs, the Court concludes that the Franco Lapel Video shows Franco striking Howard's face just as Howard surrendered.  The Court will address the dispute's materiality in the Analysis section.

2:26).[9]   Franco viewed his inability to see Howard's hand as a potential threat to his and other

officers' safety.   See MSJ ¶ 7, at 3 (citing Franco Depo. at 52:13-24).[10]

Franco "weighs 220 pounds and is fit."   MSJ ¶ 7, at 3 (citing Franco Depo. at 39:7-18);

Response ¶ 8, at 3 (admitting this fact).[11]   As officers shouted for Howard to yield his right hand,

---

[9]Franco asserts that Howard "refused to give the officers his hands and kept them under his body."   MSJ ¶ 7, at 3 (citing Franco Depo. at 41:16-19 (stating that Franco did not see Howard carrying any weapons, but asserting that "officers were giving [Howard] commands over and over to give -- for him to give his hands up, which were tucked under his body")).   Responding, the Plaintiffs contend that "Howard did not actively resist or attempt to evade arrest at the time that force was used on him.   Instead, Mr. Howard was pinned down and unable to move with multiple officers on top of him."   Response ¶ 7, at 3.   The Plaintiffs also assert, as an additional material fact, that "Howard was pinned down and unable to move with multiple officers on top of him."   Response ¶ 14, at 5 (citing Jones Lapel Video at 2:20-2:26).   In the Reply, Franco argues that he disputes the Response's paragraph 14, "because it is self-serving and contradicts the evidence contained in the relevant videos."   Reply ¶ 14, at 4 (citing Scott v. Harris, 550 U.S. at 380-81).   Franco does not, however, cite specifically any lapel videos that might support his contention that Howard "refused to give the officers his hands."   MSJ ¶ 7, at 3.   The local rules provide that proposed factual disputes "must refer with particularity to those portions of the record upon which the movant relies."   D.N.M.LR-Civ. 56.1(b).   Franco's generalized citation to "the evidence contained in the relevant videos" does not comply with this directive.   Further, upon reviewing the parties' video evidence, the Court concludes that no video shows unequivocally that Howard "refused to give the officers his hands and kept them under his body," MSJ ¶ 7, at 3, and, alternatively, no video shows unequivocally that Howard's hand was involuntarily pinned beneath his body, see Response ¶ 7, at 3.   The Court, accordingly, concludes that there is a genuine dispute regarding whether Howard was actively trying his hands from the officers, or whether his hands were merely pinned beneath his body.   The Court will address this dispute's materiality in this Memorandum Opinion and Order's ("MOO") Analysis section.

[10]The Plaintiffs purport to dispute the text's fact, but do not specifically address Franco's impression of Howard's hidden hand.   See Response ¶ 7, at 3.   As the record supports the text's fact, see Franco Depo. at 52:17-24 ("There was a threat to me because I could not see his hands . . . .   My safety and his, yes, and my other officers."), the Court deems the fact undisputed.   See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Memorandum will be deemed undisputed unless specifically controverted").

[11]The Plaintiffs admit the text's fact but contend that, "due to Mr. Howard's small build, this fact shows the lack of need for the deadly force used by Franco."   Response ¶ 8, at 3.   The Court will address this fact's materiality and relevance in this MOO's Analysis section.   The Plaintiffs do not cite the record, however, to demonstrate Howard's "small build," Response ¶ 8, at 3, and the Court does not see any support in the record for the Plaintiffs' assertion.   The Court,

Franco delivered a single knee strike to the left side of Howard's head.  See Response ¶ 9, at 3

(citing Jury Report at 3).[12]  Shortly thereafter, officers secured both of Howard's hands and took

_____

accordingly, does not adopt as fact the Plaintiffs' assertion regarding Howard's build.  See D.N.M.LR-Civ. 56.1(b) ("Each additional fact must . . . refer with particularity to those portions of the record upon which the non-movant relies.").

[12]Franco asserts as fact that he "attempted to use a distraction technique on the Plaintiff to gain compliance. . . .  The distraction technique used was a knee strike to the Plaintiff's left shoulder."  MSJ ¶ 9, at 3 (citing Franco Depo. at 47:25-48:22).  The Plaintiffs first allege that Franco reported inconsistently his use of force in his interview with Jury and argue that "Franco's inconsistencies demonstrate a lack of credibility in his recounting of the events that took place that evening."  Response ¶ 9 at 3-4 (citing Jury Report at 2, Audio of Confidential Interview of Officer Jonathon [sic] Franco at 8:34-8:58, filed Jan. 31, 2020 (Doc. 127-2)("Franco Interview"); Audio of Confidential Interview of Officer Michael Jones at 2:48-4:14, filed November 5, 2019 (Doc. 109-3)(M. Jones Interview")).  The Plaintiffs accordingly argue that the Court should disregard the Franco Depo. -- or at least temper its regard with skepticism.  See Response ¶ 9, at 3-4.  At the summary judgment stage, however, the Court cannot decide any issues of credibility.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

The Plaintiffs also assert, as an additional material fact, that Franco struck Howard's head.  See Response ¶ 16, at 5 (citing Jury Report at 1).  In the Reply, Franco purports to dispute the Plaintiffs' proffered fact, "because it is contradicted by his sworn deposition testimony and the relevant videos."  Reply ¶ 16, at 5 (citing "all videos submitted with Document 104").  Accordingly, although the record contains video evidence depicting the incident, neither Franco nor the Plaintiffs cite specific lapel videos to support their positions.  "[I]t is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat [or support] a motion for summary judgment."  Coffey v. United States, 870 F. Supp. 2d 1202, 1209 (D.N.M. 2012)(Browning, J.).  Although the Court is under no obligation to scour the record when the parties do not follow D.N.M.LR-Civ. 56.1(b)'s specificity requirements, the Court, to be generous to the parties, has located and reviewed carefully the lapel videos that most clearly depict Franco's use of force.

The two lapel videos that depict the incident most clearly are the Jones Lapel Video and the Chafin Lapel Video.  The Jones Lapel Video shows Franco lining up to knee Howard while Howard's head is clearly visible in the path of Franco's knee.  See Jones Lapel Video at 2:23.  As Franco begins his strike, however, Franco places his body between Jones' lapel camera and Howard's head, obstructing the lapel camera's view of where Franco struck Howard.  See Jones Lapel Video at 2:24.  The Court is unable to resolve definitively the ambiguity with the other lapel videos.  Nonetheless, the Chafin Lapel Video -- the best view of Franco's knee strikes -- shows, in the Court's view, Franco's knee striking Howard's face.  See Chafin Lapel Video at 2:50-2:53.  The parties cite primarily testimony to support their positions.  Although the Chafin Lapel video does not "utterly discredit[]" the Franco's version, Scott v. Harris, 550 U.S. at 379, the test at this stage is whether it has that effect on Howard's version of events, see Fed. R. Civ. P. 56(c).  Here, the Plaintiffs assert that Franco struck Howard's head, and the video evidence supports that

him into custody.  See MSJ ¶ 10, at 3 (stating this fact); Response ¶ 10, at 4 (admitting this fact).

Eleven seconds elapsed from the time Franco first made physical contact with Howard to the time

officers had secured both of Howard's hands.  See MSJ ¶ 11, at 4 (citing Jones Lapel Video at

2:16-2:27); Response ¶ 11, at 4 (admitting this fact).

    After the officers handcuffed Howard, Howard's head was hanging into a wet gutter and

he appeared to be unconscious, so officers moved him away from the gutter to ensure he could

breathe.  See Response ¶ 26, at 6 (citing Jones Lapel Video at 3:06-3:21).[13]  Howard' breathing

was labored, and Franco interpreted Howard's labored breathing to signal that Howard was in pain.

See Response ¶¶ 22-23, at 6 (stating this fact)(citing Franco Depo. at 84:2-85:5; id. at 85:16-25).[14]

---

assertion.  Because the video evidence does not render incredible Plaintiffs' supported assertion, but rather supports that Franco struck Howard's head, the Court adopts as fact that Franco administered a knee strike to Howard's head.

[13]Franco purports to dispute the text's fact, and argues that the "videos in this matter speak for themselves," and that there is "no evidence . . . that the Plaintiff lost consciousness or was injured as a result of his contact with Defendant Franco."  Reply ¶ 26, at 6 (citing "all videos submitted with Document 104").  "[I]t is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat [or support] a motion for summary judgment."  Coffey v. United States, 870 F. Supp. 2d at 1209.  Franco cites to what amounts to forty minutes of footage to support his argument that Howard was conscious and uninjured after his arrest.  Under the local rules, all material facts that the Response proposes are presumptively undisputed "unless specifically controverted" by "refer[ing] with particularity to those portions of the record upon which the movants relies."  D.N.M.LR-Civ. 56.1(b).  The Court adopts as undisputed the text's fact, because Franco does not cite to any particular portions of the record to demonstrate that Howard was uninjured and conscious, and the record supports the Plaintiffs' proposed fact.  See Jones Lapel Video at 3:03-3:21 (asking whether Howard could "breathe under that water" and instructing the officers to move Howard's head out of the gutter).

[14]Franco asserts that he "does not dispute his own deposition testimony," but he argues that "labored breathing is natural consequence of fleeing from law enforcement."  Reply ¶¶ 22-23, at 6.  The Court is uncertain whether Franco purports to admit or deny the text's fact, but Franco does not cite to the record to support his contention.  As Franco does not support his dispute with citations to the record, and because the record supports the text's fact, the Court adopts the text's fact as undisputed.  See D.N.M.LR-Civ. 56.1(b).

Howard was injured in the arrest, and he was bleeding into the gutter.  See Response ¶ 19, at 5

(citing M. Jones Interview at 8:55-9:13; Audio of Confidential Interview of Sergeant Aaron at

8:21-9:09, filed Jan. 31, 2020 (Doc. 127-3)("A. Jones Interview"); Howard Aff. ¶¶ 8-10, at 2).[15]

_____

[15]Franco purports to dispute the text's fact, and argues that Howard "is not competent to provide an affidavit in this matter."  Reply ¶ 19, at 5.  Franco cites filings in which Howard brings his competency to the Court's attention.  See Reply at 6-7 (citing Motion to Stay Proceedings Pending Determination of Competency, filed March 12, 2018 (Doc. 32)("Motion to Stay"); Unopposed Motion for Substitution of Incompetent Party, filed Feb. 4, 2019 (Doc. 76)).  Franco asserts that Howard's traumatic brain injury, which predates the incident giving rise to this lawsuit, renders him incompetent to provide a factual affidavit on which the Court may rely.  See Reply at 6-7.  Franco notes that Howard's injury affects his memory, and Franco says that Howard's "cognitive deficits are apparent during casual conversation and appear to make him uneducable."  Reply at 7 (citing Confidential Forensic Mental Health Evaluation, filed Feb. 15, 2020 (Doc. 130-1)("Competency Eval.")).

Pursuant to rule 56(c)(4), "[a]n affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  An affidavit is thus "inadmissible if 'the witness could not have actually perceived or observed that which he testifies to.'"  Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1200 (10th Cir. 2006)(quoting United States v. Sinclair, 109 F.3d 1527, 1536 (10th Cir. 1997)).  In evaluating an affidavit under this standard, a court may consider "'the witness's own testimony'" to determine whether there is "'sufficient'" evidence to support a finding of personal knowledge.  Hansen v. PT Bank Negara Indon. (Persero), 706 F.3d 1244, 1250 (10th Cir. 2013)(quoting Fed. R. Evid. 602).

Rule 601 provides that that every person is presumptively competent to be a witness, but provides that state law governs a witness' competency regarding a claim or defense for which state law supplies the rule of decision.  See Fed. R. Evid. 601.  There is, accordingly, "a low threshold for competency to testify."  United States v. Gould, 563 F. Supp. 2d. 1224, 1250 (D.N.M. 2008)(Browning, J.)(citing Bickford v. John E. Mitchell Co., 595 F.2d 540, 544 (10th Cir. 1979)).  See United States v. Allen J., 127 F.3d 1292 (10th Cir. 1997); United States v. Odom, 736 F.2d 104, 112 (4th Cir. 1984)("The only grounds for disqualifying a witness under Rule 601 . . . are that the witness does not have knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully.").  The Court must ask: "'Is his capacity to observe, remember, and recount, such that he can probably bring added knowledge of the facts?'"  Barto v. Armstrong World Indust., Inc., 923 F. Supp. 1442, 1445 (D.N.M. 1996)(Black, J.)(quoting Charles T. McCormick, McCormick on Evidence § 62, at 156 (3d ed. 1984)).  Consistent with this principle, courts routinely find that very young children may be competent to testify, see United States v. Thai, 29 F.3d 785 (2d Cir. 1994)(holding that a six-year-old witness was competent to testify), individuals intoxicated at the time of the recalled event may be competent to testify, see United States v. Ramirez, 871 F.2d 582 (6th Cir. 1989), and those individuals suffering from mental illness or deficiency may be competent to testify, see

- 12 -

Andrews v. Neer, 253 F.3d 1052 (8th Cir. 2001). The Court views competency as a kind of spectrum, wherein no witness is ever fully competent and remembers every detail, and few are ever fully incompetent. See Fed. R. Evid. 601 advisory committee notes ("A witness wholly without capacity is difficult to imagine."). An individual can, accordingly, rank low on this spectrum of competency, but still be fit to testify so long as the witness "appreciates his duty to tell the truth, and is minimally capable of observing, recalling, and communicating events." United States v. Phibbs, 999 F.2d 1053, 1070 (6th Cir. 1993). Rule 601 envisions a broad definition of competency, enabling all but the most severely incapacitated to testify, but allowing the jury to determine weight and credibility in light of a witness' competency. As discussed, at the summary judgment stage, the Court may not decide issues of credibility. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 255.

Howard suffers from a traumatic brain injury that makes it difficult for him to effectively assist counsel, "understand what transpires during courtroom proceedings," and "function independently on a daily basis." Competency Eval. at 2. The Court notes, however, that the Competency Eval. on which Franco relies refers to Howard's memory skills only in passing and is intended to inform whether Howard is competent to stand trial as a criminal defendant. See Competency Eval. at 1-2. The record on which the parties rely shows that Howard is competent enough to start a car with a screwdriver and drive in a manner consistent with posted traffic signs. See Bait Car Video at 00:04-2:46. Howard states, in the Howard Aff., that, while he needs assistance with "most things in [his] life," he "remember[s] the day when the police beat" him. Howard Aff. ¶¶ 4-5, at 1. Under rule 601's presumption, the question is not whether the Plaintiffs have demonstrated Howard's competency to testify, but rather whether Franco has demonstrated that Howard is not competent to testify. That is, Franco must demonstrate that Howard does not appreciate his ability to tell the truth, and is not "minimally capable of observing recalling, and communicating events." United States v. Phibbs, 999 F.2d at 1070. Because the Competency Eval. does not address this information, the record which Franco cites does not carry the burden of negating rule 601's presumption of competency. On a scale of one to ten, Howard may be nearer to one, but he is not a zero.

Franco also asserts that the Plaintiffs submitted a sham affidavit and that they are trying to use the Howard Aff. to "create[] a sham fact issue." Reply at 7. As support for this contention, Franco argues that Howard has "refused to respond to the Defendant's discovery, but instead had responded through his guardian." Reply at 7. Franco cites Howard's response to an interrogatory, in which Howard asserts that he "'does not independently recall his prior contact with law enforcement during the requested time period.'" Reply at 7 (quoting Plaintiff Terricia Stevenson, as Guardian Ad Litem and Conservator of Majestic Howard's First Supplemental Answers and Objections to Defendant Franco's Set of Interrogatories ¶ 13, at 2, filed February 15, 2020 (Doc. 129-2)("Interrogatories")). Franco, accordingly, argues that the Plaintiffs "submitted a sham affidavit that should be stricken." Reply at 7.

Cases in which an affidavit raises a sham issue are "unusual." Franks v. Ninmo, 796 F.2d 1230, 1237 (10th Cir. 1986). Typically, courts should not disregard an affidavit just because it "conflicts with the affiant's prior sworn statements." Franks v. Ninmo, 796 F.2d at 1237. There are situations, however, where courts "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue." Franks v. Ninmo, 796 F.2d at 1237 (citing Foster v. Arcata Assocs., Inc., 772 F.2d 1453, 1462 (9th Cir. 1985); Biechele v. Cedar Point, Inc.,

- 13 -

747 F.2d 209, 215 (6th Cir. 1984); <u>Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.</u>, 736 F.2d 656, 657-58 (11th Cir. 1984); <u>Camfield Tires, Inc. v. Michelin Tire Corp.</u>, 719 F.2d 1361, 1364 (8th Cir.1983); <u>Perma Research & Dev. Co. v. Singer Co.</u>, 410 F.2d 572, 578 (2d Cir. 1969)). The policy underlying these decisions is the "conclusion that the utility of summary judgment as a procedure for screening out sham fact issues would be greatly undermined if a party could create an issue of fact merely by submitting an affidavit contradicting his own prior testimony." <u>Franks v. Nimmo</u>, 796 F.2d at 1237 (citation omitted).

> To determine whether a contradicting affidavit seeks to create a sham fact issue, [the United States Court of Appeals for the Tenth Circuit] ha[s] looked to three factors: whether: "(1) the affiant was cross-examined during his earlier testimony; (2) the affiant had access to the pertinent evidence at the time of his earlier testimony or whether the affidavit was based on newly discovered evidence; and (3) the earlier testimony reflects confusion which the affidavit attempts to explain."

<u>Ralston v. Smith & Nephew Richards, Inc.</u>, 275 F.3d 965, 973 (10th Cir. 2001)(citing <u>Rios v. Bigler</u>, 67 F.3d 1543, 1551 (10th Cir. 1995)). In <u>Ralston v. Smith & Nephew Richards, Inc.</u>, the Tenth Circuit found that the district court did not abuse its discretion in excluding later contradictory declarations in rendering its summary judgment ruling. <u>See</u> 275 F.3d at 973. The Tenth Circuit noted that there was no question that the declarant was cross-examined in his deposition, "that he had access to the pertinent evidence at the time of his deposition," and "that there was nothing in the earlier deposition testimony reflecting any level of confusion or uncertainty concerning" the declarant's testimony "requiring clarification or explanation." 275 F.3d at 973.

The Court will consider the Howard Aff. Franco's arguments rests on the Plaintiffs response to Franco's interrogatory request that Howard "list all of [his] contact with law enforcement, including arrests, from 2010 to present." Interrogatories ¶ 13, at 15. In response, the Plaintiffs acknowledge that Howard "has been charged in several criminal cases," attach a sheet listing such charges, object to the question's relevancy, and stated that Howard "does not independently recall his prior contact with law enforcement during the requested time period." Interrogatories ¶ 13, at 16. The Howard Aff. describes, in general terms, that APD officers "hit" Howard on his "face, head, body, and back," and states that Howard was hit "on [his] head a lot of times." Howard Aff. ¶ 7, at 1. The Howard Aff. also describes that Howard "was hurt and in a lot of pain. [His] head was hurting bad." Howard Aff. ¶ 9, at 2. Notwithstanding the Plaintiffs' Interrogatories response, the Howard Aff. does not create a sham issue of fact, primarily because the Plaintiffs rely on it only secondarily, behind the video evidence. Specifically, the Plaintiffs rely upon the Howard Aff. to describe that Howard was in pain after his arrest, but they rely on the lapel videos and on APD's photographs of Howard to demonstrate that he was injured. Reliance on the Howard Aff. does not undermine rule 56 "as a procedure for screening out sham fact issues." <u>Franks v. Nimmo</u>, 796 F.2d at 1237. Further, the Court does not equate the Interrogatories response with prior cross-examination. A party incorrectly responds to an interrogatory must amend that response to correct the record. <u>See</u> Fed. R. Civ. P. 26(e)(1)(A).

After Howard's arrest, officers later found a handgun and heroin in the bait vehicle from which Howard fled, although Franco was unaware of the heroin and handgun until after Howard's arrest.  See MSJ ¶ 2, at 2 (citing Incident Report at 3).[16]  APD officers also photographed Howard

Here, none of the Franks v. Ninmo factors are present.  Howard was not cross-examined when he gave his discovery response and the new declaration does not attempt to explain any apparent confusion in his discovery response.  As to the remaining factor, new evidence's discovery is irrelevant, because the Interrogatories and the Howard Aff. both pertain to Howard's memory.  Further, the Court does not read the Howard Aff. and the Interrogatories as contradictory.  Franco's discovery question does not read as a contention interrogatory, which would direct the Plaintiffs to explain their contentions for this case, but rather a question about Howard's previous interactions with law enforcement.  See Interrogatories at 1.  Because none of the Franks v. Ninmo factors are present, the Plaintiffs are not using the Howard Aff. to create a sham issue of fact.  Franco's arguments are more appropriate to the Howard Aff.'s weight than its admissibility.  Therefore, the Court will not strike the Howard Aff.

As for the text's fact, Franco does not controvert specifically whether Howard was bleeding into the gutter after the incident.  See Reply ¶ 19, at 5.  Although Franco objects to the evidence on which the Plaintiffs rely for the text's fact, the lapel videos -- whose admissibility Franco does not contest -- show clearly that Howard was bleeding into the gutter.  See, e.g., Jones Lapel Video at 3:01-3:05.  Accordingly, the Court adopts as undisputed that Howard was bleeding into the gutter after the incident.  See D.N.M.LR-Civ. 56.1(b)("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

[16]The Plaintiffs purport to dispute the text's fact and assert that the text's fact is "immaterial to the excessive force analysis because such facts were unknown to Officer Franco at the time of his use of force."  Response ¶ 2, at 2 (citing Franco Depo. at 22:18-23:1-8).  A materiality issue is not a factual dispute.  See SEC v. Goldstone, 2015 WL 5138242, at *27 n.95.  The Court will address materiality in the MOO's Analysis section.  The Court concludes that the portion of the record which Franco cites in support of the text's fact supports the text's fact, as Pholphiboun describes that he found a "black in color handgun that had fallen between the front passenger seat and center console," as well as a "plastic baggy with a black tar substance" that tested presumptively positive for heroin.  Incident Report at 3.  The Court modifies slightly Franco's proposed fact, however, to note that officers found the handgun and heroin "[a]fter the scene was made safe."  Incident Report at 3.  Further, the portion of the record which the Plaintiffs cite supports that Franco was unaware of the handgun and heroin until after Howard's arrest.  See Franco Depo. at 22:18-25 (stating that Franco was unaware of the weapon until after he used force and arrested Howard, and so the handgun "had no bearing on [his] use of force against Mr. Howard.").  The Court concludes that the Plaintiffs do not assert a genuine dispute to the text's fact, and the Court has no independent reason to doubt its accuracy, because the record supports the text's fact, so the Court adopts it as undisputed for the MSJ's purposes.  See D.N.M.LR-Civ. 56.1(b).

to document his injuries.  See MSJ ¶ 10, at 3 (citing Photographs of Majestic Howard at 1-2, filed

Jan. 15, 2020 (Doc. 122-6)); Response ¶ 10, at 4 (admitting this fact).  The photographs show cuts

and abrasions on Howard's face and head.[17]  Paramedics examined Howard after the incident, but

APD officers did not take Howard to the hospital.[18]  See Response ¶ 19, at 5.

---

[17]Franco purports to dispute the Plaintiffs' assertion that Franco's use of force injured Howard.  See Reply ¶¶ 20, 26, at 5-6.  The Plaintiffs contend that the "Defendants struck Mr. Howard in the head and injured him," Response ¶ 20, at 6, which the Court, to be generous to the Plaintiffs, construes as an allegation that Franco's knee strike to Howard's head caused Howard's injuries.  Franco argues that there is no evidence that he caused Howard's injuries.  See Reply ¶¶ 12, 20, at 4, 6.  Franco argues that the photographs of Howard "reveal that he had no marks, abrasions or bruises on the left side of his head, where he was purportedly struck by Officer Franco."  MSJ ¶ 12, at 4 (citing Photographs of Majestic Howard, filed January 15, 2020 (Doc. 122-7)).  Responding, the Plaintiffs argue that the photographs are not conclusive evidence of the extent of Howard's injuries, and assert that, because Howard "has darker-colored hair, it is difficult, if not nearly impossible, to determine if there are any marks, abrasions or bruises on the back and sides of his head from the photographs."  Response ¶ 12, at 4.

The photographs of Howard show clearly cuts and abrasions on Howard's lower lip, right cheekbone, and forehead.  See Photographs of Majestic Howard at 2.  While the Court agrees with Franco that Howard's injuries appear less severe on the left side of Howard's face -- the side to which Franco administered a knee strike -- the photographs are not so unequivocal that a reasonable jury could not identify injuries consistent with Franco's knee strike.  See Scott v. Harris, 550 U.S. at 380.  Because the Plaintiffs and Franco both point to the same evidence to support their contentions, and because the record does not render implausible either side's contentions, the Court concludes that a genuine factual dispute exists regarding the nature and extent of Howard's injuries.  See Hunt v. Cromartie, 526 U.S. 541, 550-55 (1999)(stating that the court must resolve all reasonable inferences and doubts in favor of the non-moving party, and construe all evidence in the light most favorable to the non-moving party).  It may be that at trial, the parties put forth the same evidence of Howard's injuries; at the summary judgment stage, however, the Court must construe the evidence in the light most favorable to the nonmoving party -- here, the Plaintiffs.

[18]The Plaintiffs assert that the "Defendants refused to take Mr. Howard to the hospital to be evaluated even though APD and the officers knew that Mr. Howard needed medical attention."  Response ¶ 19, at 5.  This sentence contains two factual assertions: (i) that APD officers never took Howard to the hospital; and (ii) that APD officers knew Howard "needed medical attention."  Reply ¶ 19, at 5.  The Plaintiffs do not cite to the record to support these propositions.  Franco does not specifically respond to the Plaintiffs' contention that APD officers did not take Howard to the hospital.  "[I]t is not the Court's responsibility to scour the parties' evidence and filings to determine what facts are in dispute and what facts will defeat a motion for summary judgment."  Coffey v. United States, 870 F. Supp. 2d at 1209.  Nonetheless, the Court, to be fair to the Plaintiffs, concludes that the record supports the Plaintiffs' contention.  See M. Jones Interview at

## PROCEDURAL HISTORY

The Plaintiffs filed their original Complaint in New Mexico State Court, Second Judicial District, State of New Mexico, on June 23, 2017.  See Complaint for Violations of Civil Rights Pursuant to §§ 1983 and 1988 and the New Mexico Tort Claims Act and for Damages at 1, filed August 21, 2017 (Doc. 1-1)("Complaint").  The Complaint's Count I alleges excessive force by Franco, Defendant Ben Daffron, Defendant Joshua Chafin, and Defendant Sonny Molina in violation of 42 U.S.C. § 1983.  See Complaint ¶¶ 41-49, at 7.  The Complaint's Count II asserts a claim under Monell v. Department of Social Services, 436 U.S. 658 (1978)("Monell") against Defendant City of Albuquerque.  See Complaint ¶¶ 50-56, at 8-9.  The Complaint's Count III alleges loss of consortium for Howard's children.  See Complaint ¶¶ 57-60, at 9-10.  The City of Albuquerque, invoking federal-question jurisdiction, removed this case to federal court on August 21, 2017.  See Notice of Removal at 1, filed August 21, 2017 (Doc. 1).  Franco, Daffron, Chafin, and Molina each consented to this case's removal.  See Notice of Removal ¶¶ 8-10, at 2-3.  The Court granted summary judgment in favor of Daffron, Chafin, and Molina on Counts I and III on

---

7:45-8:02.  Because the record supports the text's fact, and because Franco does not specifically controvert it, the Court deems the text's fact undisputed.  See D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Response will be deemed undisputed unless specifically controverted.").

The Plaintiffs also argue that the text's fact supports a "reasonable inference that the Defendants, including Defendant Franco, failed to take Mr. Howard to the hospital to avoid attention being brought to their use of excessive force."  Response ¶ 12, at 4.  The Plaintiffs do not cite to the record to support this assertion.  Franco does not respond specifically to this assertion.  The Court does not adopt as fact the Plaintiffs' assertion that the APD officers did not take Howard to the hospital so as to "avoid attention being brought to their use of excessive force."  Response ¶ 12, at 4.  The Plaintiffs do not point to any evidence supporting this assertion, and the Court, after reviewing carefully the record, has found no such evidence.  Accordingly, the Court does not adopt as undisputed that APD officers chose not to take Howard to the hospital so as to conceal their use of force.  See D.N.M.LR-Civ. 56.1(b) ("Each fact in dispute must . . . refer with particularity to those portions of the record upon which the non-movant relies").

February 21, 2020.  See Memorandum Order and Opinion at 2, 2020 WL 873937, at *1, filed

February 21, 2020 (Doc. 133)("Feb. 21 MOO").

      1.    **The MSJ.**

On January 15, 2020, Franco filed the MSJ, invoking the doctrine of qualified immunity,

and asked the Court to grant summary judgment in his favor on Counts I and III.  See MSJ at 1.

Franco notes that the doctrine of qualified immunity shields officials from civil liability for

conduct that does not violate clearly established constitutional or statutory rights.  See MSJ at 5

(citing Mullenix v. Luna, 136 S. Ct. 305, 308 (2015)).  Qualified immunity, Franco notes, protects

"'all but the plainly incompetent or those who knowingly violate the law.'"  MSJ at 5 (quoting

Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  Franco contends that qualified immunity serves

to balance the need to protect public officials from baseless distraction while holding public

officials accountable when they act "'in a wholly unjustified manner.'"  MSJ at 6 (quoting Locurto

v. Safir, 264 F.3d 154, 162-63 (2d Cir. 2001)).  Franco contends that this balance demands that

qualified immunity is presumed in most cases, such that the plaintiff's burden is "'heavy.'"  MSJ

at 6 (quoting Albright v. Rodriquez, 51 F.3d 1531, 1534 (10th Cir. 1995)).  Franco notes that the

Plaintiffs must demonstrate both that Franco violated Howard's constitutional rights, and that those

rights were clearly established, but Franco focuses primarily on qualified immunity's clearly

established prong.  See MSJ at 6-7.  Franco accordingly quotes at length the United States Court

of Appeals for the Tenth Circuit:

> "[P]laintiff must do more than identify a clearly established legal test and then
> allege that the defendant has violated it.  The plaintiff must demonstrate a
> substantial correspondence between the conduct in question and prior law allegedly
> establishing that the defendant's actions were clearly prohibited. The 'contours of
> the right must be sufficiently clear that a reasonable official would understand that
> what he is doing violates that right.'"

MSJ at 7 (quoting Hannula v. City of Lakewood, 907 F.2d 129, 131 (10th Cir. 1990)(quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)))(alteration in MSJ and not in Hannula v. City of Lakewood).

Franco first asserts that he did not violate Howard's constitutional rights. See MSJ at 7. Franco argues that his use of force is reasonable "'in light of the facts and circumstances confronting'" him. MSJ at 8 (quoting Graham v. Connor, 490 U.S. 386, 397 (1989)). Franco contends that the factors which the Supreme Court of the United States of America provides in Graham v. Connor -- the suspected crime's severity, whether the suspect poses and immediate threat to the officer or the public, and whether the suspect is actively resisting or evading arrest -- all weigh in his favor. See MSJ at 8 (citing Graham v. Connor, 386 U.S. at 396. Franco notes that he arrested Howard as a felony suspect. See MSJ at 8 (citing N.M. Stat. Ann. § 30-16D-1). Franco then says that Howard "ran from the bait vehicle and attempted to escape from law enforcement" by "jump[ing] over a wall." MSJ at 8-9. Franco contends that, when he reached Howard, Howard "refused to give the officers his hands and kept them under his body," which, Franco argues, amounted to a threat to Franco's safety. MSJ at 9. Franco contends that these facts render his use of force objectively reasonable and consistent with the Fourth Amendment. See MSJ at 9.

The Tenth Circuit, Franco argues, has concluded that "the use of strikes such as those delivered by Officer Franco was objectively reasonable where the suspect was non-compliant with officers' attempts to bring the suspect into custody." MSJ at 9 (citing Serrano v. United States, 766 F. App'x 561, 569 (10th Cir. 2019)(unpublished); Youbyoung Park v. Gaitan, 680 F. App'x 724, 739-40 (10th Cir. 2017)(unpublished)). Franco also argues that the photographs of Majestic Howard "reveal that the Plaintiff had no injuries, marks or bruises on the side of his head where he claims he was struck by Officer Franco." MSJ at 9-10. Franco avers that the Plaintiffs "were

careful to document that Officer Franco weighs 220 pounds and is fit," but Franco argues that

Howard "has no record of being injured by this large and fit law enforcement officer."  MSJ at 10.

Franco quotes a Magistrate Judge's opinion to suggest that Howard's injuries are "'de minimis,'"

and, therefore, "'insufficient to qualify [Franco's use of force] as constitutionally excessive or

overcome [Franco's] entitled to qualified immunity.'"  MSJ at 10 (quoting Medina v. David, No.

CIV 17-03037-CBS, 2016 WL 122970, at *6 (D. Colo. Jan. 8, 2016)(Shaffer, M.J.)).

Franco next argues that, even if he violated Howard's constitutional rights, those rights are

not clearly established.  See MSJ at 11.  Franco notes that, to be clearly established, a right's

contours "'must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'"  MSJ at 11 (quoting Anderson v. Creighton, 483 U.S. at 640.  Noting

that the clearly established prong is "a fact-intensive inquiry," Franco argues that he is "unable to

locate a case holding that a similar use of force under these circumstances violated an individuals

[sic] Fourth Amendment rights."  MSJ at 11.  Franco argues that the Court should not define clearly

established law at a general level, but rather should require the Plaintiffs to show caselaw that is

factually similar to this case.  See MSJ at 11 (citing White v. Pauly, 137 S. Ct. 548, 552 (2017)).

Last, Franco argues that the Court must dismiss the Complaint's Count III, which alleges

a loss-of-consortium claim on behalf of Howard's children.  See MSJ at 11.  Count III "is

derivative of other injuries and not an injury in and of itself," Franco argues.  MSJ at 11 (citing

McLelland v. United Wisconsin Life Ins. Co., 1999-NMCA-055, ¶ 26, 980 P.2d 86, 93.

"Accordingly," Franco contends, "a party asserting a loss of consortium claim cannot recover

unless the injured party is entitled to a recovery."  MSJ at 11 (citing Weise v. Wash. Tru Sols.,

LLC, 2008-NMCA-121, ¶ 30, 192 P.3d 1244, 1255; Turpie v. Sw. Cardiology Assocs., P.A., 1998-

NMCA-042, ¶ 7, 955 P.2d 716, 717-18).  Franco asserts that, if the Court concludes that he is

entitled to qualified immunity on Count I, the Court must dismiss Count I in Franco's favor.  See MSJ at 12.  Accordingly, Franco argues that he is entitled to summary judgment.

> ### 2.    **The Response**.

The Plaintiffs respond.  See Response at 1.  The Plaintiffs first assert that "material facts are in dispute, precluding summary judgment."  Response at 1 (capitalization altered).  The Plaintiffs then argue that Franco is not entitled to qualified immunity.  See Response at 8.  The Plaintiffs assert that the Court may "address the two prongs of the qualified-immunity standard in either order: 'if the plaintiff fails to establish either prong of the two-pronged qualified-immunity standard, the defendant prevails on the defense.'"  Response at 8 (quoting A.M. v. Holmes, 830 F.3d 1123, 1134-35 (10th Cir. 2016)).

The Plaintiffs note that courts analyze excessive force claims not with the benefit of "'20/20 vision of hindsight,'" but rather in light of the "facts and circumstances confronting the officers."  Response at 8 (quoting Cavanaugh v. Woods Cross City, 718 F.3d 1244, 1248 (10th Cir. 2013)).  The Plaintiffs acknowledge that, if an officer reasonably, but mistakenly, believes that a suspect is resisting arrest or poses a threat to the officer, the officer is entitled to qualified immunity for using force proportionate to that perceived threat.  See Response at 8 (citing Saucier v. Katz, 533 U.S. 194, 205 (2001)).  The Plaintiffs contend that the "relevant factors 'include, *but are not limited to*, "[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.""'"  Response at 9 (quoting Cavanaugh v. Woods Cross City, 718 F.3d at 1249 (quoting Graham v. Connor, 490 U.S. at 396))(emphasis in Response and alterations in Cavanaugh v. Woods Cross City).  The Plaintiffs posit that the Tenth Circuit "has identified other relevant factors," including the commands the officers gave the suspect before

using force, whether the suspect exhibited any overtly threatening behavior, how far the suspect was from the officers when they used force, and the suspect's "'manifest intention.'"  Response at 8 (quoting Estate of Larsen ex rel. Sturdivan v. Murr, 511 F.3d 1255, 1260 (10th Cir. 2008)). "There is no question," the Plaintiffs argue, that "the general principle governing the use of force is clearly established: deadly force is justified only if a reasonable officer . . . would have had probable cause to believe that there was a threat of serious physical harm to himself or others." Response at 9 (citing Graham v. Connor, 490 U.S. at 396; Cordova v. Aragon, 569 F.3d 1183, 1192 (10th Cir. 2009)).

The Plaintiffs then focus on what they describe as Franco's inconsistent reporting and testimony regarding his use of force against Howard.  See Response at 9-10.  The Plaintiffs contend that Franco "knew that administering a strike to the head can cause death," which, the Plaintiffs argue, renders it "undisputed that force applied to the head is deadly force and constitutes a serious use of force that must be reported."  Response at 10 (citing Franco Depo. at 73:12-74:3; id. at 75:23-76:13).  The Plaintiffs argue that "there was a kick to Mr. Howard's head; there was a temporal proximity to Mr. Howard's symptoms of being visibly incoherent and unresponsive; and a failure to transport Mr. Howard to a medical care facility for his injuries."  Response at 10.  "As such," the Plaintiffs aver, "there is a reasonable inference made that . . . Franco[] failed to take Mr. Howard to the hospital to avoid attention being brought to their use of excessive force."

The Plaintiffs then argue that, "[d]espite Mr. Howard initially evading arrest, he had no weapon and he was not verbally or physically resisting arrest in the video footage."  Response at 10.  "Most importantly," the Plaintiffs contend, Howard "was not a danger to the officer, himself, or the public at the time that force, including deadly force, was used on him."  Response at 10-11.  The Plaintiffs ask that the Court focus primarily on the circumstances when Franco used

force, rather than the crime of which he was suspected and his fleeing the officers, as the Plaintiffs contend that, when Franco used force, Howard had submitted to arrest.  See Response at 11. Applying the Graham v. Connor factors, the Plaintiffs acknowledge that Howard had "committed a serious crime," but argue that Howard "did not actively resist or attempt to evade arrest" when Franco used force.  Response at 11.  The Plaintiffs accordingly argue that the Graham v. Connor factors "weigh in favor of Plaintiffs."  Response at 11.  Turning to the Tenth Circuit's additional factors, the Plaintiffs note that Howard was unarmed when Franco used force, and Howard "never made hostile motions with a weapon."  Response at 11.  The Plaintiffs also note that five other officers surrounded Howard when Franco used force, negating the need for a reasonable officer to administer a knee strike to Howard's head.  See Response at 11.  The Plaintiffs contend that this context means that "it was clearly established that the Defendant Franco . . . [was] not justified in using deadly force or striking Mr. Howard in the face and head."  Response at 11.

The Plaintiffs next seek to distinguish Franco's cited cases.  See Response at 11.  Starting with Youbyoung Park v. Gaitan, the Plaintiffs aver that, unlike that case's facts, "the only evidence of resistance is Officer Franco's testimony that Mr. Howard was concealing his hands."  Response at 11.  The Plaintiffs argue that, in Youbyoung Park v. Gaitan, the plaintiff "fought back 'forcefully' by tensing his arms, bracing his legs, and attempting to pull away from the officers." Response at 11 (quoting 680 F. App'x at 739).  The Plaintiffs say that the Tenth Circuit concluded that the defendants' use of force, "including a knee strike to Mr. Park's torso and taking him to the ground," was proportional to the plaintiff's "'forceful[]' physical resistance."  Response at 12 (quoting 680 F. App'x at 739)(alteration in Response and not in Youbyoung Park v. Gaitan).  The Plaintiffs argue that, unlike in Youbyoung Park v. Gaitan, here "there is no testimonial or video evidence that supports even an inference that Mr. Howard was fighting back."  Response at 12.

"To the contrary," the Plaintiffs assert, Howard "drove at a normal rate of speed in a stolen car," which, though felonious, is not a violent crime.  Response at 12.  The Plaintiffs say that Howard "got out of the vehicle as ordered with his hands up and immediately ran away."  Response at 12. The Plaintiffs acknowledge that, in so acting, Howard evaded arrest, but assert that Howard quickly surrendered and submitted to arrest in a nonthreatening manner.  See Response at 12.  The Plaintiffs argue that the Court should consider whether, at that moment, a reasonable officer would conclude that force was necessary to protect him- or herself or to effect arrest.  See Response at 12. The Plaintiffs contend that a reasonable officer would not conclude that such force was necessary. See Response at 12.  The Plaintiffs aver that Franco forcefully brought Howard to the ground and then used his knee to strike Howard's head even though Howard submitted to arrest and even though several other officers had arrived to arrest Howard.  See Response at 12.

The Plaintiffs next seek to distinguish Serrano v. United States.  See Response at 12.  The Plaintiffs say that, in that case, the plaintiff had "absconded from parole" and the defendant United States Marshals knew he had a history of violence against law enforcement and believed he was armed.  Response at 12 (citing Serrano v. United States, 766 F. App'x at 568).  The Plaintiffs describe the plaintiff "reaching in his [vehicle] for what could have been a firearm after being shot by other defendants."  Response at 13 (citing 766 F. App'x at 566).  "In contrast to Mr. Serrano," the Plaintiffs argue, Franco did not know anything of Howard's criminal history, and Howard "was not known to be armed and [does not have] a history of fleeing and being combative with law enforcement."  Response at 12.

Finally, the Plaintiffs argue that their loss of consortium claims are "viable."  Response at 13.  The Plaintiffs concede that, if the Court grants summary judgment in Franco's favor on Count I, "there cannot be a derivative loss of consortium claim."  Response at 13.  The Plaintiffs

argue, however, that, because Franco is not entitled to qualified immunity, he is not entitled to summary judgment on Count I.  See Response at 13.  As such, the Plaintiffs contend that their loss-of-consortium claims are valid.  See Response at 13.  The Plaintiffs therefore argue that the Court should deny the MSJ.  See Response at 13.

### 3.    **The Reply**.

Franco replies.  See Reply at 1.  Franco first asserts that, on October 30, 2015, when Franco arrested and used force on Howard, "there was no case law holding that a knee strike constitutes deadly force."   Reply at 8-9 (citing Myser v. Spokane Cty., No. CV-06-24-FVS, 2008 WL 4833294, at *8 (E.D. Wash. Nov. 3, 2008)(Van Sickle, J.)),  Franco further contends that, in 2015, the United States Court of Appeals for the Sixth Circuit held that "when a person actively resists arrest by, for instance, struggling, verbalizing threats, or refusing to comply with officers' commands, police may tase the person or use a knee strike."  Reply at 9 (citing Rudlaff v. Gillispie, 791 F.3d 638, 641-42 (6th Cir. 2015)).  Franco says that the video evidence "reveals that Defendant Franco delivered one knee strike to the Plaintiff's left shoulder" and argues that "there is no physical evidence to corroborate the Plaintiff's story, that Defendant Franco, a fit 220[-]pound man, delivered multiple knew [sic] strikes to the left side of the Plaintiff's head."  Reply at 8 (citing "[a]ll videos attached to Document No. 104").  Franco also disagrees with the Plaintiffs' contention that Howard did not resist arrest, and notes that, when video evidence "blatantly contradict[s]" a party's contentions, "the Court need not accept them as true."  Reply at 11 (citing Scott v. Harris, 550 U.S. at 380-81).

Franco next argues that he is qualifiedly immune from the Plaintiffs' Fourth Amendment claims against him.  See Reply at 9.  Franco first reasserts that he did not violate Howard's Fourth Amendment rights.  See Reply at 10.  Franco contends that "all three *Graham* factors support

Officer Franco's use of force."  Reply at 11 (emphasis in Reply).  Franco argues that Howard's theft of the bait vehicle, his attempt at fleeing, and his "failing to comply with [the officers'] commands and their attempts to take him into custody" all render Franco's use of force objectively reasonable.  Reply at 11 (citing Graham v. Connor, 490 U.S. at 396).  Franco contends that, with Serrano v. United  and Youbyoung v. Gaitan, the Tenth Circuit sanctioned Franco's use of force against Howard as objectively reasonable.  See Reply at 11 (citing Youbyoung Park v. Gaitan, 680 F. App'x at 739-40; Serrano v. United States, 766 F. App'x at 569).  Franco then argues that, even if his use of force violates Howard's Fourth Amendment rights, those rights are not clearly established.  See Reply at 11.  Franco asserts that he is "unable to locate a case holding that a similar use of force under these circumstances violates an individuals [sic] Fourth Amendment rights."  Reply at 12.  Because no caselaw exists that would inform a reasonable official that Franco's actions violate the Fourth Amendment, Franco argues that Howard's asserted rights are not clearly established.  See Reply at 11-12.  Accordingly, Franco avers that he is entitled to qualified immunity and requests that the Court grant the MSJ.  See Reply at 12.

### 4.    The Hearing.

The Court held a hearing on February 19, 2020.  See Draft Transcript of Hearing at 1:21 (held February 19, 2020)("Tr.").[19]  The Court began the hearing by previewing the Feb. 21 MOO, which it had not yet filed, to inform the parties' argument.  See Tr. at 3:9-4:13 (Court).  The Court informed the party that it would grant summary judgment in Daffron, Chafin, and Molina's favor on Counts I and III, and discussed the Feb. 21 MOO's undisputed material facts.  See Tr. at 5:17-19 (Court); id. at 6:2-11 (Court).  Specifically, the Court noted that the evidence, in the light most

---

[19]The Court's citation to the hearing transcript refers to the unedited draft transcript. Accordingly, page and line numbers are subject to slight change in the final transcript.

favorable to the Plaintiffs, shows that Franco delivered a single knee strike to Howard's head.  See Tr. at 14:24-15:2 (Court).

Franco then began his argument.  See Tr. at 15:14-18 (Martinez).  Franco directed the Court to Serrano v. United States and asserted that, in that case, the Tenth Circuit concluded that a knee strike to a felony suspect's head is objectively reasonable when the suspect "was not compliant with demands to put his hands behind his back."  Tr. at 16:10-11 (Martinez).  See id. at 16:1-8 (Martinez).  Franco argued that Serrano v. United States establishes that Franco's use of force against Howard is objectively reasonable, because, like in Serrano v. United States, Howard "failed to follow orders and was not showing his hands."  Tr. at 16:21-24 (Martinez).  Franco also asserted that, in Serrano v. United States, the district court concluded that the plaintiff did not prove that the complained-of force "caused any lasting injury," which factored into the district court's and the Tenth Circuit's holding that there was no constitutional violation.  Tr. at 17:4-12 (Martinez).  Franco argued that the Plaintiffs have presented "no evidence the force used was excessive or caused him any injury," and so Franco's use of force cannot be unconstitutionally excessive.  Tr. at 17:14-21 (Martinez).  Franco turned to Youbyoung Park v. Gaitan, in which, Franco asserted, the Tenth Circuit "determined that a knee strike used on someone while they were trying to effect an arrest was reasonable under the circumstances."  Tr. at 17:22-18:2 (Martinez).  Franco argued that the Plaintiffs "cited no case at all that would hold that" Franco's knee strike to Howard's head "violated his rights or clearly established law."  Tr. at 18:4-8 (Martinez).

Franco then argued that the Howard Aff. is inadmissible, because Howard has "been determined to be incompetent."  Tr. at 18:9-13 (Martinez).  Franco also asserted that, in response to one of Franco's interrogatories, Howard's guardian stated that Howard could not recall any interactions with law enforcement.  See Tr. at 18:13-15 (Martinez).  Franco noted that Howard's

"psychological evaluation specifically determined that he's unable to read," but Franco argued that the Howard Aff. "doesn't indicate that it was read to" Howard.  Tr. at 18:18-22 (Martinez).  Franco averred that the Howard Aff. "is a sham affidavit," because it "contradicts other evidence" which the Plaintiffs provided in discovery, and so Franco requested that the Court strike the Howard Aff. for the MSJ's purposes.  Tr. at 18:23-19-4 (Martinez).

The Court then asked Franco whether he directs his argument primarily at qualified immunity's clearly-established prong, or whether he argues that Franco committed no constitutional violation.  See Tr. at 19:12-17 (Court).  "Obviously," Franco responded, the clearly-established prong is "stronger," because "there is no clearly established law on this matter."  Tr. at 19:18:21 (Martinez).  Franco nonetheless averred that he used constitutionally permissible force, because Howard was a noncompliant felony suspect whom Franco reasonably suspected was armed.  See Tr. at 19:21-20:9 (Martinez).

The Plaintiffs responded.  See Tr. at 20:22 (Court).  The Plaintiffs argued that, although "some force is authorized," Franco's use of "deadly force" is objectively unreasonable, because four officers were assisting in handcuffing Howard in close proximity to one another when Franco used force.  Tr. at 21:11:14 (Oliveros).  See id. at 20:23-21:7 (Oliveros).  Franco's use of force is deadly, the Plaintiffs argued, because "a strike to the head has capacity to inflict serious bodily harm, or deadly harm."  Tr. at 21:25-22:1 (Oliveros).  The Plaintiffs asserted that, to justify such force, "there should be a serious threat of harm, and in this case, what we have is Mr. Howard being subdued by all four[] officers, and he is not presenting any serious threat of harm" to the officers when Franco struck Howard.  Tr. at 22:7-11 (Oliveros).

The Plaintiffs turned to Franco's cited cases.  See Tr. at 22:12 (Oliveros).  The Plaintiffs distinguished Serrano v. United States by arguing that the defendant United States Marshals in that

case were aware of the plaintiff's history of violence towards law enforcement officers and used hand strikes, rather than knee strikes, to the plaintiff's head.  See Tr. at 22:17-23:3 (Oliveros).  The Plaintiffs also pointed to Cordova v. Aragon as clearly establishing Howard's right to be free from deadly force during his arrest.  See Tr. at 27:12-14 (Oliveros).  The Court asked the Plaintiffs which case most clearly establishes Howard's asserted right.  See Tr. at 28:13-14 (Court).  The Plaintiffs responded that Tennessee v. Garner, 471 U.S. 1 (1985), and Cordova v. Aragon most directly support their position.  See Tr. at 28:17-18 (Oliveros).  The Plaintiffs conceded that, in Cordova v. Aragon, the Tenth Circuit affirmed that the defendant officer was entitled to qualified immunity, but the Plaintiffs argued that the Tenth Circuit's use-of-force discussion in that case clearly established Howard's asserted right.  See Tr. at 28:18-25 (Oliveros).

The Plaintiffs next discussed the evidence that Franco and the Plaintiffs submit with their summary judgment briefs.  See Tr. at 23:6 (Oliveros).  The Plaintiffs asked that the Court temper its reliance upon the officers' reporting and upon the Franco Depo., because the Plaintiffs argue that the officers' reporting raises questions about their credibility.  See Tr. at 23:6-9 (Oliveros).  Specifically, the Plaintiffs said that "Franco . . . made four statements and he never says that he struck Mr. Howard in the face," and that Franco has made contradictory statements about where he struck Howard.  Tr. at 23:20-25 (Oliveros).  The Plaintiffs contended that Franco's inconsistent reporting "at a minimum creates an issue of fact."  Tr. at 24:5-6 (Oliveros).

The Plaintiffs then sought to rebut Franco's argument about Howard's competency and the Howard Aff.'s admissibility.  The Plaintiffs asserted that Franco "is conflating the issues between legal competency, which is the competency that the Court evaluates to find out if someone is able to stand trial and assist their attorney in their defense," and witness competency.  Tr. at 24:9-13 (Oliveros).  Witness competency, the Plaintiffs argued, is "much broader, and it really has to do

with whether . . . a witness has foundation," and understands that he or she must testify truthfully. Tr. at 24:13-15 (Oliveros).  The Plaintiffs "concede that Mr. Howard does have some competency issues," but argued that he recalls his arrest and understands his obligation to testify truthfully.  Tr. at 25:10-15 (Oliveros).  The Plaintiffs also contended that the Howard Aff. does not create a sham issue of fact, because the Plaintiffs submitted other evidence that corroborates the Howard Aff. See Tr. at 24:19-23 (Oliveros).  The Plaintiffs asserted that the lapel videos show that APD officer Michael Jones was aware of Howard's preexisting head injury and was concerned, after Howard's arrest, that Howard might have suffered a traumatic head injury as a result of the officers' use of force.  See Tr. at 25:5-10 (Oliveros).  The Court responded that witness "competency is a very difficult thing to knock out as a matter of law."  Tr. at 26:2-3 (Court).  The Court stated that competency is not a binary, on-off concept, and that, while some would-be witnesses rank low on the competency spectrum, such issues affect testimony's weight and not its admissibility.  See Tr. at 26:9-13 (Court).

Franco replied that, in Mullenix v. Luna and White v. Pauly, the Supreme Court admonished lower courts to require a high degree of factual similarity in precedential cases for a right to be clearly established.  See Tr. at 30:18-22 (Martinez).  Franco argued that "[t]here simply isn't a case in this jurisdiction that has held that what [Franco] did was unconstitutional."  Tr. at 31:3-5 (Martinez).   Franco asserted that, in Serrano v. United States, the Tenth Circuit established that the Fourth Amendment does not prohibit law enforcement officers from striking noncompliant felony suspects in the head, even those with preexisting head injuries and even when the officer is mistaken about the threat that the suspect poses.  See Tr. at 31:16-22 (Martinez).  The Court then indicated that it was disinclined to grant summary judgment on whether Franco violated Howard's constitutional rights, because the parties genuinely dispute material facts.  See Tr.

at 32:10-13 (Court).  The Court said that it is "a little concerned that" the Plaintiffs' cited cases are too dissimilar to this case, but opined that the Tenth Circuit should grant more leeway regarding precedential similarity in deadly force cases lest plaintiffs never prevail on such cases.  Tr. at 32:16-20 (Court).  The Court noted, however, that the "Tenth circuit has been very, very strict." Tr. at 32:23-24 (Court).

5.      **The Feb. 21 MOO.**

On February 21, 2020, the Court granted summary judgment in Daffron, Chafin, and Molina's favor.  See Feb. 21 MOO, 2020 WL 873937, at *1.  In the Feb. 21 MOO, the Court concludes, first, that Daffron is entitled to qualified immunity on the Plaintiffs' excessive force claim, because Daffron acted reasonably in delivering two knee strikes to Howard's shoulder to effect Howard's arrest.  See Feb. 21 MOO, 2020 WL 873937, at *30.  Specifically, the Court concludes that Daffron's knee strikes did not violate Howard's Fourth Amendment rights, and that, even if there was a constitutional violation, those rights were not clearly established.  See Feb. 21 MOO, 2020 WL 873937, at *30.  The Court next concludes that Daffron, Chafin, and Molina are entitled to summary judgment on the Plaintiffs' failure-to-intervene claim, because the officers did not have a realistic opportunity to intervene.  See Feb. 21 MOO, 2020 WL 873937, at *36.  The Court holds that Chafin and Molina did not have an opportunity to intervene against Daffron and Franco's use of force, and Daffron did not have an opportunity to intervene against Franco's use of force.[20]  See Feb. 21 MOO, 2020 WL 873937, at *36-38.  Finally, the Court concludes that,

---

[20]The Court analyzed only the Plaintiffs' failure to intervene claim regarding Franco's knee strike, because the Plaintiffs did not, in their response to Daffron, Chafin, and Molina's motion for summary judgment, allege as a material fact that Franco struck Howard's face as Howard surrendered.  See Feb. 21 MOO, 2020 WL 873937, at *36.  The Court pauses to note that, even had the Plaintiffs so alleged, the result would be the same, because Daffron, Chafin, and Molina

because Daffron, Chafin, and Molina are entitled to summary judgment on each of the Plaintiffs direct claims against them, they are entitled to summary judgment on the Plaintiffs' loss-of-consortium claim against them.  See Feb. 21 MOO, 2020 WL 873937, at *41.

**6.**     **The Motion to Clarify.**

On February 25, 2020, the Plaintiffs requested that the Court "Clarify the Record regarding their Response."   Motion to Clarify at 1, filed Feb. 25, 2020 (Doc. 134)("Motion to Clarify")(capitalization in original).   The Plaintiffs seek to amend their proposed undisputed material facts in response to the Feb. 21 MOO.  See Motion to Clarify at 1.  The Plaintiffs assert that they "dispute Defendant Franco's purported 'undisputed' material fact that he struck Mr. Howard only once in the shoulder."  Motion to Clarify ¶ 1, at 1 (quoting MSJ ¶ 9, at 3).  The Plaintiffs propose as fact that Franco "struck Mr. Howard 'at least once' in the head and that he administered several other strikes."  Motion to Clarify ¶ 1, at 1-2 (citing Jury Report at 3; Franco Interview at 8:34-8:58).  The Plaintiffs aver that "[i]t is clear from the video when played in slow motion that Defendant Franco kicks or punches Mr. Howard in the face before a second knee strike to his head moments later."  Motion to Clarify ¶ 2, at 2 (citing Franco Lapel Video at 7:07-7:10).  The Plaintiffs request that the Court "clarify the record," and that the Court consider the Plaintiffs' new proposed fact in deciding the MSJ.  Motion to Clarify at 2.

**7.**     **The Response to the Plaintiffs' Motion to Clarify.**

Franco responds to the Plaintiffs' Motion to Clarify.  See Defendant Franco's Response to Plaintiffs' Motion to Clarify the Record, filed March 10, 2020 (Doc. 136)("Motion to Clarify

---

were behind Franco, who reached Howard first, when Franco struck Howard's face.  See Feb. 21 MOO, 2020 WL 873937, at *4 n.23.

Response").  Franco first quotes the Plaintiffs' factual allegations in the Complaint and notes that the Plaintiffs do not allege that Franco struck Howard's face after Howard's surrender.  See Motion to Clarify Response at 1-2 (quoting Complaint ¶¶ 15, 17, 21, at 3-4).  Franco also notes that he "attempted to ascertain the precise nature of the Plaintiff's claims of alleged excessive force though discovery requests," but asserts that Stevenson "specifically stated that Mr. Howard has no recollection of his contact with law enforcement during the requested time period, 2010 to present."  Motion to Clarify Response at 2.  Franco asserts that "the only factual allegations [that he] has regarding the Plaintiff's claims are the allegations contained in the Plaintiff's Complaint."  Motion to Clarify Response at 2.

Franco characterizes the Motion to Clarify as a "procedural irregularity" and contends that the Federal Rules of Civil Procedure do not permit clarifying the record at this stage of the proceedings.  Motion to Clarify Response at 2.  Franco argues that, because the Plaintiffs do not cite any authority to support the Motion to Clarify, the Court "need not devote much time to this Motion."  Motion to Clarify Response at 2 (citing United States v. Quintana-Grijalva, 332 F. App'x 487, 491 (10th Cir. 2009)(unpublished); MacArthur v. San Juan Cty., 495 F.3d 1157, 1160-61 (10th Cir. 2007)("[M]ere conclusory allegations with no citations to the record or any legal authority for support does not constitute adequate briefing.")).  As for the Plaintiffs' requested clarifications, Franco asserts that the Court reviewed carefully the record in the Feb. 21 MOO, and the Plaintiffs' Motion to Clarify is merely an expression of the Plaintiffs' disagreement with the Feb. 21 MOO's Factual Background section.  See Motion to Clarify Response at 3.

Next, Franco returns to his argument that Howard suffered no injury.  See Motion to Clarify Response at 4.  Franco contends that the photographs of Howard after the incident "belie[]" Howard's Fourth Amendment claim.  Motion to Clarify Response at 4.  Franco characterizes those

photographs as not showing any injury, and Franco argues, therefore, that his use of force cannot be deemed excessive.  See Motion to Clarify Response at 4-5 (citing Serrano v. United States, 766 F. App'x at 569).  Although Franco "denies that he struck Plaintiff in the head as determined in the light most favorable to the Plaintiff," he contends that, as a matter of law, his use of knee strikes is constitutionally reasonable.  Motion to Clarify Response at 5 & n.3.  Franco then cites several additional authorities to support this contention.  See Motion to Clarify Response at 5-6 (citing Nolin v. Isbell, 207 F.3d 1253, 1258 n.4 (11th Cir. 2000); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997); Woodruff v. City of Trussville, 434 F. App'x 852, 855 (11th Cir. 2011)(unpublished); Reyes v. Chinnici, 54 F. App'x 44 (3rd Cir. 2002)(unpublished); Lyell v. Schachle, No. 1:95-00351995, WL 870803 (M.D. Tenn. 1995)(Griffin, M.J.); Jackson v. Hurley, No. C. 91-2170, 1993 WL 515688 (N.D. Cal. 1993)(Caulfield, J.); DeArmas v. Jaycox, No. 92 CIV. 6139, 1993 WL 37501 (S.D.N.Y. 1993)(McKenna, J.), aff'd 14 F.3d 591 (2nd Cir. 1993)).  Accordingly, Franco asserts that, while the Court should not grant the Motion to Clarify, Franco is entitled to summary judgment regardless.  See Motion to Clarify Response at 5-6.

### 8. The Motion to Clarify Reply.

The Plaintiffs reply.  See Reply to Defendant Franco's Response to Plaintiffs' Motion to Clarify at 1, filed March 24, 2020 (Doc. 139)(Motion to Clarify Reply).  The Plaintiffs first contend that the facts which the Court included in the Feb. 21 MOO derive from "a different record," and so the Plaintiffs' Motion to Clarify does not express mere disagreement with the Court's factual conclusions.  See Motion to Clarify Reply at 1-2.  The Plaintiffs assert that they "seek to ensure that their submission on Defendant Franco's Motion reflects that Plaintiffs find it material that the video evidence *that is already in the record* shows that Defendant Franco struck Mr. Howard in the face or head more than once."  Motion to Clarify Reply at 2 (emphasis in original).  The

Plaintiffs refer to the Franco Lapel Video and the Jury Report, in which Jury indicates that he "believed that either Mr. Howard assumed a fetal position on his own, or that Officer Franco pushed him."  Motion to Clarify Reply at 2 (citing Jury Report at 2).  The Plaintiffs argue that, contrary to Franco's contention, they "now seek to clarify the record and contend that, viewing the video in the light most favorable to Plaintiffs, it is clear from the video -- particularly when viewed in slow motion -- that Officer Franco either struck or kicked Mr. Howard in the head to get him on the ground."  Motion to Clarify Reply at 2.  The Plaintiffs cite Scott v. Harris for the proposition that the Court may rely on the record's video evidence and disregard the parties' initial factual assertions.  See Motion to Clarify Reply at 2 (citing Scott v. Harris, 550 U.S. at 374).

The Plaintiffs turn to a rule 403 argument and aver that Franco's strikes are relevant to the Court's Fourth Amendment analysis.  See Motion to Clarify Reply at 2.  The Plaintiff's contend that the qualified immunity caselaw directs the Court to consider separately each use of force to determine whether Franco violated Howard's clearly established rights.  See Motion to Clarify Reply at 2-3 (citing McCoy v. Meyers, 887 F3d 1034, 1046 (10th Cir. 2018); Casey v. City of Fed. Heights, 509 F.3d at 1281-82; Weigel v. Broad, 544 F.3d at 1152-55).  The Plaintiffs then characterize the incident and assert that Franco's use of force came as Howard "was in the process of fleeing after being engaged in a non-violent theft."  Motion to Clarify Reply at 2.  Next, although the Motion to Clarify does not pertain to Franco's knee strike, the Plaintiffs assert that Franco's knee strike "is even more egregious."  Motion to Clarify Reply at 3.  The Plaintiffs contend that this egregiousness is relevant to the Fourth Amendment analysis under Tenth Circuit caselaw.  See Motion to Clarify Reply at 3 (citing Booker v. Gomez, 745 F.3d 405, 427-28 (10th Cir. 2014)).  According to the Plaintiffs, the parties disagree about the nature and extent of Franco's use of force, rendering summary judgment inappropriate.  See Motion to Clarify Reply at 3.

The Plaintiffs turn to Franco's argument that Howard suffered no injury.  See Motion to Clarify Reply at 3.  The Court should discount Franco's assertion, the Plaintiffs argue, because "neither Defendant Franco, nor anyone else at APD called a medic or ambulance to the scene to have Mr. Howard's condition assessed."  Motion to Clarify Reply at 3-4.  The Plaintiffs assert that, because the Defendants did not have Howard evaluated medically, Franco forfeited the ability to argue that his use of force did not injure Howard.  See Motion to Clarify Reply at 4.  Howard also contends that, contrary to Franco's argument, the record reflects Howard's injuries.  See Motion to Clarify Reply at 4 (citing Response ¶¶ 12, 19, at 4-5).  Accordingly, the Plaintiffs request that the Court grant the Motion to Clarify.  See Motion to Clarify Reply at 4.

### 9.    The March 24, 2020, Hearing.

The Court held a hearing on the Motion to Clarify.  See Draft Hearing Transcript at 1:1 (taken March 24, 2020)(Court)("March 24 Tr.").[21]  The Court began by summarizing the Court's progress on this Memorandum Opinion and Order.  See March 24 Tr. at 3:10-12 (Court).  The Court summarized its view of the undisputed facts regarding Franco's use of force and indicated that it was inclined to grant the MSJ.  See March 24 Tr. at 4:2-10 (Court); id. at 8:21-22 (Court). The Court also indicated that, because the facts that the Plaintiffs assert in the Motion to Clarify are already in the record, the Court is inclined to grant the Motion to Clarify.  See March 24 Tr. at 9:22-25 (Court).  The parties then declined to add any argument beyond that contained in the briefs. See March 24 Tr. at 10:9-11 (Oliveros); id. at 11:4-6 (Martinez).

---

[21]The Court's citation to the March 24 Tr. refers to the court reporter's unedited draft transcript.  Accordingly, page and line numbers are subject to slight changes in the final transcript.

## LAW REGARDING MOTIONS FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the initial burden of 'show[ing] that there is an absence of evidence to support the nonmoving party's case.'" Herrera v. Santa Fe Pub. Sch., 956 F. Supp. 2d 1191, 1221 (D.N.M. 2013)(Browning, J.)(alteration in Herrera v. Santa Fe Pub. Sch.)(quoting Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991)). See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)("Celotex").

> Before the court can rule on a party's motion for summary judgment, the moving party must satisfy its burden of production in one of two ways: by putting evidence into the record that affirmatively disproves an element of the nonmoving party's case, or by directing the court's attention to the fact that the non-moving party lacks evidence on an element of its claim, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323-25. On those issues for which it bears the burden of proof at trial, the nonmovant "must go beyond the pleadings and designate specific facts to make a showing sufficient to establish the existence of an element essential to his case in order to survive summary judgment." Cardoso v. Calbone, 490 F.3d 1194, 1197 (10th Cir. 2007)(internal quotations and brackets omitted).

Plustwik v. Voss of Nor. ASA, No. 2:11CV00757 DS, 2013 WL 1945082, at *1 (D. Utah May 9, 2013)(Sam, J.)(emphasis added). "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence -- using any of the materials specified in Rule 56(c) -- that would entitle it to a directed verdict if not controverted at trial." Celotex, 477 U.S. at 331 (Brennan, J., dissenting)(emphasis in original).[22] Once the movant meets this burden,

---

[22]Although the Honorable William J. Brennan, Jr., then-Associate Justice of the Supreme Court, dissented in Celotex, this sentence is widely understood to be an accurate statement of the law. See 10A Charles Allen Wright & Arthur R. Miller, Federal Practice and Procedure § 2727,

rule 56 requires the nonmoving party to designate specific facts showing that there is a genuine issue for trial.  See Celotex, 477 U.S. at 324; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1985)("Liberty Lobby").  In American Mechanical Solutions, LLC v. Northland Piping, Inc., 184 F. Supp. 3d 1030 (D.N.M. 2016)(Browning, J.), the Court granted summary judgment for the defendant when the plaintiff did not offer expert evidence supporting causation or proximate causation in its breach-of-contract or breach-of-the-implied-warranty-of-merchantability claims.  See 184 F. Supp. 3d at 1075-78.  The Court reasoned that the plaintiff could prove neither the breach-of-contract claim's causation requirement nor the breach-of-the-implied-warranty-of-merchantability claim's proximate-causation requirement with mere common knowledge, and so New Mexico law required that the plaintiff bolster its arguments with expert testimony, which the plaintiff had not provided.  See 184 F. Supp. 3d at 1067, 1073, 1075, 1079.  Without the requisite evidence, the plaintiff, the Court determined, failed to prove "an essential element of the nonmoving party's case," rendering "all other facts immaterial."  184 F. Supp. 3d at 1075 (internal quotation marks omitted)(quoting Plustwik v. Voss of Nor. ASA, 2013 WL 1945082, at *1).  Thus, if a plaintiff has the burden of proof, and the plaintiff has no competent evidence, the defendant may move, without any competent evidence itself, past the plaintiff's lack of competent evidence, and secure summary judgment.  See, e.g., Celotex, 477 U.S. at 323-25 (providing that summary judgment is proper where a plaintiff lacks evidence on an essential element of its case); Am. Mech. Sols., LLC v. Northland Piping, Inc., 184 F. Supp. 3d at 1075 (granting summary judgment because plaintiff lacked evidence on causation); Morales v. E.D. Entyre & Co., 382 F. Supp. 2d

---

at 470 (3d ed. 1998)("Although the Court issued a five-to-four decision, the majority and dissent both agreed as to how the summary-judgment burden of proof operates; they disagreed as to how the standard was applied to the facts of the case.").

1252, 1272 (D.N.M. 2005)(Browning, J.)(granting summary judgment because plaintiff lacked competent evidence that defendants defectively manufactured an oil distributor). A conclusory assertion that the plaintiff lacks evidence is insufficient, however, to secure summary judgment; the defendant must make some evidentiary showing that the plaintiff lacks competent evidence. See Halley v. Huckaby, 902 F.3d 1136, 1143 (10th Cir. 2018)(stating that summary judgment may be warranted if the movant notes a lack of evidence for an essential element of the claim). See also 11 James Wm. Moore et al., Moore's Federal Practice § 56.40[1][b][iv], at 56-109 to -111 (3d ed. 2018).

The party opposing a motion for summary judgment must "set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990). See Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993)("However, the nonmoving party may not rest on its pleadings but must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." (internal quotation marks omitted)). Rule 56(c)(1) provides: "A party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1)(A). It is not enough for the party opposing a properly supported motion for summary judgment to "rest on mere allegations or denials of his pleadings." Liberty Lobby, 477 U.S. at 259. See Abercrombie v. City of Catoosa, 896 F.2d 1228, 1231 (10th Cir. 1990); Otteson v. United States, 622 F.2d 516, 519 (10th Cir. 1980)("[O]nce a properly supported summary judgment motion is made, the opposing party may

not rest on the allegations contained in his complaint, but must respond with specific facts showing the existence of a genuine factual issue to be tried."   (citation and internal quotation marks omitted)).

Nor can a party "avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation."  Colony Nat'l Ins. v. Omer, No. 07-2123-JAR, 2008 WL 2309005, at *1 (D. Kan. June 2, 2008)(Robinson, J.)(citing Fed. R. Civ. P. 56(e); Argo v. Blue Cross & Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(McConnell, J.)).  "In responding to a motion for summary judgment, 'a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.'"  Colony Nat'l Ins. v. Omer, 2008 WL 2309005, at *1 (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988)).

To deny a motion for summary judgment, genuine factual issues must exist that "can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  A mere "scintilla" of evidence will not avoid summary judgment.  Vitkus v. Beatrice Co., 11 F.3d at 1539 (citing Liberty Lobby, 477 U.S. at 248).  Rather, there must be sufficient evidence on which the fact finder could reasonably find for the nonmoving party.  See Liberty Lobby, 477 U.S. at 251 (quoting Schuylkill & Dauphin Improvement Co. v. Munson, 81 U.S. (14 Wall.) 442, 448 (1871)("Schuylkill")); Vitkus v. Beatrice Co., 11 F.3d at 1539.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted."  Liberty Lobby, 477 U.S. at 249 (citations omitted).  Where a rational trier of fact, considering the record as a whole, cannot find for the nonmoving party, "there is no 'genuine issue for trial.'"  Matsushita Elec. Indus. Co. v.

Zenith Radio Corp., 475 U.S. at 587 (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

When reviewing a motion for summary judgment, the court should keep in mind certain principles.  First, the court's role is not to weigh the evidence, but to assess the threshold issue whether a genuine issue exists as to material facts requiring a trial.  See Liberty Lobby, 477 U.S. at 249.  Second, the ultimate standard of proof is relevant for purposes of ruling on a summary judgment motion, such that the court must "bear in mind the actual quantum and quality of proof necessary to support liability."  Liberty Lobby, 477 U.S. at 254.  Third, the court must resolve all reasonable inferences and doubts in the nonmoving party's favor, and construe all evidence in the light most favorable to the nonmoving party.  See Hunt v. Cromartie, 526 U.S. at 550-55; Liberty Lobby, 477 U.S. at 255 ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  (citation omitted)).  Fourth, the court cannot decide any issues of credibility.  See Liberty Lobby, 477 U.S. at 255.

There are, however, limited circumstances in which the court may disregard a party's version of the facts.  This doctrine has developed most robustly in the qualified immunity arena.  In Scott v. Harris, 550 U.S. 372 (2007), the Supreme Court concluded that summary judgment is appropriate where video evidence quite clearly contradicted the plaintiff's version of the facts.  See 550 U.S. at 378-81.  The Supreme Court explained:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.  Fed. Rule Civ. Proc. 56(c).  As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. [at] 586-587 . . . (footnote omitted).  "[T]he mere existence of *some* alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. [at] 247-248 . . . . When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

That was the case here with regard to the factual issue whether respondent was driving in such fashion as to endanger human life. Respondent's version of events is so utterly discredited by the record that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

Scott v. Harris, 550 U.S. at 380-81 (alterations in Scott v. Harris)(emphasis in Liberty Lobby).

The Tenth Circuit applied this doctrine in Thomson v. Salt Lake County, 584 F.3d 1304

(10th Cir. 2009), and explained:

[B]ecause at summary judgment we are beyond the pleading phase of the litigation, a plaintiff's version of the facts must find support in the record: more specifically, "[a]s with any motion for summary judgment, '[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts[.]'" *York v. City of Las Cruces*, 523 F.3d 1205, 1210 (10th Cir. 2008)(quoting *Scott*, 550 U.S. at 380); *see also Estate of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1258 (10th Cir. 2008).

Thomson v. Salt Lake Cty., 584 F.3d at 1312 (second alteration in Thomson v. Salt Lake Cty.,

third and fourth alterations in York v. City of Las Cruces). "The Tenth Circuit, in *Rhoads v. Miller*,

[352 F. App'x 289 (10th Cir. 2009)(Tymkovich, J.)(unpublished),] explained that the blatant

contradictions of the record must be supported by more than other witnesses' testimony[.]" Lymon

v. Aramark Corp., 728 F. Supp. 2d at 1249.

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise

their discretion and the related public interest in encouraging the vigorous exercise of official

authority." Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982). "Qualified immunity protects federal

and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'" Roybal v. City of Albuquerque, No. CIV 08-0181 JB/LFG, 2009 WL 1329834, at *10 (D.N.M. April 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).   Under § 1983, a plaintiff may seek money damages from government officials who have violated his or her constitutional or statutory rights.   To ensure, however, that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. at 638, the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, the officials are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. at 818.

> That means a court can often avoid ruling on the plaintiff's claim that a particular right exists. If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages. The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Greene, 563 U.S. 692, 705 (2011).

Qualified immunity shields government officials from liability where "'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009)(quoting Harlow v. Fitzgerald, 457 U.S. at 818).   Qualified immunity also shields officers who have "reasonable, but mistaken beliefs," and operates to protect officers from the sometimes "hazy border[s]" of the law.   Saucier v. Katz, 533 U.S. at 205.   When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct.   See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009); Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d 1028, 1079 (D.N.M. 2016)(Browning, J.).

1.     __Procedural Approach to Qualified Immunity__.

The Supreme Court revisited the proper procedure for lower courts to evaluate a qualified immunity defense in 2009.  In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand."  555 U.S. at 236.  The Supreme Court also noted that, while no longer mandatory, Saucier v. Katz' protocol -- by which a court first decides if the defendant's actions violated the Constitution, and then the court determines if the right violated was clearly established -- will often be beneficial.  See Pearson v. Callahan, 555 U.S. at 241.  In rejecting the prior mandatory approach, the Supreme Court recognizes that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district courts and Courts of Appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The Supreme Court also recognizes that the prior mandatory approach "departs from the general rule of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on questions of constitutionality unless such adjudication is unavoidable."  555 U.S. at 241 (alterations omitted).  See Reichle v. Howards, 566 U.S. 658, 664 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified immunity issues on the basis of a right being not "clearly established" by prior caselaw "comports with our usual reluctance to decide constitutional questions unnecessarily").

The Supreme Court recognizes seven circumstances where district courts "should address only"[23] the clearly established prong of the qualified immunity analysis: when (i) the first,

---

[23]In Camreta v. Greene, the Supreme Court, somewhat confusingly, states that there are seven circumstances in which the district courts "should address only" the clearly established

constitutional violation question "is so factbound that the decision provides little guidance for future cases"; (ii) "it appears that the question will soon be decided by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation of state law"; (iv) "qualified immunity is asserted at the pleading stage," and "the precise factual basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a risk of bad decisionmaking," because of inadequate briefing; (vi) discussing both elements risks "bad decisionmaking," because the court is firmly convinced that the law is not clearly established and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional question when "'it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right.'"   Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(Gorsuch, J.)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary, and the conduct is likely to face challenges only in the qualified immunity context.  Camreta v. Greene, 563 U.S. at 706-

---

prong, but, in the same sentence, notes that deciding the violation prong is left "to the discretion of the lower courts." Camreta v. Greene, 563 U.S. at 707.  In Kerns v. Bader, 663 F.3d 1173 (10th Cir. 2011), the Tenth Circuit interpreted Camreta v. Greene to mean that district courts are restricted from considering the violation prong in seven particular circumstances.  See Kerns v. Bader, 663 F.3d at 1180-81.  The Supreme Court, however, has not stressed the seven circumstances as mandatory.  Instead, it has recently reaffirmed only that lower courts "should think hard, and then think hard again before addressing both qualified immunity and the merits of an underlying constitutional claim."  District of Columbia v. Wesby, 138 S. Ct. 577, 589 n.7 (2018).  This language suggests that the inquiry is still discretionary, although the Court's discretion should be exercised carefully.

07.  See Kerns v. Bader, 663 F.3d at 1181.[24]  "Courts should think carefully before expending

'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory

---

[24]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.   See Sanchez v. Labate, 564 F. App'x 371, 372 (10th Cir. 2014)(unpublished)("If dispositive of the claim, we ordinarily need address only the second element of qualified immunity, that is, whether the law supporting a constitutional violation was clearly established."  (citing Kerns v. Bader, 663 F.3d at 1180)).  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)." 663 F.3d at 1187 n.5.
   The Tenth Circuit does not always undertake the clearly established law analysis before the constitutional violation analysis.  See, e.g., Savage v. Troutt, 774 F. App'x 574, 579 (10th Cir. 2019)(unpublished); Rudnick v. Raemisch, 774 F. App'x 446, 449 (10th Cir. 2019)(unpublished); Serrano v. United States, 766 F. App'x at 565.  Since Kerns v. Bader, the Tenth Circuit has commented:

> Although it is within the court's sound discretion to determine which of the two elements to address first, Pearson, 555 U.S. at 236 . . . , "the Supreme Court has recently instructed that courts should proceed directly to, 'should address only,' and should deny relief exclusively based on the second element" in certain circumstances,  Kerns, 663 F.3d at 1180 (quoting Camreta v. Greene, 563 U.S. [at] 707 . . . .)).

Serrano v. United States, 766 F. App'x at 565.  In Serrano v. United States, the Tenth Circuit stated that the district court addressed only the constitutional violation prong after concluding that Serrano had not established a constitutional violation and approved the district court's analysis, because the district court "also had to consider the reasonableness of the team's use of force for

- 46 -

_____

purposes of Serrano's [Federal Tort Claim Act, 28 U.S.C. §§ 1291, 1346, 1402, 2401-02, 2411-12, 2671-60,] claims." Serrano v. United States, 766 F. App'x at 565.

The Court believes, as a general rule, that the constitutional violation analysis should receive more attention. On remand from Kerns v. Bader, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by [the Tenth Circuit's] statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations. A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations. See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972). In Mitchum v. Foster, the Supreme Court explained:
>
>> Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.
>
> 407 U.S. at 238-39. Congress did not say it would remedy only violations of "clearly established" law, but that
>
>> [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.
>
> 42 U.S.C. § 1983. The Supreme Court established the qualified immunity defense in Pierson v. Ray, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional. See E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases, 24 B.Y.U. J. Pub. L. 313, 329 (2010). The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized

as being in good faith." <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly established prong became a part of the qualified immunity test.  <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only the guilty and is a judicially created, rather than legislatively created, remedy.  Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983.  J. Marceau, <u>The Fourth Amendment at a Three-Way Stop</u>, 62 Ala. L. Rev. 687, 687 (2011).  Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations.  <u>See</u> Christopher Slobogin, <u>Why Liberals Should Chuck the Exclusionary Rule</u>, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving . . . .  These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, <u>Constitutional Alternatives to the Exclusionary Rule</u>, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives).  In <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering.  <u>See</u> 547 U.S. at 596-97.  Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress.  It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights.  It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases but protect municipalities from damages in § 1983 cases.

<u>Kerns v. Bd. of Comm'rs</u>, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.).  <u>See</u> Richard E. Myers, <u>Fourth Amendment Small Claims Court</u>, 10 Ohio St. J. Crim. L. 571, 590-97 (2013)(arguing that municipalities should establish small-claims courts to adjudicate police officers' Fourth Amendment violations and award monetary judgments).  Since <u>Kerns v. Board of Commissioners</u>, the Court has also observed:

interpretation that will 'have no effect on the outcome of the case.'"  Ashcroft v. al-Kidd, 563 U.S. 731, 735 (2011)(quoting Pearson v. Callahan, 555 U.S. at 236-37).[25]  See Camreta v. Greene, 563 U.S. at 707 ("In general, courts should think hard, and then think hard again, before turning small cases into large ones.").  The Tenth Circuit will remand a case to the district court for further consideration when the district court has given only cursory treatment to qualified immunity's clearly established prong.  See Kerns v. Bader, 663 F.3d at 1182; Pueblo of Pojoaque v. New Mexico, 214 F. Supp. 3d at 1082-83.

## 2.    **Clearly Established Rights**.

To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that what he

---

The unfortunate result of Kerns v. Bader is that nuanced factual distinctions can create a near-insurmountable hurdle for plaintiffs attempting to overcome a qualified immunity defense without a precisely analogous precedent.

A secondary consequence of Kerns v. Bader is that constitutional protections are unlikely to develop in the Tenth Circuit beyond where they stood at the time the case was decided.

A.M. ex rel. Youngers v. N.M. Dep't of Health, 108 F. Supp. 3d 963, 1029 (D.N.M. 2015)(Browning, J.).

[25]The appellate courts have little appreciation for how hard it is to do a clearly established prong review first without looking -- closely and thoroughly -- at whether there is a constitutional right and whether there is a violation.  It is difficult to review the facts, rights, and alleged violations in the comparative cases without looking at the facts, rights, and alleged violations on the merits in the case before the Court.  Pearson v. Callahan sounds like a good idea in theory, but it does not work well in practice.  The clearly established prong is a comparison between the case before the Court and previous cases, and Pearson v. Callahan suggests that the Court can compare before the Court fully understands what it is comparing.  In practice, Saucier v. Katz works better.

or she violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th

Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed

and consistently recognized under the law of the jurisdiction as to be 'indisputable' and

'unquestioned.'"   Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir.

2011)[26](quoting Zweibon v. Mitchell, 720 F.2d 162, 172-73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court

or Tenth Circuit decision on point, or the clearly established weight of authority from other courts

must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  "In

determining whether the right was 'clearly established,' the court assesses the objective legal

reasonableness of the action at the time of the alleged violation and asks whether 'the contours of

the right [were] sufficiently clear that a reasonable official would understand that what he is doing

violates that right.'"   Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir.

---

[26]Lobozzo v. Colo. Department of Correction, is an unpublished opinion, but the Court can
rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before
it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be
cited for their persuasive value"). The Tenth Circuit has stated: "In this circuit, unpublished orders
are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. . . .  However,
if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and
would assist the court in its disposition, we allow a citation to that decision."  United States v.
Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Serrano v. United States, 776
F. App'x 561, 569 (10th Cir. 2019); Rudnick v. Raemisch, 774 F. App'x 446 (10th Cir. 2019);
Savage v. Troutt, 774 F. App'x 574 (10th Cir. 2019);  Choate v. Huff, 773 F. App'x 484 (10th Cir.
2019); Perry v. Durborow, 892 F.3d 1116 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377
(10th Cir. 2018); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552 (10th
Cir. 2017);  Youbyoung Park v. Gaitan, 680 F. App'x 724 (10th Cir. 2017); Brown v. City of Colo.
Springs, 709 F. App'x 906 (10th Cir. 2017); Sanchez v. Labate, 564 F. App'x 371 (10th Cir. 2014);
Wilson v. City of Lafayette, 510 F. App'x 775 (10th Cir. 2013); Yadon v. Hilton, 516 F. App'x
694 (10th Cir. 2013); Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707 (10th Cir. 2011); Wallin
v. Dycus, 381 F. App'x 819 (10th Cir. 2010); and Hall v. Burke, 12 F. App'x 856 (10th Cir. 2001),
have persuasive value with respect to a material issue, and will assist the Court in its disposition
of this Memorandum Opinion and Order.

2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202).  The Supreme Court has clarified that qualified immunity's clearly established prong is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Ashcroft v. al-Kidd, 563 U.S. at 741.  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  Reichle v. Howards, 566 U.S. at 664 (quoting Ashcroft v. al-Kidd, 563 U.S. at 741).  "[Q]ualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'"  Mullenix v. Luna, 136 S. Ct. at 308 (quoting Malley v. Briggs, 475 U.S. at 341).

"The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639.  The Supreme Court has stated: "[T]he clearly established right must be defined with specificity."  City of Escondido v. Emmons, 139 S. Ct. 500, 503 (2019).  "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742.  "[T]the clearly established law must[, rather,] be 'particularized' to the facts of the case," White v. Pauly, 137 S. Ct. at 552 (quoting Anderson v. Creighton, 483 U.S. at 640); under this view of the clearly established prong, a court should inquire whether clearly established law makes improper the actions that the officer took in the case's circumstances, see City of Escondido v. Emmons, 139 S. Ct. at 503 (directing the Court of Appeals to ask, in excessive force cases, "whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances").  See Ziglar v. Abbasi, 137 S. Ct. 1843, 1866 (2017)("[T]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'"

(quoting <u>Mullenix v. Luna</u>, 136 S. Ct. at 308)); <u>District of Columbia v. Wesby</u>, 138 S. Ct. 577, 591 (2018)("Tellingly, neither the panel majority nor the partygoers have identified a single precedent -- much less a controlling case or robust consensus of cases -- finding a Fourth Amendment violation under similar circumstances.").

The Tenth Circuit has, however, emphasized the Supreme Court's statements that, in some situations, "clearly established general rules of law can provide notice of the unlawfulness of an official's conduct in appropriate circumstances." <u>A.N. by & through Ponder v. Syling</u>, 928 F.3d 1191, 1198 (10th Cir. 2019). The Tenth Circuit has commented: "'[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers' that their conduct violates a constitutional right, and that such statements provide the required notice when 'the unlawfulness' of their conduct is 'apparent' from the pre-existing law." <u>A.N. by & through Ponder v. Syling</u>, 928 F.3d at 1198 (quoting <u>White v. Pauly</u>, 137 S. Ct. at 552). According to the Tenth Circuit, "In other words, '[g]eneral statements of the law can clearly establish a right for qualified immunity purposes if they apply with obvious clarity to the specific conduct in question.' And this is so 'even though the very action in question has not previously been held unlawful.'" <u>A.N. by & through Ponder v. Syling</u>, 928 F.3d at 1198 (first quoting <u>Halley v. Huckaby</u>, 902 F.3d 1136, 1149 (10th Cir. 2018), and then quoting <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002)). The Tenth Circuit has cautioned that such an approach is inappropriate where a case involves "relevant ambiguities." <u>Colbruno v. Kessler</u>, 928 F.3d 1155, 1165 (10th Cir. 2019)(citing <u>Aldaba v. Pickens</u>, 844 F.3d 870, 879 (10th Cir. 2016)("<u>Aldaba II</u>"); <u>Wilson v. City of Lafayette</u>, 510 F. App'x 775, 778 (10th Cir. 2013)(unpublished); <u>Thomson v. Salt Lake Cty.</u>, 584 F.3d at 1315-17).

Although the Tenth Circuit has recognized a sliding scale for qualified immunity's clearly established inquiry, <u>see</u> <u>Casey v. City of Fed. Heights</u>, 509 F.3d at 1284 ("We have therefore

adopted a sliding scale to determine when law is clearly established."), the Tenth Circuit may have

since walked back its holding that a sliding-scale is the appropriate analysis, see Aldaba II, 844

F.3d at 876.  In Aldaba II, the Tenth Circuit reconsidered its ruling from Aldaba v. Pickens, 777

F.3d 1148 (10th Cir. 2015)("Aldaba I"), that officers were entitled to qualified immunity after the

Supreme Court vacated its decision in light of Mullenix v. Luna.  In concluding that it had

previously erred in Aldaba I, the Tenth Circuit determined:

> We erred . . . by relying on excessive-force cases markedly different from
> this one.  Although we cited Graham v. Connor, 490 U.S. 386 (1989) to lead off
> our clearly-established-law discussion, we did not just repeat its general rule and
> conclude that the officers' conduct had violated it.  Instead, we turned to our
> circuit's sliding-scale approach measuring degrees of egregiousness in affirming
> the denial of qualified immunity.  We also relied on several cases resolving
> excessive-force claims.  But none of those cases remotely involved a situation as
> here.

Aldaba II, 844 F.3d at 876.  The Tenth Circuit further noted that its sliding-scale approach may

have fallen out of favor, because the sliding-scale test relies, in part, on Hope v. Pelzer, 536 U.S.

at 739-41, and the Supreme Court's most recent qualified immunity decisions do not invoke that

case.  See Aldaba II, 844 F.3d at 874 n.1.  See also Lowe v. Raemisch, 864 F.3d 1205, 1211 n.10

(10th Cir. 2017).  The Tenth Circuit explained:

> To show clearly established law, the Hope Court did not require earlier cases with
> "fundamentally similar" facts, noting that "officials can still be on notice that their
> conduct violates established law even in novel factual circumstances."  *Id.* at 741
> . . . .  This calls to mind our sliding-scale approach measuring the egregiousness of
> conduct.  *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012).  But the
> Supreme Court has vacated our opinion here and remanded for us to reconsider our
> opinion in view of *Mullenix*, which reversed the [United States Court of Appeals
> for the] Fifth Circuit after finding that the cases it relied on were "simply too
> factually distinct to speak clearly to the specific circumstances here."  136 S. Ct.
> at 312.  We also note that the majority opinion in *Mullenix* does not cite *Hope v.
> Pelzer* . . . .  As can happen over time, the Supreme Court might be emphasizing
> different portions of its earlier decisions.

Aldaba II, 844 F.3d at 874 n.1. Since Aldaba II, the Supreme Court has reversed, per curiam, another Tenth Circuit qualified immunity decision. See White v. Pauly, 137 S. Ct. at 551. In White v. Pauly, the Supreme Court explained: "The panel majority misunderstood the 'clearly established' analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment." White v. Pauly, 137 S. Ct. at 552.[27] The Supreme Court's per curiam reversals appear to have the Tenth

_____

[27]The Supreme Court signals to the lower courts that a factually identical or a highly similar factual case is required for the law to be clearly established, and the Tenth Circuit is now sending those signals to the district courts. See Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 556 (10th Cir. 2017)(unpublished)(reversing the Court's judgment that the case should proceed where a deceased plaintiff was backing away from the police and was not raising his gun when shot, because "the parties do not cite, nor could we find, any Supreme Court or Tenth Circuit case that is sufficiently close factually to the circumstances presented here to establish clearly the Fourth Amendment law that applies"). Factually identical or highly similar factual cases are not, however, the way the real world works. Cases differ. Many cases have so many facts that are unlikely to ever occur again in a significantly similar way. See York v. City of Las Cruces, 523 F.3d 1205, 1212 (10th Cir. 2008)("However, [the clearly established prong] does not mean that there must be a published case involving identical facts; otherwise we would be required to find qualified immunity wherever we have a new fact pattern."). The Supreme Court's view of the clearly established prong assumes that officers are routinely reading Supreme Court and Tenth Circuit opinions in their spare time, carefully comparing the facts in these qualified immunity cases with the circumstances they confront in their day-to-day police work. It is hard enough for the federal judiciary to embark on such an exercise, let alone likely that police officers are endeavoring to parse opinions. It is far more likely that, in their training and continuing education, police officers are taught general principles, and, in the intense atmosphere of an arrest, police officers rely on these general principles, rather than engaging in a detailed comparison of their situation with a previous Supreme Court or published Tenth Circuit case. It strains credulity to believe that a reasonable officer, as he is approaching a suspect to arrest, is thinking to himself: "Are the facts here anything like the facts in York v. City of Las Cruces?" Thus, when the Supreme Court grounds its clearly-established jurisprudence in the language of what a reasonable officer or a "reasonable official" would know, Kisela v. Hughes, 138 S. Ct. at 1153, yet still requires a highly factually analogous case, it has either lost sight of reasonable officer's experience or it is using that language to mask an intent to create "an absolute shield for law enforcement officers," Kisela v. Hughes, 138 S. Ct. at 1162 (Sotomayor, J. dissenting). The Court concludes that the Supreme Court is doing the latter, crafting its recent qualified immunity jurisprudence to effectively eliminate § 1983 claims against state actors in their individual capacities by requiring an indistinguishable case and by encouraging courts to go straight to the clearly established prong.

See Saenz v. Lovington Mun. Sch. Dist., 105 F. Supp. 3d 1271, 1297 n.4 (D.N.M. 2015)(Browning, J.).

The Court disagrees with the Supreme Court's approach. The most conservative, principled approach is to minimize the expansion of the judicially created clearly established prong, so that it does not eclipse the congressionally enacted § 1983 remedy. As the Cato Institute noted in a recent amicus brief, "qualified immunity has increasingly diverged from the statutory and historical framework on which it is supposed to be based." Brief of the Cato Institute as Amicus Curiae Supporting Petitioners at 2, White v. Pauly, 137 S. Ct. 548 (2017)(No. 17-1078)("Cato Brief"). "The text of 42 U.S.C. § 1983 . . . makes no mention of immunity, and the common law of 1871 did not include any across-the-board defense for all public officials." Cato Brief at 2. "With limited exceptions, the baseline assumption at the founding and throughout the nineteenth century was that public officials were strictly liable for unconstitutional misconduct. Judges and scholars alike have thus increasingly arrived at the conclusion that the contemporary doctrine of qualified immunity is unmoored from any lawful justification." Cato Brief at 2. See generally William Baude, Is Qualified Immunity Unlawful?, 106 Cal. L. Rev. 45 (2018)(arguing that the Supreme Court's justifications for qualified immunity are incorrect). Further, as the Honorable Clarence Thomas, Associate Justice for the Supreme Court, has argued, because the Supreme Court's qualified immunity analysis "is no longer grounded in the common-law backdrop against which Congress enacted [§ 1983], we are no longer engaged in 'interpret[ing] the intent of Congress in enacting' the Act." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Malley v. Briggs, 475 U.S. at 342). "Our qualified immunity precedents instead represent precisely the sort of 'freewheeling policy choice[s]' that we have previously disclaimed the power to make." Ziglar v. Abbasi, 137 S. Ct. at 1871 (Thomas, J., concurring)(quoting Rehberg v. Paulk, 566 U.S. 356, 363 (2012)). The judiciary should be true to § 1983 as Congress wrote it.

Moreover, there should be a remedy when there is a constitutional violation, and jury trials are the most democratic expression of what police action is reasonable and what action is excessive. If the citizens of New Mexico decide that state actors used excessive force or were deliberately indifferent, the verdict should stand, not be set aside because the parties could not find an indistinguishable Tenth Circuit or Supreme Court decision. Finally, to always decide the clearly established prong first and then to always say that the law is not clearly established could be stunting the development of constitutional law. See Aaron L. Nielson & Christopher J. Walker, The New Qualified Immunity, 89 S. Cal. L. Rev. 1, 6 (2015). And while the Tenth Circuit -- with the exception of now-Justice Gorsuch, see Shannon M. Grammel, Justice Gorsuch on Qualified Immunity, 69 Stan. L. Rev. Online 163 (2017) -- seems to agree with the Court, see, e.g., Casey v. City of Federal Heights, 509 F.3d at 1286, the per curiam reversals appear to have the Tenth Circuit stepping lightly around qualified immunity's clearly established prong, see Aldaba II, 844 F.3d at 874; Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x at 555-56; Brown v. City of Colo. Springs, 709 F. App'x 906, 915-16 (10th Cir. 2017), and willing to reverse district court decisions.

Circuit stepping lightly around qualified immunity's clearly established prong, see, e.g., Choate v. Huff, 773 F. App'x 484, 487-88, at *2 (10th Cir. 2019)(unpublished); Perry v. Durborow, 892 F.3d 1116, 1123-27 (10th Cir. 2018); Rife v. Jefferson, 742 F. App'x 377, 381-88 (10th Cir. 2018)(unpublished); Malone v. Bd. of Cty. Comm'rs for Cty. of Dona Ana, 707 F. App'x 552, 555-56 (10th Cir. 2017)(unpublished); Brown v. City of Colo. Springs, 709 F. App'x 906, 915 (10th Cir. 2017)(unpublished); Aldaba II, 844 F.3d at 874, and willing to reverse district court decisions should the district court conclude that the law is clearly established, but see A.N. by & through Ponder v. Syling, 928 F.3d at 1198 (concluding that the publication of information about an arrested and detained juvenile violated clearly established equal protection law prohibited treating the juvenile differently than similarly situated juveniles); Matthews v. Bergdorf, 889 F.3d 1136, 1149-50 (10th Cir. 2018)(holding that a child caseworker was not entitled to qualified immunity, because a caseworker would know that "child abuse and neglect allegations might give rise to constitutional liability under the special relationship exception"); McCoy v. Meyers, 887 F.3d 1034, 1052-53 (10th Cir. 2018)(concluding that there was clearly established law even though the three decisions invoked to satisfy that prong were not "factually identical to this case," because those cases "nevertheless made it clear that the use of force on effectively subdued individuals violates the Fourth Amendment").  The Court notes, however, that the Tenth Circuit recently has relied on the sliding scale analysis.  See Easter v. Cramer, 785 F. App'x 602, 607 (10th Cir. 2019)(unpublished)("Thus, when addressing claims of excessive force, we apply a sliding scale in which '[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation.'"

## LAW REGARDING EXCESSIVE FORCE

An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard." Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all claims of excessive force in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.   See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  The Supreme Court recognizes that "police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain, and rapidly evolving -- about the amount of force that is necessary in a particular situation." Graham v. Connor, 490 U.S. at 397.  Consequently, "the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." Saucier v. Katz, 533 U.S. at 205.  When an officer moves for qualified immunity on an excessive-force claim, "a plaintiff is required to show that the force used was impermissible (a constitutional violation) and that objectively reasonable officers could not have thought the force constitutionally permissible (violates clearly established law)."  Cortez v. McCauley, 478 F.3d 1108, 1128 (10th Cir. 2007).

1.  **Relevant Factors in Determining Whether Officers' Actions Were Objectively Reasonable.**

The Tenth Circuit has provided lists of non-exclusive factors that courts consider when determining whether force was objectively reasonable.  In Estate of Larsen v. Murr, 511 F.3d 1255 (10th Cir. 2008), the Tenth Circuit stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

511 F.3d at 1260.  In Weigel v. Broad, 544 F.3d 1143 (10th Cir. 2008), the Tenth Circuit also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

544 F.3d at 1151-52 (citations omitted).  The court assesses "objective reasonableness based on whether the totality of the circumstances justified the use of force, and pay careful attention to the facts and circumstances of the particular case." Estate of Larsen v. Murr, 511 F.3d at 1260 (internal quotation marks omitted).

### 2. **Least- or Less-forceful Alternatives in Excessive-Force Cases**.

To avoid a "Monday morning quarterback" approach, the Fourth Amendment does not require the use of the least, or even a less, forceful or intrusive alternative to effect custody, so long as the use of force is reasonable under Graham v. Connor.  The Fourth Amendment requires only that the defendant officers chose a "reasonable" method to end the threat that the plaintiff posed to the officers in a force situation, regardless of the availability of less intrusive alternatives. Graham v. Connor, 490 U.S. at 397.

In Michigan Department of State Police v. Sitz, 496 U.S. 444, 450-51 (1990), the Supreme Court examined a case addressing the constitutionality of highway sobriety checkpoints and stated that Brown v. Texas, 443 U.S. 47 (1979),

> was not meant to transfer from politically accountable officials to the courts the
> decision as to which among reasonable alternative law enforcement techniques
> should be employed to deal with a serious public danger.  Experts in police science
> might disagree over which of several methods of apprehending drunken drivers is
> preferable as an ideal.  But for purposes of Fourth Amendment analysis, the choice
> among such reasonable alternatives remains with government officials who have a
> unique understanding of, and a responsibility for, limited public resources,
> including a finite number of police officers.

496 U.S. at 453-54.  See Illinois v. Lafayette, 462 U.S. 640, 647 (1983)("[T]he reasonableness of

any particular government activity does not necessarily turn on the existence of alternative 'less

intrusive' means.").  To avoid unrealistic second-guessing, the Fourth Amendment does not

require that an officer use the least-intrusive alternative available to protect himself or others so

long as the method chosen is reasonable.

In United States v. Sokolow, 490 U.S. 1 (1989), the Supreme Court examined the Terry[28]

stop of a suspected drug courier in an airport.  The Supreme Court rejected Sokolow's contention

that the arresting officers were "obligated to use the least intrusive means available to dispel their

suspicions that he was smuggling narcotics."  490 U.S. at 11.  Instead, the Supreme Court held:

"The reasonableness of the officer's decision to stop a suspect does not turn on the availability of

less intrusive investigatory techniques.  Such a rule would unduly hamper the police's ability to

make swift, on-the-spot decisions . . . and require courts to indulge in unrealistic second guessing."

United States v. Sokolow, 490 U.S. at 11 (internal quotations and citations omitted).  Similarly, in

United States v. Sharpe, 470 U.S. 675, 686-87 (1985), the Supreme Court stated that

> a creative judge engaged in post hoc evaluation of police conduct can almost always
> imagine some alternative means by which the objectives of police might have been
> accomplished.  But "[t]he fact that the protection of the public might, in the abstract,
> have been accomplished by less intrusive means does not, by itself, render the
> search unreasonable."

---

[28]Terry v. Ohio, 392 U.S. 1 (1968).

470 U.S. at 686-87 (quoting Cady v. Dombrowski, 413 U.S. 433, 447 (1973)).

In Marquez v. City of Albuquerque, 399 F.3d 1216 (10th Cir. 2005), the Tenth Circuit disagreed with the plaintiff's contention that expert testimony about when a police dog's use is objectively reasonable and about how defendant Lehocky's actions violated "well established law enforcement standards" and rejected the plaintiff's argument that district the testimony "should have been admitted since it would have been helpful to the jury in determining whether Lehocky used a reasonable amount of force." 399 F.3d at 1222. In so holding, the Tenth Circuit explained:

> As the district court correctly noted, the Fourth Amendment "do[es] not require [police] to use the least intrusive means in the course of a detention, only reasonable ones." United States v. Melendez-Garcia, 28 F.3d 1046, 1052 (10th Cir.1994). Similarly, "violations of state law and police procedure generally do not give rise to a [42 U.S.C. §] 1983 claim" for excessive force. Romero v. Bd. of County Comm'rs, 60 F.3d 702, 705 (10th Cir. 1995); see also Wilson v. Meeks, 52 F.3d 1547, 1554 (10th Cir. 1995)(holding that "violation of a police department regulation is insufficient for liability under section 1983" for excessive force). Both of these principles of our Fourth Amendment jurisprudence stem from the proper perspective from which to evaluate the conduct of a police officer -- that "of a reasonable officer on the scene, acknowledging that the officer may be forced to make split-second judgments in certain difficult circumstances." Olsen [v. Layton Hills Mall], 312 F.3d [1304,] 1314 [(10th Cir. 2002)]. Together, they prevent the courts from engaging in "unrealistic second guessing of police officer's decisions." [United States v.] Melendez-Garcia, 28 F.3d at 1052
>
> Here, the only issue before the jury was whether Lehocky acted as a "reasonable officer" when he ordered his police dog to apprehend Marquez. In making this determination, the issues of whether Lehocky used the minimum amount of force to apprehend Marquez and whether Lehocky violated some "well established police procedure" are only tangentially related. This is because even if it found Lehocky used more than the minimum amount of force necessary and violated police procedure, the jury could nonetheless find he acted reasonably. [United States v.] Melendez-Garcia, 28 F.3d at 1052; Romero [v. Bd. of Cty. Comm'rs of Cty. Lake, 60 F.3d at 705].

Marquez v. City of Albuquerque, 399 F.3d at 1222.

In United States v. Melendez-Garcia, 28 F.3d 1046 (10th Cir. 1994), the Tenth Circuit stated: "We must avoid unrealistic second guessing of police officers' decisions in this regard and

thus do not require them to use the least intrusive means in the course of a detention, only a reasonable ones." 28 F.3d at 1052 (internal quotations omitted).  See Medina v. Cram, 252 F.3d 1124, 1133 (10th Cir. 2001)(stating that "the reasonableness standard does not require that officers use alternative less intrusive means" (internal quotation marks omitted)(citation omitted)); Dickerson v. McClellan, 101 F.3d 1151, 1160 (6th Cir. 1996)("[T]he Fourth Amendment does not require officers to use the best technique available as long as their method is reasonable under the circumstances."); Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995)("[T]he Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within the range of conduct which is objectively 'reasonable' under the Fourth Amendment."); Scott v. Henrich, 39 F.3d 912, 915 (9th Cir. 1994)("Requiring officers to find and choose the least intrusive alternative would require them to exercise superhuman judgment . . . .  Officers thus need not avail themselves of the least intrusive means of responding to an exigent situations; they need only act within that range of conduct we identify as reasonable."); Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994)("[T]he Fourth Amendment does not require officers to use the least intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable."); Plakas v. Drinski, 19 F.3d 1143, 1149 (7th Cir. 1994)("We do not believe the Fourth Amendment requires the use of the least or even a less deadly alternative so long as the use of force is reasonable under *Garner v. Tennessee* [sic] and *Graham v. Connor*.").

"Thus, the clearly established law in the Tenth Circuit holds that the Fourth Amendment does not require an officer to use the least or a less forceful alternative." Jonas v. Bd. of Comm'rs of Luna Cty., 699 F. Supp. 2d 1284, 1296 (D.N.M. 2010)(Browning, J.). See, e.g., Blossom v. Yarbrough, 429 F.3d at 968 (quoting Medina v. Cram, 252 F.3d at 1133)("It is well settled that 'the

reasonableness standard does not require that officers use alternative, less intrusive means' when confronted with a threat of serious bodily injury."); <u>Jiron v. City of Lakewood</u>, 392 F.3d 410, 414 (10th Cir. 2004)(stating that, in a police-shooting case, officers are not required to use alternative, less intrusive means if their conduct is objectively reasonable).  <u>See also Roy v. Inhabitants Lewiston</u>, 42 F.3d 691, 695 (1st Cir. 1994)("[I]n close cases, a jury does not automatically get to second guess these life and death decisions, even though plaintiff has an expert and a plausible claim that the situation could better have been handled differently."); <u>Diaz v. Salazar</u>, 924 F. Supp. 1088, 1100 (D.N.M. 1996)(Hansen, J.).  Moreover, the reasonableness standard does not require that officers use "alternative 'less intrusive' means."  <u>Illinois v. Lafayette</u>, 462 U.S. 640, 647-48, (1983). The Court also has rejected the consideration of a less intrusive alternative to end a threat. <u>See Chamberlin v. City of Albuquerque</u>, No. 02-0603, 2005 WL 2313527, at *2 (D.N.M. July 31, 2005)(Browning, J.)(precluding the plaintiff's police procedures expert from testifying at trial regarding alternative less intrusive means).

## <u>ANALYSIS</u>

The Court grants the MSJ.  The Court concludes that the undisputed facts, viewed in the light most favorable to the Plaintiffs, show that Franco violated Howard's Fourth Amendment rights when he struck Howard, who was seated on the ground after fleeing the bait vehicle, in the face.  The Court concludes, however, that Tenth Circuit and Supreme Court caselaw does not clearly establish those rights.  The Court also concludes that Franco did not violate Howard's Fourth Amendment rights when he administered a single knee strike to Howard's head while several other officers pinned Howard.  The Court concludes, further, that, if Franco's knee strike is a violation, Howard's asserted rights are not clearly established.  Accordingly, Franco is entitled to qualified immunity on Count I.  Having concluded that Franco is not directly liable to Howard

for his use of force, the Court dismisses Count III's derivative loss-of-consortium claim against Howard.

## I.  <u>THE COURT GRANTS THE MOTION TO CLARIFY</u>.

The Court construes the Plaintiffs' request that the Court "clarify the record," Motion to Clarify at 1, as a motion to supplement the Plaintiffs' proposed undisputed facts. The Court's factual background in the Feb. 21 MOO motivates the Motion to Clarify. <u>See</u> Motion to Clarify Reply at 2 (citing Feb. 21 MOO at 10-12 n.23). Franco notes that the Plaintiffs cite no authority in support of the Motion to Clarify and objects, in part, on that basis. <u>See</u> Motion to Clarify Response at 1-2. Franco contends that the Motion to Clarify is "a procedural irregularity" which the Federal Rules of Civil Procedure do not permit. Motion to Clarify Response at 2.

In the Plaintiffs' Response to Franco's MSJ, the Plaintiffs do not propose as fact that Franco struck Howard's face as Howard ceased his flight from the APD officers. <u>See</u> Response ¶¶ 5, 13, at 2, 4-5. The Plaintiffs provide, however, a quotation from the Jury Report, in which Jury states: "'It appears the suspect is either pushed to the ground by Officer Franco or assumes a fetal position on his own as other officers arrive.'" Response ¶ 13, at 4-5 (quoting Jury Report at 3). As the Court discusses <u>supra</u> n. 8, at 7, if Franco had raised an objection, rule 1002 of the Federal Rules of Evidence prohibits the Court from relying on the Jury Report for the Plaintiffs' asserted fact, because the quoted portion refers to Jury's interpretation of the Franco Lapel Video. <u>See</u> Fed. R. Evid. 1002 ("To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required."). Because Franco did not raise this objection, perhaps for strategic reasons, the Court will consider Jury's interpretation of the Franco Lapel Video. The Court, accordingly, also relies on its independent assessment of the Franco Lapel

Video to determine what the Franco Lapel Video depicts, and its assessment and Jury's assessment are similar.

The Jury Report does not expressly state that Franco struck Howard's face just as Howard stopped fleeing the APD officers, and the Plaintiffs do not specifically allege as fact in the Response that Franco used such force.  See Response ¶ 13, at 4-5.  Accordingly, the Plaintiffs now wish to assert as material fact that Franco struck Howard's face.  See Motion to Clarify at 2 ("Franco kicks or punches Mr. Howard in the face . . . .").  The Plaintiffs apparently justify this request by asserting that the Franco Lapel Video, "when played in slow motion," shows Franco kicking or punching Howard's face, Motion to Clarify at 2 (citing Franco Lapel Video at 7:05-7:10), suggesting that the Plaintiffs had not previously closely scrutinized the Franco Lapel Video by playing it in slow motion.  Accordingly, the Plaintiffs seek not to supplement the record but rather their proposed undisputed material facts.  The Court also notes that the Plaintiffs do not specifically allege in the Complaint that Franco struck Howard immediately after Howard stopped fleeing.  Instead, the Plaintiffs allege that Franco "forcibly pulled Mr. Howard to the ground." Complaint ¶ 15, at 3.

Although the Plaintiffs have not offered any justification for the Motion to Clarify, the Court grants the Plaintiffs' request.  Rule 56, like many of the procedural rules, endows the Court with considerable discretion in adjudicating summary judgment motions.  See, e.g., Patty Precision v. Brown & Sharpe Mfg. Co., 742 F.2d 1260, 1264 (10th Cir. 1984).  For example, "[w]hen a party files an affidavit or declaration, and moves for additional discovery time under rule 56(d), the party invokes the court's discretion."  Chavez v. Cty. of Bernalillo, 3 F. Supp. 3d 936, 968 (D.N.M. 2014)(Browning, J.)(citing Jensen v. Redevelopment Agency of Sandy City, 998 F.2d 1550, 1553-54 (10th Cir. 1993)).  The Court must take care, however, to avoid prejudicing a non-movant in

deciding a motion to amend or clarify.  See, e.g., Foman v. Davis, 371 U.S. 178, 182 (1962). Granting the Motion to Clarify does not prejudice Franco, because both parties have had access to the Franco Lapel Video for years.  See Certificate of Service, filed October 19, 2017 (Doc. 20).

Additionally, although the Plaintiffs had not previously alleged that Franco struck Howard's face after Howard stopped fleeing, the parties disagree generally as to the nature and extent of Franco's use of force.  Both parties disagree about what the Franco Lapel Video shows. Accordingly, the Court may rely on its independent assessment what the Franco Lapel Video shows.  See Scott v. Harris, 550 U.S. at 380.  The Lapel Video shows that Franco struck Howard's head almost immediately after Howard's apparent surrender.  See Franco Lapel Video at 7:00-7:10.  To deny the Plaintiffs' request is to place procedure before substance, in contravention of rule 1 of the Federal Rules of Civil Procedure.  See Fed. R Civ. P. 1 (providing that the rules "should be construed and administered to secure the just, speedy and inexpensive determination of every action and proceeding.").  Accordingly, the Court grants the Motion to Clarify.

## II.    <u>FRANCO IS ENTITLED TO QUALIFIED IMMUNITY ON COUNT I.</u>

The Plaintiffs allege that Franco twice violated Howard's clearly established constitutional rights -- once when Franco struck Howard's face when Howard yielded, and once when Franco administered a knee strike to Howard's head while officers sought to secure and handcuff both of Howard's hands.  See Complaint ¶¶ 41-49, at 7; Motion to Clarify at 1-2.  The Court conducts separate analyses for each alleged violation.  The Court concludes that, although Franco violated Howard's constitutional rights, those rights were not clearly established on the night of Howard's arrest.  Accordingly, Franco is entitled to qualified immunity on Count I.

A.   **FRANCO VIOLATED HOWARD'S FOURTH AMENDMENT RIGHTS WHEN HE STRUCK HOWARD'S FACE AS HOWARD SUBMITTED TO ARREST.**

Although district courts may first address either of the qualified-immunity prongs, the Court's analysis is best served -- in this case's unique circumstances -- by first determining whether the defendant's actions violated the Constitution.  See Pearson v. Callahan, 555 U.S. at 241.  It is difficult to first decide whether the law is clearly established, because in the excessive force arena, a single fact can be of constitutional significance.  See Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d at 1224 n.36.  An excessive force claim "must . . . be judged by reference to the specific constitutional standard which governs that right, rather than to some generalized 'excessive force' standard."  Graham v. Connor, 490 U.S. at 394.  The Supreme Court has long held that all excessive force claims in the context of an arrest or detention should be analyzed under the Fourth Amendment's reasonableness standard.  See Graham v. Connor, 490 U.S. at 395 ("[A]ll claims that law enforcement officers have used excessive force -- deadly or not -- in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . .").  To determine whether an officer's use of force violated a plaintiff's Fourth Amendment rights, the court must balance carefully "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  Graham v. Connor, 490 U.S. at 396.  The Supreme Court provides three factors to guide this balancing: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Graham v. Connor, 490 U.S. at 396.  Applying the first Graham v. Connor factor, the crime's severity, Howard stole a City of Albuquerque-owned bait vehicle, a felony, see N.M. Stat. Ann. § 30-16D-1, and fled officers'

commands that he yield to arrest.  Howard's felony is nonviolent, however, and, after fleeing on foot for ten seconds, Howard sat down and presented his hands to Franco.  The Court notes that Franco was so close behind Howard that he may not have recognized Howard's actions as indicative of surrender, because Franco reached Howard mere seconds after Howard sat and presented his hands.  Still, a jury viewing the evidence in the light most favorable to the Plaintiffs could conclude that those seconds were sufficient for a reasonable officer to conclude that Howard had submitted to arrest.  "[A]n exercise of force that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased."  Lytle v. Bexar Cty., Tex., 560 F.3d 404, 413 (5th Cir. 2009).

In examining the second Graham v. Connor factor, which looks at the extent to which the suspect posed a threat to the officers' or others' safety, "a simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern."  Mattos v. Agarano, 661 F.3d 433, 441-42 (9th Cir. 2011)(en banc)(internal quotation marks omitted).  Here, Howard showed both of his hands to Franco twice -- once upon exiting the bait vehicle, and again upon stopping his flight and sitting down.  Just before Howard stopped, Franco shouted "stop or you'll get shot!"  Franco Lapel Video at 6:58-7:03.  It was at this point that Howard stopped running, sat, and proffered his hands.  See supra n.7 at 6-7.  Franco reached Howard almost immediately after Howard's apparent surrender -- less than two seconds elapsed between when Howard stopped running and when Franco made contact with Howard -- with at least three APD officers immediately behind him.  See supra n. 6 at 6.  Franco's response to this situation -- striking Howard's face at least once -- was unreasonable.  Although the Fourth Amendment does not require Howard to use the least forceful means to effect custody, the Fourth Amendment demands that Franco choose a reasonable method to end the threat that Howard posed

to the officers.  See Graham v. Connor, 490 U.S. at 397.  While the Court should avoid "unrealistic second guessing of police officers' decisions," United States v. Melendez-Garcia, 28 F.3d at 1052, Franco's decision to strike a yielding suspect in the face -- even if that suspect yielded suddenly -- is objectively unreasonable.

The third and final Graham v. Connor factor directs the Court to weigh Franco's conduct against Howard's attempts to evade or resist arrest.  Howard certainly resisted arrest.  He remained in the bait vehicle for two minutes while officers shouted that he exit the vehicle with his hands in the air.  See supra n.5 and accompanying text, at 6.  Howard eventually exited, showed the officers his empty hands, and fled.  See supra n.6 at 6-7.  But the mere fact that Howard tried evading arrest does not justify Franco's conduct as a matter of law.  See Baker v. City of Hamilton, 471 F.3d 601, 607-08 (6th Cir. 2006)(concluding that a suspect's attempt to escape arrest by running two blocks from an officer did not preclude the suspect's excessive force claim against the officer's subsequent baton strikes).  "The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command."  Martin v. City of Broadview Heights, 712 F.3d 951, 959 (6th Cir. 2013).  Franco's conduct becomes more unjustified when weighed against Howard's submission which preceded Franco's use of force.  Although Howard's surrender was sudden, Franco's demand that Howard stop or else be shot preceded Howard's surrender by mere seconds.  See Franco Lapel Video at 7:03-7:08.  Taking the evidence in the light most favorable to the Plaintiffs, Franco's striking Howard's face was objectively unreasonable.

The Tenth Circuit's factors do not render Franco's conduct any more reasonable.  The Tenth Circuit has stated:

> In assessing the degree of threat facing officers, then, we consider a number of non-exclusive factors.  These include (1) whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands; (2) whether

> any hostile motions were made with the weapon towards the officers; (3) the distance separating the officers and the suspect; and (4) the manifest intentions of the suspect.

Estate of Larsen v. Murr, 511 F.3d at 1260.  The Court notes, however, that the Tenth Circuit's test presumes that the suspect was armed.  Franco made no commands that Howard disarm himself, because Howard was unarmed.  See supra n. 16 at 15.  Instead, Franco shouted, "stop or you'll get shot!" -- a legally dubious command -- but one with which Howard complied.  Accordingly, that fact of the Tent Circuit's test counsel against the reasonableness of Franco's use of force.  The Tenth Circuit has also provided:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors: the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

Weigel v. Broad, 544 F.3d at 1151-52.  Although Howard committed a felony, his crime involved no violence.  Howard demonstrated with his that he held no weapons and, when he stopped, Howard kept his hands in Franco's sight.  When Howard evaded officers, a reasonable officer could conclude that some force was necessary to effect Howard's arrest.  The question is not, however, whether the circumstances justified any force, but rather whether Franco could reasonably use the degree of force he employed against Howard.  Taking the facts in the light most favorable to the Plaintiffs, the Court concludes that Franco could have had enough time to perceive that Howard had surrendered, negating any need to use force, or at least negating the need to strike Howard's face.  The Court concludes that the circumstances' totality does not justify Franco's decision to strike Howard's face.  Although the Court defers to officers' split-second judgment and avoids "unrealistic second guessing," United States v. Sokolow, 490 U.S. at 11, there was no need to strike a sitting, yielding suspect.  Howard's decision to stop running and yield to arrest

negated the force that his initial evasion might have justified.  Accordingly, taking the facts in the light most favorable to the Plaintiffs, the Court concludes that Franco violated Howard's Fourth Amendment rights when he struck Howard in the face.[29]

### B.   THE PLAINTIFFS HAVE NOT DEMONSTRATED THAT FRANCO'S STRIKE VIOLATED CLEARLY ESTABLISHED LAW.

Having determined that Franco violated Howard's constitutional right, the next step is consider whether that right was clearly established on October 30, 2015, when Franco arrested Howard.  To determine whether a right was clearly established, a court must consider whether the right was sufficiently clear that a reasonable government employee would understand that he or

---

[29]Franco contends that Howard's suffered no injury and so does not have a viable excessive force claim.  See, e.g., Motion to Clarify Response at 5.  The cases make clear that "actual injury," not "physical injury," is required to sustain a claim of excessive use of force.  E.g., Fisher v. City of Las Cruces, 584 F.3d 888, 894 (10th Cir. 2009)("[T]o recover on an excessive force claim, a plaintiff must show: (1) that the officers used greater force than would have been reasonably necessary to effect a lawful seizure, and (2) some actual injury caused by the unreasonable seizure that is not de minimis, be it physical or emotional." (emphasis added)(quoting Cortez v. McCauley, 478 F.3d at 1129 n.25)).  The Tenth Circuit explained in Vondrak v. City of Las Cruces: "We have consistently rejected a bright-line rule requiring plaintiffs to demonstrate physical injury when bringing excessive force claims."  535 F.3d 1198, 1208 (10th Cir. 2008)(citing Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001))(emphasis added)(citations omitted).

In the Complaint, the Plaintiffs allege that Howard "suffered serious trauma and injuries, . . . pain and suffering, emotional harm and distress."  Complaint ¶¶ 39-40, at 7.  Franco contends that "there is no documentation of any physical injury to Howard."  Motion to Clarify Response at 5.  The Plaintiffs note that the lapel videos show that he bled a fair amount into the gutter after his arrest.  See Response ¶ 19, at 5.  The Court has concluded that the undisputed material facts demonstrate that Howard bled into the gutter, exhibited labored breathing, and appeared unconscious.  See supra nn. 13-15, at 11-12.  These facts establish sufficient injuries for the Fourth Amendment's purposes to the extent that the Fourth Amendment requires physical injury.  See . Fisher v. City of Las Cruces, 584 F.3d at 897 (stating that Cortez v. McCauley "acknowledged -- and did not overrule -- our prior conclusion that in excessive force cases 'proof of physical injury manifested by visible cuts, bruises, abrasions or scars, is not an essential element'").  Further, as discussed supra, the photographs of Howard show quite clearly that he suffered plainly apparent injuries to his head and face.  The Court concludes that the evidence, viewed in the light most favorable to the Plaintiffs, show that Howard's injuries are more than de minimis.

she violated a right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d at 1327.  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x at 710.  "Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  Currier v. Doran, 242 F.3d at 923.  Further, to serve the policy goals that motivated the Supreme Court to develop the qualified immunity doctrine, the Supreme Court requires district courts "not to define clearly established law at a high level of generality" and requires that they focus on "whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 563 U.S. at 742 (emphasis added).  As the Tenth Circuit has emphasized, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction *might* make a constitutional difference."  Kerns v. Bader, 663 F.3d at 1186-87 (emphasis in Kerns v. Bader).  For example, in Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  Kerns v. Bader, 663 F.3d at 1183.

Franco contends that "there simply isn't a case in this jurisdiction" that clearly establishes Howard's asserted right.  Tr. at 31:3-4 (Martinez).  The Plaintiffs contend that Tennessee v. Garner and Cordova v. Aragon most clearly establish Howard's asserted right.  See Tr. at 28:18 (Oliveros).  The Supreme Court has asserted that Tennessee v. Garner does not by itself create clearly established law "outside 'an obvious case.'"  White v. Pauly, 137 S. Ct. at 552 (quoting Brousseau

v. Haugen, 543 U.S. at 199).  Given that less than two seconds elapsed between Howard's apparent surrender -- before which some force would have been justified as Howard was a fleeing felony suspect, see, e.g., Perea v. Baca, 817 F.3d 1198, 1203 (10th Cir. 2016) -- and Franco's strike, this is not an obvious case.

In Cordova v. Aragon, the Tenth Circuit held that police officers may not use deadly force against a fleeing suspect merely because he or she is driving recklessly.  See 569 F.3d at 1191-92. There, police officers began pursuing a suspect who was driving a stolen truck that was pulling a trailer carrying heavy excavation equipment.  See 569 F.3d at 1183.  During the pursuit, the suspect nearly rammed a patrol car, twice drove off the road to avoid spike strips, ran multiple red lights, refused to stop for patrol cars that had their lights and sirens activated, and drove at speeds between thirty and fifty miles per hour.  See 569 F.3d at 1186.  Eventually, the suspect entered a highway and began driving on the highway's wrong side.  See 569 F.3d at 1186.  Two officers drove ahead of the suspect in an attempt to deploy stop sticks.  See 569 F.3d at 1186-87.  The suspect drove the truck too close to the officers for them to deploy the stop sticks, so one officer drew his firearm and fired at the truck, killing the suspect.  See 569 F.3d at 1187.  Of the four to five shots the officer fired, only one hit the truck's front -- the remaining hit the truck's side -- and the fatal shot hit the suspect in the back of his head.  See 569 F.3d at 1187.  The officer argued that he shot the suspect, because he was in immediate danger, and because the truck was about to run over him. See 569 F.3d at 1187.

The Tenth Circuit held that the officer's conduct in shooting the suspect was unreasonable. See Cordova v. Aragon, 569 F.3d at 1192.  The Tenth Circuit first concluded that the suspect did not pose an imminent threat to other motorists.  See 569 F.3d at 1190.  The Tenth Circuit noted that, even though the suspect was driving recklessly on the highway's wrong side, the record did

not contain any facts showing that, at that time, there were any motorists in the vicinity.  See 569 F.3d at 1190.  The Tenth Circuit held that the mere possibility that the suspect's behavior could endanger motorists who might come along was insufficient to justify killing the suspect.  See 569 F.3d at 1190 ("Mr. Cordova's behavior did, of course, create risks for other motorists who might come along, but that risk of future harm was not enough to justify the near certainty of Mr. Cordova's death.").  The Tenth Circuit held that "the general risks created by a motorist's fleeing from the police are, without more, [not] enough to justify a shooting that is nearly certain to cause that suspect's death."  569 F.3d at 1190.  The Tenth Circuit next held that the suspect did not pose an imminent threat to the officers.  See 569 F.3d at 1191.  The Tenth Circuit focused on the fact that several shots hit the truck's side and that the fatal shot struck the back of the decedent's head to conclude that a reasonable jury could find that the officer was not "in immediate danger when he fired the fatal shot."  569 F.3d at 1191.  Here, in contrast, the Plaintiffs do not contend that Franco's strike amounts to deadly force, and so the calculus is different.  Although the defendant officer's use of deadly force was unjustified in Cordova v. Aragon, the officer was justified in using some lesser degree of force, such as the deployment of stop sticks to prevent the decedent's escape.  See 569 F.3d at 1190.  Although Franco's strike is objectively unreasonable, Cordova v. Aragon does not speak to the constitutionality of using some lesser degree of nonlethal force, like a punch to the face.

The Plaintiffs also distinguish Franco's cited cases to argue that those cases are sufficiently dissimilar that a reasonable officer would not interpret them as authorizing Franco's use of force.  See Response at 11-12.  The Plaintiffs have not directed the Court to any analogous case which could support a conclusion that Howard has a clearly established right to be free from nonlethal force just as he ended his flight from law enforcement attempting a felony arrest.  The Plaintiffs

assert that "the Graham factors weigh in favor of Plaintiffs," because Howard "did not pose an immediate threat to the safety of the officers or others when he submitted to his arrest after initially fleeing." Response at 11. This high level of generality contradicts the Supreme Court's holding on qualified immunity and does not elucidate a right that "every 'reasonable official would have understood.'" Ashcroft v. al-Kidd, 563 U.S. at 741 (Anderson v. Creighton, 483 U.S. at 640). The Court cannot dispense with this specificity requirement, as it serves, according to the Supreme Court and the Tenth Circuit, a central policy behind the judge-made doctrine of qualified immunity. The level of generality at which the legal rule is defined is important, because the Supreme Court says that qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates "to protect officers from the sometimes 'hazy border[s]'" of the law. Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit has concluded, however, that it is "clearly established that a police officer's violation of the *Graham* reasonableness test amounted to a violation of the Constitution if there were no substantial grounds for a reasonable officer to believe there was legitimate justification for acting as he did." Lundstrom v. Romero, 616 F.3d 1108, 1127 (10th Cir. 2010). The Tenth Circuit has, nonetheless, also noted that "the general factors outlined in Graham are insufficiently specific to render every novel use of excessive force unreasonable[.]" Fogarty v. Gallegos, 523 F.3d 1147, 1161 (10th Cir. 2008). Although the Tenth Circuit's view is that meeting the Graham v. Connor factors does not in all cases amount to a clearly established right, the Tenth Circuit has consistently held that a use of force violates clearly established rights when each of the Graham v. Connor factors weighs unequivocally in a plaintiff's favor. See Buck v. City of Albuquerque, 549 F.3d 1269, 1291 (10th Cir. 2008)(finding a right clearly established when "'each factor in *Graham* counseled against the use of a large amount of force'")(quoting Casey v. City of

Fed. Heights, 509 F.3d at 1286).   Nonetheless, the Supreme Court's more recent opinion in Mullenix v. Lena makes the Court question the Tenth Circuit's treatment of the Graham v. Connor factors.   See Mullenix v. Lena, 136 S. Ct. at 309 (admonishing lower courts to avoid generalized statements of law, and instead decide "whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the 'situation [she] confronted,'" and defining that situation with exacting specificity)(quoting Brosseau v. Haugen, 643 U.S. at 199-200)(alteration in Mullenix v. Lena and not in Brosseau v. Haugen).   Although the Court has made known its views on this hyperspecificity requirement, see supra n.29 and accompanying text, at 50-51, the requirement binds the Court.   Further, relevant caselaw which the Plaintiffs have not cited does not clearly establish Howard's asserted right.   "'[T]here undoubtedly is a clearly established legal norm' precluding the use of violent physical force against a criminal suspect . . . 'who already has been subdued and does not present a danger to himself or others.'"   Estate of Booker v. Gomez, 745 F.3d 405, 428 (10th Cir. 2014)(quoting Harris v. City of Circleville, 583 F.3d 356, 367 (6th Cir. 2009)).   In Estate of Booker v. Gomez, officers continued applying potentially lethal force well after a detainee was clearly subdued and di not present a danger to himself or others.   See 745 F.3d at 429 (holding that clearly established law put the defendants on notice that "the use of [significant or lethal] force on a person who is not resisting and who is restrained in handcuffs is disproportionate").   Here, in contrast, the mere seconds that passed between Howard's apparent surrender -- before Howard was subdued or restrained in handcuffs, and while his continued resistance might be feared -- amounts to too close a call to put Franco on clear notice that his strike was disproportionate.   Accordingly, the Court concludes that Howard did not have a clearly established right to be free from nonlethal force just as he ended his flight from law enforcement attempting a felony arrest.

### C.   FRANCO DID NOT VIOLATE HOWARD'S CONSTITUTIONAL RIGHTS WHEN HE ADMINISTERED A KNEE STRIKE TO HOWARD'S HEAD.

The Court next determines whether Franco violated Howard's constitutional rights when he administered a single knee strike to Howard's head.  See Dixon v. Richer, 922 F.2d 1456, 1462-63 (10th Cir. 1991)(analyzing separately each alleged act of excessive force).  As discussed, the undisputed facts, in the light most favorable to the Plaintiffs, show that, after Franco brought Howard to the ground by striking his face, three APD officers pinned Howard to the ground, trapping his arm underneath him and placing it out of the officers' reach.  See supra nn.10-12 and accompanying text, at 13-14.  Officers shouted for Howard to yield his hands, and when Howard did not do so, Franco feared that Howard's left hand, which was underneath him and near his waistband, may have held or had access to a weapon.  See supra n.10 and accompanying text, at 8; Franco Depo. at 42:13-18; id. at 43:15-21.  Franco then administered a single knee strike to the left side of Howard's head.[30]  See supra n.15 and accompanying text, at 15.

The Plaintiffs assert that Franco's knee strike amounts to a constitutional violation, because "the Graham factors weigh in favor of Plaintiffs."  Response at 11.  The Plaintiffs assert that, "although Mr. Howard had committed a serious crime, he did not pose an immediate threat to the safety of the officers or others when he submitted to his arrest after initially fleeing."  Response at 11.  The Plaintiffs also contend that Howard "did not actively resist or attempt to evade arrest at

---

[30]Howard previously suffered a severe head injury which left him, at the time of this incident, missing a large portion of the right side of his skull.  See Interrogatories ¶ 20, at 2; MSJ at 2.  Howard "underwent a right craniectomy on September 14, 2015 after he was diagnosed with a subdural right acute hematoma after he was shot in the head.  The surgery resulted in the removal of a portion of his skull leaving him particularly vulnerable to a head injury by Defendants." Interrogatories ¶ 20, at 16.  Although the record shows that Howard was missing a portion of his skull during his October 30, 2015, arrest, no party alleges this fact for the MSJ's purposes.  The Court infers, then, that no party deems this fact material to the MSJ.

the time that force was used on him."  Response at 11.  Finally, Howard notes that Franco acknowledged his view that knee strikes to a suspect's head can be lethal.  Franco, in contrast, argues that "all three *Graham* factors support Officer Franco's use of force."  MSJ at 8 (emphasis omitted).  Franco notes that Howard's felony offense and subsequence flight from law enforcement justify Franco's use of force.  See MSJ at 8-9.  Franco also contends that Howard "has no record of being injured by" Franco, and Franco argues that Fourth Amendment excessive-force claims require more than de minimis injuries.  MSJ at 10.  Franco does not respond to the Plaintiffs' argument that Franco understood a knee strike to be deadly force and instead argues that knee strikes to the head are not lethal as a matter of law.  See Reply at 8-9.

As the Plaintiffs point out, this case has an added wrinkle in that Franco testified that he believes that knee strikes to the head can be lethal.  See Franco Depo. at 73:12-74:3; id. at 76:6-16.  The Plaintiffs accordingly assert that it is "undisputed that force applied to the head is deadly force and constitutes a serious use of force that must be reported."  Response at 10.  Nonetheless, under the Fourth Amendment's objective reasonableness test, an officer's subjective approach, understanding, or state of mind are "irrelevant to the jury's proper inquiry."  Tanberg v. Sholtis, 401 F.3d 1151, 1168 (10th Cir. 2005).  See Graham v. Connor, 490 U.S. at 397 ("[A]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").  The Tenth Circuit likewise uses an objective standard to determine whether a given use of force is lethal in the § 1983 context.[31]  Lethal force is that which "creates a substantial

---

[31]The Tenth Circuit derived its definition of deadly force from the Model Penal Code.  See Ryder v. City of Topeka, 814 F.2d 1412, 1416 n.11 (10th Cir. 1987)(quoting Model Penal Code § 3.11(2) (1985)).  The Model Penal Code's definition of deadly force includes an alternative subjective element which asks whether an individual intended to create a substantial risk of death

risk of causing death or serious bodily harm." Thomson v. Salt Lake Cty., 584 F.3d at 1313.

Deadly force "encompasses a range of applications of force, some more likely to cause death than

others." Cordova v. Aragon, 569 F.3d at 1189.  Although still analyzed under the objective

reasonableness standard, deadly force is "justified under the Fourth Amendment if a reasonable

officer in the Defendants' position would have had probable cause to believe that there was a threat

of serious physical harm to themselves or to others." Sevier v. City of Lawrence, 60 F.3d 695,

699 (10th Cir. 1995).  Courts typically consider knee strikes significant -- but not deadly -- uses of

force.  See Martin v. City of Albuquerque, 147 F. Supp. 3d at 1331 ("[K]nee strikes to other parts

of a suspect's body are inherently dangerous, are intended to inflict severe pain, and are 'capable

of injuring an arrestee.'" (quoting Myser v. Spokane Cty., 2008 WL 4833294, at 8)); Lopez v. City

of Imperial, No. 13-cv-00597-BAS(WVG), 2015 WL 4077635, at *7 (S.D. Cal. July 2,

---

or serious bodily injury.  See Model Penal Code § 3.11(2).  The Tenth Circuit has quoted the Model
Penal Code's lethal-force definition, including its subjective component.  See Jiron v. City of
Lakewood, 392 F.3d at 415.  In Thomson v. Salt Lake County, however, the Tenth Circuit deferred
answering definitively whether the Model Penal Code's subjective element has any place in the
§ 1983 case, but it noted that the Tenth Circuit had never factored a defendant's subjective intent
in evaluating force's lethality.  See 584 F.3d at 1313 n.3.  The Tenth Circuit also noted that other
Courts of Appeal have uniformly adopted the Model Penal Code's objective element while
eschewing its subjective element.  See 584 F.3d at 1313 n.3; Smith v. City of Hemet, 394 F.3d
689, 706 (9th Cir. 2005)(en banc)(noting that the Model Penal Code is "primarily designed to
govern criminal liability," and so its reference to an individual's state of mind may be inapposite
in the § 1983 context).

Although the Tenth Circuit's approach is unsettled, the Court concludes that the same result
would flow from either approach.  The Court employs the objective approach infra, and concludes
that Franco did not use deadly force.  As to the subjective approach, the Plaintiffs have offered no
evidence that Franco administered his knee strike with the purpose of causing a substantial risk of
death or serious bodily injury, and so his knee strike "cannot be found to be an act of deadly force
under the subjective component." Thomson v. Salt Lake Cty., 584 F.3d at 1313 n.3.  Further, the
Court agrees with the Ninth Circuit's approach and commends it to the Tenth Circuit.
Incorporating an officer's state of mind into the qualified immunity context would be an anomaly,
given that the law of qualified immunity focuses almost entirely on objective factors.

2015)(Bashant, J.); Aranda v. City of McMinnville, 942 F. Supp. 2d 1096, 1105 (D. Or. 2013)(Simon, J.).

The Court concludes that a reasonable officer in Franco's position could determine that a single knee strike to Howard's head was necessary to effect Howard's arrest and ensure that Howard's hidden hand did not hold or have access to a weapon. Although Franco's first use of force was unjustified, Franco struck Howard's head with his knee as several officers struggled unsuccessfully to handcuff Howard, shouting for Howard to yield both of his hands. See supra n. 12 at 9-11. While a knee strike to the head may not have been necessary in hindsight, "[n]ot every push of shove, even if it may later seem unnecessary in the peace of a judge's chambers violates the Fourth Amendment." Graham v. Connor, 490 U.S. at 397. The three Graham v. Connor factors support the constitutionality of Franco's use of force. Howard was suspected of a felony offense and resisted officers' commands to stop the vehicle. See supra n.3 and accompanying text, at 4. When the bait vehicle eventually stopped, Howard sat in the car for two minutes while officers shouted that he exit the vehicle with his hands raised. See supra n.5 and accompanying text, at 6. Howard eventually did so, only to briefly show the officers his hands before fleeing on foot. See supra n.6 and accompanying text, at 7. Franco caught up to Howard just as Howard sat down to submit to arrest. See supra n.7 and accompanying text, at 8. Franco first administered his unreasonable use of force, but Franco next saw several officers struggling to arrest an apparently resisting Howard, who appeared to be hiding his hand beneath his body. See supra n.9 and accompanying text, at 10. Although the officers' weight may have pinned Howard's hand, a reasonable officer in Franco's position could conclude that Howard was hiding his hand and, potentially, a weapon, and that quick force was necessary to overcome Howard's apparent resistance and ensure that Howard's hand held no weapon. "[O]fficers may employ the amount of

force necessary to complete the arrest, and -- if they believe (even mistakenly) that the arrestee will continue to fight back -- they may use 'more than in fact' necessary." Youbyoung Park v. Gaitan, F. App'x at 739-40 (quoting Saucier v. Katz, 533 U.S. at 205).  Franco's knee strike did not violate Howard's Fourth Amendment rights.

> ### D.    EVEN IF FRANCO'S KNEE STRIKE VIOLATED HOWARD'S FOURTH AMENDMENT RIGHTS, THOSE RIGHTS WERE NOT CLEARLY ESTABLISHED.

The Plaintiffs contend that Graham v. Connor and Cordova v. Aragon clearly establish Howard's Fourth Amendment right to be free from Franco's knee strike.  See Response at 11.  The Plaintiffs contend:

> Mr. Howard did not possess a weapon at the time the officers used force and he never made hostile motions with a weapon.  The officers were close to Mr. Howard and Mr. Howard intended to submit to arrest.  Mr. Howard did not pose a serious threat to any of the Defendants. Moreover, Defendant Franco was in the presence of at least five (5) other armed police officers who were able to provide protection, if necessary.  In weighing all of these facts, it was clearly established that the Defendant Franco, as well as the other officers, were not justified in using deadly force or striking Mr. Howard in the face and head.

Response at 11.  The Plaintiffs do not cite, however, any factually on-point cases which could clearly establish Howard's asserted right.  As discussed, Graham v. Connor cannot serve as the basis of clearly established Fourth Amendment rights, because its test is too general.  This high level of generality contradicts the Supreme Court's more recent holding on qualified immunity and does not elucidate a right that "every 'reasonable official would have understood.'"  Ashcroft v. al-Kidd, 563 U.S. at 741 (Anderson v. Creighton, 483 U.S. at 640).  The Court cannot dispense with this specificity requirement, as it serves, according to the Supreme Court and the Tenth Circuit, a central policy behind the judicially-crafted doctrine of qualified immunity.  The level of generality at which the legal rule is defined is important, because the Supreme Court says that

qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the law's application to facts and operates "to protect officers from the sometimes 'hazy border[s]'" of the law. Saucier v. Katz, 533 U.S. at 205.

Instead of pointing to factually on-point cases, the Plaintiffs seek only to distinguish Franco's cited cases. See Response at 11-13. It is the Plaintiffs' burden, however, to show that the law that they assert Franco violated is clearly established. See Saucier v. Katz, 533 U.S. at 200; Holland ex rel. Overdorff v. Harrington, 268 F.3d at 1185. Nonetheless, the Court, to be fair to the Plaintiffs, discusses the Plaintiffs' distinguished cases to determine whether they provide Howard a clearly established right.

The Plaintiffs first seek to distinguish Youbyoung Park v. Gaitan. See Response at 11. In that case, the Tenth Circuit considered an appeal from a district court's determination, in relevant part, that the officer's use of force -- delivering a knee strike to the plaintiff's torso -- did not violate the plaintiff's clearly established rights. See Youbyoung Park v. Gaitan, 680 F. App'x at 726. Investigating a nearby stabbing, the officer sought to view the security footage from the plaintiff's business. See F. App'x at 727. The plaintiff refused, so the officer later returned with a search warrant to view the footage. See F. App'x at 727. Immediately after the officer's arrival, the officer "forcibly escorted" the plaintiff out of his business. F. App'x at 727-28. As they approached the exit, the plaintiff "began to tense his arms, brace his legs, and attempt to pull away from the officers." F. App'x at 728. The defendant officer "forcibly took Mr. Park to the Ground by giving him a knee strike to the side of his body." F. App'x at 728 (internal quotations omitted). The district court concluded that the first two Graham v. Connor factors, "the severity of the crime at issue and whether Mr. Park posed a threat to Defendants' safety[] favored Mr. Park," while the third factor -- the extent of the plaintiff's resistance -- heavily favored the defendants. F. App'x.

at 739.  The Tenth Circuit panel agreed with the district court and concluded that there was no constitutional violation.  See F. App'x at 739.  The plaintiff "tense[d] his arms, brace[d] his legs, and tr[ied] to pull his arms away from" the officers, which amounted to "physical resistance" against arrest.  F. App'x at 739.  The Tenth Circuit noted that "officers may employ the amount of force necessary to complete the arrest, and -- if they believe (even mistakenly) that the arrestee will continue to fight back -- they may use 'more than in fact' necessary."  F. App'x at 739-40 (quoting Saucier v. Katz, 533 U.S. at 205).  "Guided by the third Graham factor, and considering the totality of the circumstances," the Tenth Circuit concluded that the officer's "use of force -- including a knee strike to Mr. Park's torso and taking him to the ground -- was proportional and reasonable given the nature of Mr. Park's forceful physical resistance."  F. App'x at 740 (internal quotation marks and alterations omitted).  The Tenth Circuit accordingly held that a constitutional violation may not arise where one factor "heavily" favors the defendant, even where two of the Graham v. Connor factors suggest a constitutional violation.  F. App'x at 740.

The Plaintiffs argue that, in contrast to Youbyoung Park v. Gaitan, "there is no . . . evidence that supports even an inference that Mr. Howard was fighting back."  Response at 12.  The Plaintiffs contend that Howard "drove at a slow rate or normal rate of speed in a stolen car," and say that, "[a]lthough he was eluding initially, he stopped, turned toward Officer Franco with his arms in plain view and open as if to surrender."  Response at 12.  "At no time," the Plaintiffs argue, "did Mr. Howard fight back or physically threaten the Defendants during the melee-like use of force applied against him."  Response at 12.  The Court disagrees with the Plaintiffs' argument.  In the light most favorable to the Plaintiffs, the undisputed material facts show that Howard, suspected of committing a felony, ignored tailing police sirens and sat in a dimly lit vehicle for two minutes as officers shouted commands for him to exit the vehicle and surrender.  Howard then

fled on foot through a dimly lit street.  See supra n.5 and accompanying text, at 6.  Franco delivered

his knee strike while officers struggled with Howard and commanded him to yield both hands, one

of which was beneath his body near his waistband.   Using an objective standard, the Court

concludes that an officer in Franco's position reasonably could decide that Howard was resisting

arrest -- which he first tried to avoid by fleeing -- and reasonably feared that Howard's hidden

hand might hold a weapon.  In such a situation, Franco was entitled to use "'more force than in

fact' necessary."  Youbyoung Park v. Gaitan, 680 F. App'x at 740 (quoting Saucier v. Katz, 533

U.S. at 205).  The plaintiff in Youbyoung Park v. Gaitan was arrested for obstructing an officer, a

misdemeanor, and the defendant officer could see he was unarmed.  See 680 F. App'x at 740.

Nonetheless, when he resisted arrest, officers did not violate the plaintiff's Fourth Amendment

rights by delivering a knee strike to the plaintiff's torso.  See 680 F. App'x at 740.  Here, Howard

was arrested for a felony offense, and officers reasonably feared that he was hiding a weapon under

his body.  See supra n.10 and accompanying text, at 8; Franco Depo. at 42:13-18; id. at 43:15-21.

Franco did not violate Howard's Fourth Amendment rights by delivering a knee strike to Howard's

head, even if a less forceful alternative was available.  See Cady v. Dombrowski, 413 U.S. at 447;

Marquez v. City of Albuquerque, 399 F.3d 1222.

The Plaintiffs next distinguish Serrano v. United States.  See Response at 12.  In that case,

the Tenth Circuit reviewed an encounter in which defendant United States Marshals, executing an

arrest warrant, struck repeatedly and shot a noncompliant arrestee.  See 766 F. App'x at 563-64.

The defendant United States Marshals were aware of the plaintiff's criminal history, which

included "aggravated fleeing a law enforcement officer . . . and battery on a police officer."  766

F. App'x at 563.  The defendant United States Marshals blocked and surrounded the plaintiff's

vehicle, guns drawn.  See 766 F. App'x at 563-64.  One defendant United States Marshal saw the

plaintiff "fumbling for something underneath the dash" before turning the steering wheel to point the vehicle at the defendant United States Marshal.  766 F. App'x at 64.  Fearing that the plaintiff was going to run the Marshal down, the Marshal shot the plaintiff "in the head, creasing his skull, but he remained conscious and moving."  766 F. App'x at 564.  The plaintiff's car "started moving backward, pushing [the defendant United States Marshal's] vehicle out of the way and crossing curbs, sidewalks, and street before coming to rest."  766 F. App'x at 564.  The Marshals then ordered the plaintiff to exit the vehicle, but the plaintiff did not comply, instead apparently searching around for something in the car.  See 766 F. App'x at 564.  Although the plaintiff later asserted that he was looking for a cigarette, the defendant United States Marshals feared that he might have a weapon, so they "yanked Serrano out of the truck and took him to the ground."  766 F. App'x at 564.  The plaintiff fell with his hands underneath his chest, and one defendant United States Marshal struck the plaintiff "repeatedly on the back of the head" after the plaintiff did not comply with the defendant United States Marshal's demands that he put his hands behind his back. 766 F. App'x at 564.  The plaintiff testified that his injuries from the gunshot wound prevented him from complying with the defendant United States Marshal's commands, as he had "lost control of the left side of his body."  766 F. App'x at 564.  The plaintiff sued one Marshal for shooting him and another Marshal for pulling him out of his truck and hitting him in the head.  See 766 F. App'x at 564.

The Tenth Circuit concluded that none of the Marshals violated the plaintiff's Fourth Amendment rights.  See 766 F. App'x at 566-70.  The defendant United States Marshal who shot the plaintiff did not violate his Fourth Amendment rights, as an objective officer in the same position would reasonably fear that the plaintiff intended to weaponize his vehicle, justifying the defensive use of deadly force.  See 766 F. App'x at 567.  The defendant United States Marshal

knew of the plaintiff's history of fleeing and being violent with law enforcement, making his fear more objectively reasonable.  See 766 F. App'x at 567.  The Tenth Circuit also concluded that the second defendant United States Marshal acted reasonably in "pulling Serrano from the truck and in striking him," because the plaintiff was "not compliant with demands to put his hands behind his back."  766 F. App'x at 568.   The Tenth Circuit's analysis turned on the defendant United States Marshal's reasonable belief that the plaintiff had something in his hands and was purposefully not complying; "there was no evidence that Aragon was, or should have been, aware that Serrano's injuries meant that he could not control the left side of his body."  766 F. App'x at 568.  The Tenth Circuit rejected the plaintiff's argument that "'[i]t is clearly established that a law enforcement officer may not use force on a compliant suspect, under the officer's control and not resisting arrest.'"  766 F. App'x at 568 (quoting Serrano v. United States, Aplt. Opening Br. at 21, 766 F. App'x 561 (10th Cir. 2019)).   The Tenth Circuit concluded that the plaintiff failed to establish a genuine dispute whether he was compliant and under control when the Marshal struck him, and noted that the plaintiff acknowledged that he did not follow the defendant United States Marshal's "demands to present his left arm."  766 F. App'x at 568-69.  Notably, the Tenth Circuit asserted that an "arrestee [is not] totally under an officer's control" until the officer secures both of the arrestee's hands.  766 F. App'x at 569.

The Plaintiffs attempt to distinguish Serrano v. United States by arguing that, unlike in that case, "Howard's criminal history was not known to the Defendants and Mr. Howard was not known to be armed and have a history of fleeing and being combative with law enforcement." Response at 13.  The Court agrees that those factors were relevant to the Tenth Circuit's analysis, but the Tenth Circuit's conclusion regarding the second defendant United States Marshal -- the one whose use of force is most analogous to that used in this case -- turned on the fact that the

Marshal reasonably believed the plaintiff was armed and not complying with his demands to yield both of his hands for arrest.  <u>See</u> 766 F. App'x at 567-8.  The Tenth Circuit refers to the plaintiff's criminal history only when discussing whether the defendant United States Marshal acted reasonably in pulling the plaintiff out of his truck; the plaintiff's apparent resistance and the defendant United States Marshal's reasonable fear that the plaintiff was hiding a weapon in the hand that he withheld justified the defendant United States Marshal's striking the plaintiff in the head.  <u>See</u> 766 F. App'x at 567-69.  Here, although there is no evidence that Franco was aware of Howard's criminal history, he sought to arrest him for committing a felony and, before Howard fled the bait vehicle, officers saw him moving about inside the vehicle.  The Plaintiffs assert that Howard attempted to submit to his arrest and was unable to immediately yield his left hand, which was pinned underneath his torso.  <u>See</u> Response ¶ 7, at 3.  Just as one defendant United States Marshal feared the plaintiff in <u>Serrano v. United States</u>, however, Franco reasonably feared that Howard may have been armed and reasonably believed he was resisting arrest.  Although both Howard and the <u>Serrano v. United States</u> plaintiff were unable to comply with officers' commands that they yield both hands for arrest, both Franco and the defendant United States Marshal in <u>Serrano v. United States</u> reasonably construed their suspects' unresponsiveness as resistance, and both reasonably feared that resistance as a threat.  <u>See</u> 766 F. App'x at 567-69.  When viewing these facts in the light most favorable to the Plaintiffs, the Court concludes that a reasonable officer in Franco's position would not have known that delivering a knee strike to Howard's head clearly violated the Fourth Amendment.

Although the Plaintiffs do not cite to specific caselaw in the Response, the Plaintiffs asserted at the hearing that <u>Tennessee v. Garner</u> and <u>Cordova v. Aragon</u> clearly establish Howard's asserted Fourth Amendment right.  <u>See</u> Tr. at 28:17-18 (Oliveros).  In <u>Tennessee v. Garner</u>, the

Supreme Court held that it is unconstitutional to use deadly force against a fleeing suspect when there is no probable cause that the suspect poses a threat of serious physical harm to the officer or to others.  See 471 U.S. at 11.  In that case, an officer responded to a "prowler inside call" and, when he arrived at the scene, saw the suspect trying to climb a fence to evade arrest.  471 U.S. at 3.  The officer "saw no sign of a weapon, and, though not certain," was reasonably sure that the suspect was unarmed.  471 U.S. at 3.  The officer identified himself as police and called for the suspect to halt.  See 471 U.S. at 3.  When the suspect continued to climb the fence, the officer shot the suspect in the back of his head.  See 471 U.S. at 4.  The Supreme Court concluded that deadly force was not justified, as there was no reason to believe that the fleeing suspect posed a threat to the officer or to others.  See 471 U.S. at 11.  The Supreme Court has asserted that Tennessee v. Garner and Graham v. Connor "do not by themselves create clearly established law outside 'an obvious case.'"  White v. Pauly, 137 S. Ct. at 552 (quoting Brousseau v. Haugen, 543 U.S. at 199). The Supreme Court stated in Tennessee v. Garner that, "if the suspect threatens the officer with a weapon . . . , deadly force may be used if necessary to prevent escape, and if where feasible, some warning has been given."  471 U.S. at 11.  The Tenth Circuit construed this statement to be "merely . . . an example, and not a limitation, on the type of circumstances that would justify an officer's belief that the suspect was threatening immediate harm."  Ryder v. City of Topeka, 814 F.2d 1412, 1419 n.16 (10th Cir. 1987).  The Tenth Circuit concluded that "whether a particular seizure is reasonable is dependent on the 'totality of the circumstance,' and not simply on whether the suspect was actually armed."  Ryder v. City of Topeka, 814 F.2d at 1419 n.16 (quoting Tennessee v. Garner, 471 U.S. at 9).  Here, an officer in Franco's position could reasonably conclude that Howard might have held a weapon in his hidden hand, and Franco acted accordingly -- using

significant but nondeadly force -- to subdue that threat.  Tennessee v. Garner is so factually dissimilar that it cannot establish clearly Howard's asserted constitutional right.

The Plaintiffs' reliance on Cordova v. Aragon is misplaced.  In that case, the parties agreed that the officer was in no immediate danger.  See 569 F.3d at 1187.  Here, in contrast, the undisputed facts show that Franco reasonably feared that Howard's hidden hand might have posed a danger to himself and the other officers.  See supra n.10 and accompanying text, at 8; Franco Depo. at 42:13-18; id. at 43:15-21.   Further, unlike in Cordova v. Aragon, Franco did not use lethal force in subduing the danger that he perceived.  See Thomson v. Salt Lake Cty., 584 F.3d at 1312.  The Plaintiffs have not pointed to any caselaw clearly establishing Howard's asserted Fourth Amendment rights, and the cases which they seek to distinguish are similar to the present case. While "[t]he degree of physical coercion that law enforcement officers may use is not unlimited[,] . . . the excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." Cortez v. McCauley, 478 F.3d at 1125-26.  Courts must also consider, however, that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."  Graham v. Connor, 490 U.S. at 396.  The rights that the Plaintiffs assert are not clearly established.

## III.   FRANCO IS ENTITLED TO SUMMARY JUDGMENT ON THE PLAINTIFFS' LOSS-OF-CONSORTIUM CLAIM.

The Complaint's Count III alleges that Howard's children, Majesty Howard, Majestic Howard, Jr., and Karisma Strong, "have suffered and will continue to suffer emotional distress and loss of love, companionship, guidance and comfort."  Complaint ¶ 60, at 10.  Franco argues that a claim for loss of consortium derives from other torts and is "not an injury in and of itself."  MSJ

at 11 (citing Fitzjerrell v. City of Gallup ex rel. Gallup Police Dep't, 2003-NMCA-125, ¶ 12, 79 P.3d 836, 840-41).  Franco contends that he is liable for the Plaintiffs' loss of consortium only if he is directly liable to Howard for the underlying injury.  See MSJ at 11 (citing Weise v. Wash. Tru Sols., L.L.C., 2008-NMCA-121, ¶ 30, 192 P.3d 1244, 1255).  Franco argues that, because Howard is not entitled to recovery against Franco, the Court must dismiss his children's claim for loss of consortium against Franco.  See MSJ at 11.  The Plaintiffs concede that, if there is not an underlying claim, there cannot be a derivative loss of consortium claim."  Response at 13.

Loss-of-consortium damages are consequential or special damages, and so "are contingent upon the injured person's entitlement to general damages."  Archer v. Roadrunner Trucking, Inc., 1997-NMSC-003, ¶ 11, 930 P.2d 1155.  "Where the defendant is not liable to the injured person for physical injuries there can be no derivative claim for consequential damages by the injured person's" dependents.  Archer v. Roadrunner Trucking, Inc., 1997-NMSC-003, ¶ 12, 930 P.2d 1155.  Here, the Court has concluded that the undisputed facts show that, although Franco violated Howard's Fourth Amendment rights when he struck Howard's face, Franco is entitled to qualified immunity, because Howard's asserted rights are not clearly established.  Franco, accordingly, is not liable to Howard for his injuries.  Howard's children thus have no derivative claim against the Movants, and so Franco is entitled to summary judgment on Count III.

**IT IS ORDERED** that Officer Franco's Motion for Summary Judgment Based on Qualified Immunity, filed January 15, 2020 (Doc. 122), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Louren Oliveros
Robert J. Gorence
Gorence & Oliveros, P.C.
Albuquerque, New Mexico

>   *Attorneys for the Plaintiffs*

Jonlyn M. Martinez
Law Firm of Jonlyn M. Martinez
Albuquerque, New Mexico

>   *Attorney for Defendant Jonathan Franco*

David Roman
Robles, Rael, & Anaya, P.C.
Albuquerque, New Mexico

>   *Attorneys for Defendants Ben Daffron, Joshua Chafin, and Sonny Molina*

Esteban Aguilar
  City Attorney for the City of Albuquerque
Stephanie Griffin, Esq.
  Deputy City Attorney for the City of Albuquerque
Albuquerque, New Mexico

>   *Attorneys for Defendant City of Albuquerque*